# <u>15-CV-0014</u>
# <u>15-CV-0015</u>

IN THE
## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AHRON BERLIN, | ) | Appeal, |
| | ) | |
| Appellant, | ) | from the UNITED STATES |
| | ) | BANKRUPTCY COURT |
| | ) | EASTERN DISTRICT OF NEW YORK |
| | ) | |
| v. | ) | Case No. 8:12-AP-08371 |
| | ) | |
| ELLIOT ZARETSKY, | ) | |
| HAROLD ZARETSKY, | ) | Hon. ROBERT E. GROSSMAN |
| SHIRLEY ZARETSKY, | ) | |
| AND MAXI-AIDS, INC., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

---

# APPELLANT'S APPENDIX
## Pages  A1 - A263

---

AHRON BERLIN
1909 New York Avenue
Brooklyn, NY, 11210
347-254-3532
APPELLANT  PRO SE

# TABLE OF CONTENTS

**VOLUME 1**                                            Page

Bankruptcy Court Docket Sheet, Case No. 8:12-ap-08371-REG ........... A1 - A18

Complaint objecting to dischargeability  (ECF 1)
    September 24, 2012 ........................................................ A19 - A24

    Exhibit B (ECF 1.3) Order Unopposed Summary Judgment ........ A25 - A26

    Exhibit C (ECF 1.4) Order for Damages ...................................... A27 - A29

    Exhibit D (ECF 1.5) Order - State ............................................... A30

    Exhibit E (ECF 1.6) Order - State ................................................ A31 - A32

    Exhibit G (ECF 1.8) Order - State ............................................... A33 - A38

Exhibit B of Answer,  (ECF 4),  Excerpt ........................................... A39

Exhibit F (ECF 6.8) Hear and Report, Inquest State ............................ A40 - A44

Exhibit Excerpts (State Appeal),  (ECF 10.5) ..................................... A45 - A47

Exhibit Excerpt (State Appeal),  (ECF 12.1) ...................................... A48

Transcript (Full) Summary Judgment motion
    July 22, 2013 ............................................................................ A49 - A68

Exhibit Excerpt, Letter of Elliot Zaretsky, (ECF 15.1) ..................... A69

Exhibit Excerpt, Letter of Elliot Zaretsky, (ECF 15.2) .................... A70

Exhibit Excerpt, Letter of Michael Mc Auliffe, (ECF 15.3) ................. A71 - A72

Letter of Elliot Zaretsky, (ECF 18)................................................. A73

Transcript (Full) October 28, 2013 ........................................ A74 - A86

Notice of Appearance,  (ECF 21) ................................................... A87

<u>Page</u>

Joint Pre Trial Memorandum, (ECF 22) ................................................ A88 - A95

Transcript Trial (Full), November 5, 2013 (ECF 34) ............................ A96 - A209

Decision after trial, June 19, 2014 (ECF 36) .......................................... A210 - A19

Judgment, June 19, 2014 (ECF 37) ....................................................... A220

Order reconsider motion, September 11, 2014 (ECF 40) ..................... A221 - A222

Letter Ahron Berlin, September 16, 2014 (ECF 41) .......................................... A223

Objection to motion, (ECF 46) .......................................................... A224 - A226

Reply in Support, (ECF 48) ............................................................... A227 - A244

Transcript, November 5, 2014 ............................................................ A245 - A259

Order on motion to reconsider, (ECF 49) .......................................... A260 - A261

Notice of Appeal, (ECF 50) ................................................................. A262

Notice of Appeal two, (ECF 51) .......................................................... A263

**U.S. Bankruptcy Court**
**Eastern District of New York (Central Islip)**
**Adversary Proceeding #: 8-12-08371-reg**

*Assigned to:* Robert E. Grossman                    *Date Filed:* 09/24/12
*Lead BK Case:* 12-74600
*Lead BK Title:* Ahron Berlin
*Lead BK Chapter:* 7
Show Associated Cases

*Demand:*

*Nature[s] of Suit:* 68 Dischargeability - 523(a)(6), willful and malicious injury

*Plaintiff*
--------------------
**Elliot Zaretsky**                    represented by **Robert Hewitt**
2 Bay Club Drive                                   240 Mineola Blvd
Bayside, NY 11360                                  The Esposito Building
                                                   Mineola, NY 11501
                                                   Email: rhewitt@msssv.com
                                                   *LEAD ATTORNEY*

                                                   **Brian J Hufnagel**
                                                   Forchelli, Curto, Deegan,
                                                   Schwartz, Mineo & Terrana, LLP
                                                   The Omni
                                                   333 Earle Ovington Boulevard, Suite 1010
                                                   Uniondale, NY 11553
                                                   (516) 248-1700
                                                   Fax : (516) 248-1729
                                                   Email: BHufnagel@forchellilaw.com

*Plaintiff*
--------------------
**Maxi-Aids, Inc.**                    represented by **Robert Hewitt**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*

                                                   **Brian J Hufnagel**
                                                   (See above for address)

*Plaintiff*
--------------------
**Shirley Zaretsky**                   represented by **Robert Hewitt**

Appendix   A - 1

(See above for address)
*LEAD ATTORNEY*

**Brian J Hufnagel**
(See above for address)

*Plaintiff*
-----------------

**Harold Zaretsky**            represented by **Robert Hewitt**
                                             (See above for address)
                                             *LEAD ATTORNEY*

                                             **Brian J Hufnagel**
                                             (See above for address)

V.

*Defendant*
-----------------

**Ahron Berlin**              represented by **Ahron Berlin**
1909 New York Ave                            PRO SE
Brooklyn, NY 11210
SSN / ITIN: xxx-xx-1787

| Filing Date | # | clear | Docket Text |
|---|---|---|---|
| 09/24/2012 | <u>1</u> (136 pgs; 9 docs) | ☐ 11.555931 MB | Adversary case 8-12-08371. Complaint by Elliot Zaretsky against Ahron Berlin. Fee Amount $293. Nature(s) of Suit: (68 (Dischargeability - 523(a)(6), willful and malicious injury)). (Attachments: #<u>1</u> Exhibit A part 1# <u>2</u>Exhibit A part 2# <u>3</u>Exhibit B# <u>4</u> Exhibit C# <u>5</u>Exhibit D# <u>6</u> Exhibit E# <u>7</u>Exhibit F# <u>8</u> Exhibit G) (McAuliffe, Michael) (Entered: 09/24/2012) |
| 09/25/2012 | <u>2</u> (1 pg) | 4.827 KB | Summons and Notice of Pre-Trial Conference issued by Clerk's Office against Ahron Berlin Answer Due: 10/25/2012 Pre-Trial Conference set for 11/7/2012 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (sap) (Entered: 09/25/2012) |
| | | | Receipt of Complaint(8-12-08371-reg) |

Appendix   A - 2

| | | | |
|---|---|---|---|
| 09/25/2012 | | | [cmp,cmp] ( 293.00) Filing Fee. Receipt number 10505838. Fee amount 293.00. (U.S. Treasury) (Entered: 09/25/2012) |
| 10/02/2012 | 3<br>(1 pg) | 113.091 KB | Summons Service Executed on 10/2/12 Filed by Michael G McAuliffe on behalf of Elliot Zaretsky (RE: related document(s)1Complaint filed by Plaintiff Elliot Zaretsky, 2Summons and Notice of Pre-Trial Conference (Auto)) (McAuliffe, Michael) Modified on 10/3/2012 (sld). (Entered: 10/02/2012) |
| 10/24/2012 | 4<br>(25 pgs) | 1.472799 MB | Answer to ComplaintFiled by Ahron Berlin (mem) (Entered: 10/24/2012) |
| 11/07/2012 | | | Hearing Held and Adjourned; (related document(s): 2 Summons and Notice of Pre-Trial Conference ) Appearance: Michael McAuliffe & Ahron Berlin: Pre-Trial Conference set for 11/14/2012 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (PRE-TRIAL ORDER TO BE FILED) (mtt) (Entered: 11/07/2012) |
| 11/14/2012 | | | Hearing Held and Adjourned; (related document(s): 2 Summons and Notice of Pre-Trial Conference ) Appearance : Michael Farina, Michael McAuliffe, Ahron Berlin, Feigel Zaretsky & Interpreter - Patricia Cagliustro: Pre-Trial Conference set for 12/12/2012 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (HOLDING DATE; PRE-TRIAL ORDER TO BE SUBMITTED) (mtt) (Entered: 11/16/2012) |
| | 5<br>(1 pg) | 73.582 KB | Initial Pre Trial Order. Signed on 12/4/2012 Final Pre-Trial Conference will be held on 4/22/2013 at 09:30 AM at Courtroom 860, United States Bankruptcy Court, Central Islip, New York. In the event a dispositive motion is filed,the Court will adjourn the final pretrial conference to the date of such hearing. At the final pretrial conference, the Court will issue a Final Pretrial Order scheduling the deadline for filing a joint pretrialmemorandum and scheduling a trial date.(Judge Grossman), CI, NY. Discovery due by 3/15/2013. Any dispositive motions shall be filed on or before |

Appendix   A - 3

| | | | |
|---|---|---|---|
| 12/04/2012 | | | March 15, 2013 or the relief sought in such motions shall be deemed to have been waived. (sld) (Entered: 12/04/2012) |
| 12/12/2012 | | | Adjourned Without Hearing (related document(s): 2 Summons and Notice of Pre-Trial Conference) Pre-Trial Conference set for 04/22/2013 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (mtt) (Entered: 12/12/2012) |
| 04/22/2013 | | | Hearing Held and Adjourned; (related document(s): 2 Summons and Notice of Pre-Trial Conference ) Appearance: Michael McAuliffe & Ahron Berlin: Pre-Trial Conference set for 06/03/2013 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (mtt) (Entered: 04/22/2013) |
| 05/30/2013 | 6 (198 pgs; 16 docs) | 24.157322 MB | Motion For Summary Judgment Filed by Michael G McAuliffe on behalf of Elliot Zaretsky. Hearing scheduled for 6/26/2013 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (Attachments: # 1statement # 2 Exhibit A #3 Exhibit B # 4 Exhibit C # 5 Exhibit D # 6 Exhibit D part 2 # 7 Exhibit E # 8Exhibit F # 9 Exhibit G #10 Exhibit H # 11 Exhibit I # 12 Exhibit J # 13Exhibit K # 14Memorandum of Law #15 Affidavit of Service) (McAuliffe, Michael) (Entered: 05/30/2013) |
| 05/31/2013 | 7 (1 pg) | 45.82 KB | Letter of Adjournment: Hearing rescheduled from June 3, 2013 at 9:30 a.m. to June 26, 2013 at 9:30 a.m. Filed by Michael G McAuliffe on behalf of Elliot Zaretsky (McAuliffe, Michael). Related document(s) 2Summons and Notice of Pre-Trial Conference (Auto). Modified on 6/3/2013 to add related document. (mtt) (Entered: 05/31/2013) |
| 06/03/2013 | | | Adjourned Without Hearing (related document(s): 2 Summons and Notice of Pre-Trial Conference ) Pre-Trial Conference set for 06/26/2013 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (mtt) (Entered: 06/04/2013) |

| | | | |
|---|---|---|---|
| 06/05/2013 | <u>8</u><br>(13 pgs) | 1.260866 MB | Letter Filed by Ahron Berlin (RE: related document(s)<u>6</u> Motion for Summary Judgment filed by Plaintiff Elliot Zaretsky) (srm) (Entered: 06/05/2013) |
| 06/11/2013 | <u>9</u><br>(2 pgs) | 107.912 KB | Letter *confirming adjournment, extension of time and deadlines to respond* Filed by Michael G McAuliffe on behalf of Elliot Zaretsky (RE: related document(s)<u>6</u>Motion for Summary Judgment filed by Plaintiff Elliot Zaretsky) (McAuliffe, Michael) (Entered: 06/11/2013) |
| 06/25/2013 | <u>10</u><br>(283 pgs; 6 docs) | 21.09375 MB | Cross Motion For Summary Judgment *in favor of defendant and against plainitffs* Filed by Ahron Berlin (related document(s)<u>6</u>). Hearing scheduled for 7/22/2013 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (Attachments: # <u>1</u> Exhibit # <u>2</u> Exhibit # <u>3</u> Exhibit #<u>4</u> Exhibit # <u>5</u> Exhibit) (dmc) (Entered: 07/02/2013) |
| 06/25/2013 | <u>11</u><br>(12 pgs) | 1.388667 MB | Memorandum of Law in Support *in opposition to plaintiffs' motion and in support of defendant's motion.* Filed by Ahron Berlin (RE: related document(s)<u>6</u> Motion for Summary Judgment filed by Plaintiff Elliot Zaretsky, <u>10</u> Motion for Summary Judgment filed by Defendant Ahron Berlin) (dmc) (Entered: 07/02/2013) |
| 06/26/2013 | | | Adjourned Without Hearing (related document(s): <u>2</u> Summons and Notice of Pre-Trial Conference) Pre-Trial Conference set for 07/22/2013 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (mtt) (Entered: 06/26/2013) |
| 06/26/2013 | | | Adjourned Without Hearing (related document(s): <u>6</u> Motion for Summary Judgment filed by Elliot Zaretsky) Hearing scheduled for 07/22/2013 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (mtt) (Entered: 06/26/2013) |
| | <u>12</u><br>(12 pgs; 3 docs) | | Reply *Affirmation in Further Support and in Opposition* Filed by Michael G McAuliffe on |

| | | | |
|---|---|---|---|
| 07/15/2013 | | 1.339362 MB | behalf of Elliot Zaretsky (RE: related document(s)6 Motion for Summary Judgment filed by Plaintiff Elliot Zaretsky, 10 Motion for Summary Judgment filed by Defendant Ahron Berlin) (Attachments: # 1 Exhibit A # 2 Affidavit of Service) (McAuliffe, Michael) (Entered: 07/15/2013) |
| 07/18/2013 | 13 (10 pgs) | 1.328997 MB | Response *Memorandum in Support of Defendants' Cross-motion and in Opposition to Plaintiffs' Motion* Filed by Ahron Berlin (RE: related document(s)10 Motion for Summary Judgment filed by Defendant Ahron Berlin, 11 Memorandum of Law in Support filed by Defendant Ahron Berlin) (dhc) (Entered: 07/18/2013) |
| 07/22/2013 | | | Hearing Held and Adjourned; (related document(s): 2 Summons and Notice of Pre-Trial Conference) Appearance: Michael McAuliffe & Ahron Berlin: Trial date set for 11/05/2013 at 10:00 AM at Courtroom 860 (Judge Grossman), CI, NY. (mtt) (Entered: 07/22/2013) |
| 07/22/2013 | | | Hearing Held; (related document(s): 6 Motion for Summary Judgment filed by Elliot Zaretsky) Appearance: Michael McAuliffe & Ahron Berlin: MOTION DENIED; SUBMIT ORDER. (mtt) (Entered: 07/22/2013) |
| 07/22/2013 | | | Hearing Held; (related document(s): 10 Motion for Summary Judgment filed by Ahron Berlin) Appearance: Michael McAuliffe & Ahron Berlin: MOTION DENIED; SUBMIT ORDER. (mtt) (Entered: 07/22/2013) |
| 07/24/2013 | 14 (3 pgs) | 76.71 KB | Final Pre-Trial Order. A Trial will be held on 11/5/13 @ 10:00 am in Courtroom 860, United States Bankruptcy Court, CI NY Signed on 7/24/2013 Joint Pre-Trial Memorandum due by 10/29/2013. (sld) (Entered: 07/24/2013) |
| | 15 (15 pgs; 5 docs) | | Proposed Motion to Withdraw as Attorney *for Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky and Maxi Aides, Inc.* Filed by Michael |

| | | | |
|---|---|---|---|
| 10/21/2013 | | 174.533 KB | G McAuliffe on behalf of Elliot Zaretsky. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Proposed Order) (McAuliffe, Michael) (Entered: 10/21/2013) |
| 10/22/2013 | 16 (3 pgs; 2 docs) | 157.21 KB | Order to Show Cause for an Order Relieving the Law Offices of Michael G. McAuliffe, Esq. as Counsel to Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky and Maxi-Aides, Inc. (RE: related document(s)15 Motion to Withdraw as Attorney filed by Plaintiff Elliot Zaretsky). Signed on 10/22/2013. Hearing scheduled for 10/28/2013 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (srm) (Entered: 10/22/2013) |
| 10/22/2013 | 17 (8 pgs) | 1.124104 MB | Affidavit/Certificate of Service Filed by Michael G McAuliffe on behalf of Elliot Zaretsky (RE: related document(s)16Order to Schedule Hearing (Generic)) (McAuliffe, Michael) (Entered: 10/22/2013) |
| 10/23/2013 | 18 (1 pg) | 53.272 KB | Response *withdrawing Michael G McAuliffe as attorney* Filed by Elliot Zaretsky (RE: related document(s)16 Order to Schedule Hearing (Generic)) (amh) (Entered: 10/23/2013) |
| 10/24/2013 | 19 (3 pgs) | 108.504 KB | BNC Certificate of Mailing with Application/Notice/Order Notice Date 10/24/2013. (Admin.) (Entered: 10/25/2013) |
| 10/25/2013 | 20 (10 pgs) | 465.063 KB | Affirmation in OppositionFiled by Ahron Berlin (RE: related document(s)15 Motion to Withdraw as Attorney filed by Plaintiff Elliot Zaretsky, 16 Order to Schedule Hearing (Generic)) (mem) (Entered: 10/25/2013) |
| | | | Hearing Held; (related document(s): 16 Order to Schedule Hearing for an Order Relieving the Law Offices of Michael G. McAuliffe, Esq. as Counsel to Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky and Maxi-Aides, Inc. 15 Motion to Withdraw as Attorney by Plaintiff Elliot Zaretsky.) Appearance: Michael McAuliffe, Robert Hewitt & Ahron Berlin: MOTION GRANTED; SUBMIT ORDER |

Appendix   A - 7

| | | | |
|---|---|---|---|
| 10/28/2013 | | | AND ORAL MOTION TO ADJOURN TRIAL IS DENIED. (mtt) (Entered: 10/28/2013) |
| 10/28/2013 | 21 (1 pg) | 11.621 KB | Notice of Appearance and Request for Notice Filed by Michael A Miranda on behalf of Elliot Zaretsky (Miranda, Michael) (Entered: 10/28/2013) |
| 10/29/2013 | 22 (8 pgs) | 77.948 KB | Joint Pre-Trial Memorandum Filed by Michael A Miranda on behalf of Maxi-Aids, Inc., Shirley Zaretsky, Harold Zaretsky, Elliot Zaretsky (RE: related document(s)14 Pre-Trial Order) (Miranda, Michael) (Entered: 10/29/2013) |
| 10/30/2013 | 23 (6 pgs) | 102.725 KB | Motion Limiting the Scope of Trial in the Instant Adversary Proceeding and Proposed Order to Show Cause filed by Ahron Berlin (cjm) (Entered: 10/30/2013) |
| 10/30/2013 | 24 (2 pgs) | 107.083 KB | Order Granting Motion for Michael G McAuliffe to Withdraw As Attorney for the the Zaretsky Parties. (Related Doc #15) Signed on 10/30/2013. (sld) (Entered: 10/30/2013) |
| 10/30/2013 | 25 (7 pgs) | 126.822 KB | Defendant's Amended Pre-Trial Memorandum Filed by Ahron Berlin (cjm) (Entered: 10/30/2013) |
| 10/30/2013 | 26 (6 pgs) | 116.296 KB | Pre-Trial Brief by Debtor/Defendant Ahron Berlin Filed by Ahron Berlin (cjm) (Entered: 10/30/2013) |
| 10/30/2013 | 27 (1 pg) | 16.245 KB | Notice of Appearance and Request for Notice Filed by Robert Hewitt on behalf of Maxi-Aids, Inc., Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky (sld) (Entered: 10/30/2013) |
| 10/30/2013 | 28 (1 pg) | 82.344 KB | Certificate of Service Filed by Ahron Berlin (related document(s)25,26) (cjm) (Entered: 10/30/2013) |
| | 29 (1 pg) | | Order Denying Motion: The Court declines to schedule the Application on shortened notice. The Application will not be heard on November 5, 2013 and the trial will commence |

| | | | |
|---|---|---|---|
| 10/31/2013 | | 73.327 KB | at 10:00 a.m. on November 5, 2013 as originally scheduled before the Honorable Robert E. Grossman, Bankruptcy Judge, in Courtroom 860 at the United States Bankruptcy Court located at 290 Federal Plaza, Alfonse M. DAmato Federal Courthouse, Central Islip, NY . (Related Doc # 23) Signed on 10/31/2013. (sld) (Entered: 10/31/2013) |
| 10/31/2013 | 30 (2 pgs; 2 docs) | 263.392 KB | Court's Service List (RE: related document(s)29 R Order (Generic)) (Attachments: # 1 order) (sld) Additional attachment(s) added on 10/31/2013 (sld). (Entered: 10/31/2013) |
| 11/01/2013 | 31 (19 pgs) | 1.36522 MB | Exhibit B-F Filed by Ahron Berlin (RE: related document(s)26 Statement filed by Defendant Ahron Berlin) (amh) (Entered: 11/01/2013) |
| 11/05/2013 | | | Hearing Held; (related document(s): 2 Summons and Notice of Pre-Trial Conference) Appearance: Robert Hewitt, Ahron Berlin, Elliot Zaretsky, Feige Zaretsky & Gloria Vargas: RESERVE DECISION. (mtt) (Entered: 11/05/2013) |
| 03/05/2014 | 32 (118 pgs; 4 docs) | 490.562 KB | Transcript & Notice regarding the hearing held on 11/05/2013. Pursuant to the new policy adopted by the Judicial Conference, transcripts are available for inspection only at the Office of the Clerk or may be purchased from the court transcriber. [Please see the courts website for contact information for the Transcription Service Agency]. (RE: related document(s) Hearing Held (Case Owned AP)). Notice of Intent to Request Redaction Due By 03/12/2014. Redaction Request Due By 03/26/2014. Redacted Transcript Submission Due By 04/7/2014. TRANSCRIPT ACCESS WILL BE ELECTRONICALLY RESTRICTED THROUGH 06/3/2014 AND MAY BE VIEWED AT THE OFFICE OF THE CLERK. (Writers Cramp, Inc) Additional attachment(s) added on 3/11/2014 (sld). (Entered: 03/05/2014) |

| | | | |
|---|---|---|---|
| 03/08/2014 | <u>33</u><br>(2 pgs) | 5.795 KB | BNC Certificate of Mailing with Notice of Filing of Official Transcript (AP) Notice Date 03/08/2014. (Admin.) (Entered: 03/09/2014) |
| 03/11/2014 | <u>34</u><br>(119 pgs; 2 docs) | 0.53107 MB | Court's Service List (RE: related document(s)<u>32</u>Transcript Court Ordered (All Other Judges)(AP)) (sld) (Entered: 03/11/2014) |
| 03/13/2014 | <u>35</u><br>(119 pgs) | 233.306 KB | BNC Certificate of Mailing with Application/Notice/Order Notice Date 03/13/2014. (Admin.) (Entered: 03/14/2014) |
| 06/19/2014 | <u>36</u><br>(10 pgs) | 59.61 KB | Decision after Trial that for all of the foregoing reasons, this Court finds that the Plaintiffs have proved that the Debtors actions were willful and malicious within the meaning of 11 U.S.C. § 523(a)(6). Accordingly, the Plaintiffs awards against the Debtor in the amounts set forth in the State Courtjudgment are nondischargeable. The Court shall enter judgment in favor of the Plaintiffs forthwith. (RE: related document(s)<u>1</u>Complaint filed by Plaintiff Elliot Zaretsky). Signed on 6/19/2014 (sld) (Entered: 06/19/2014) |
| 06/19/2014 | <u>37</u><br>(2 pgs; 2 docs) | 22.11 KB | Judgment that Pursuant to the Courts Decision After Trial, dated June 19, 2014, JUDGMENT is hereby entered in favor of the Plaintiffs. The full amount of the judgment-debt described in the Decision After Trial is hereby excepted from discharge under 11 U.S.C. § 523(a)(6). (RE: related document(s)<u>36</u> Decision After Trial for External Web Page). Signed on 6/19/2014 (sld) (Entered: 06/19/2014) |
| 06/21/2014 | <u>38</u><br>(2 pgs) | 62.579 KB | BNC Certificate of Mailing with Application/Notice/Order Notice Date 06/21/2014. (Admin.) (Entered: 06/22/2014) |
| 07/03/2014 | <u>39</u><br>(19 pgs) | 2.602119 MB | Motion to Reconsider , *Alter or Amend Judgment and Decision After Trial dated June 19, 2014* Filed by Ahron Berlin (RE: related document(s)<u>36</u>Opinion/Decision for External Web Page, <u>37</u>Judgment). (mem) (Entered: 07/03/2014) |

| | | | |
|---|---|---|---|
| 09/11/2014 | <u>40</u><br>(2 pgs) | 148.966 KB | Order to Schedule Hearing. Hearing scheduled for 11/5/2014 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. Movant shall serve a copy of this Order, the Notice of Motion and Motion by regular mail upon the Plaintiffs and counsel to the Plaintiffs on or before September 16, 2014. If objections, if any, to the relief requested in the Motion shall be served upon the Movant and filed with the Court on or before October 29, 2014. Movant shall file an affidavit of service with the Court on or before September 22, 2014. (RE: related document(s)<u>39</u>Motion to Reconsider filed by Defendant Ahron Berlin). Signed on 9/11/2014. (sld) (Entered: 09/11/2014) |
| 09/18/2014 | <u>41</u><br>(1 pg) | 57.338 KB | Letter Filed by Ahron Berlin (RE: related document(s)<u>40</u> Order to Schedule Hearing (Generic)) (amh) (Entered: 09/18/2014) |
| 09/22/2014 | <u>42</u><br>(2 pgs) | 112.656 KB | Affidavit/Certificate of Service Filed by Ahron Berlin (related document(s): <u>39</u> Motion to Reconsider filed by Defendant Ahron Berlin,<u>40</u> Order to Schedule Hearing (Generic)) (mem) (Entered: 09/22/2014) |
| 10/27/2014 | <u>43</u><br>(2 pgs) | 73.257 KB | Motion to Withdraw as Attorney Filed by Michael A Miranda on behalf of Maxi-Aids, Inc., Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky. Hearing scheduled for 11/5/2014 at 09:30 AM at Courtroom 860 (Judge Grossman), CI, NY. (Miranda, Michael) (Entered: 10/27/2014) |
| 10/27/2014 | <u>44</u><br>(6 pgs; 2 docs) | 0.52239 MB | Declaration re: Filed by Michael A Miranda on behalf of Maxi-Aids, Inc., Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky (RE: related document(s)<u>43</u> Motion to Withdraw as Attorney filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky) (Attachments: #<u>1</u> Exhibit) (Miranda, Michael) (Entered: 10/27/2014) |
| | <u>45</u><br>(3 pgs) | 15.071 KB | Notice of Appearance and Request for Notice Filed by Brian J Hufnagel on behalf of Maxi-Aids, Inc., Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky (Hufnagel, Brian) (Entered: |

| 10/29/2014 | | | 10/29/2014 |
|---|---|---|---|
| 10/29/2014 | 46 ℞ (169 pgs; 5 docs) | 7.44322 MB | Objection *of the Plaintiffs to Motion of Defendant to Reconsider, Alter or Amend Judgment* Filed by Brian J Hufnagel on behalf of Maxi-Aids, Inc., Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky (RE: related document(s)39 Motion to Reconsider filed by Defendant Ahron Berlin) (Attachments: # 1 Exhibit 1 - Decision after Trial #2 Exhibit 2 - State Court Judgment # 3 Exhibit 3 - Bankruptcy Court Judgment # 4 Exhibit 4 - Federal Complaint) (Hufnagel, Brian) (Entered: 10/29/2014) |
| 10/30/2014 | 47 (1 pg) | 14.494 KB | Affidavit/Certificate of Service Filed by Brian J Hufnagel on behalf of Maxi-Aids, Inc., Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky (RE: related document(s)46 ℞ Objection filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky) (Hufnagel, Brian) (Entered: 10/30/2014) |
| 11/04/2014 | 48 ℞ (19 pgs) | 446.626 KB | Defendants Reply in Support *of motion to reconsider alter or amend Judgement* Filed by Ahron Berlin (RE: related document(s)39 Motion to Reconsider filed by Defendant Ahron Berlin) (amh) Modified on 11/4/2014 (amh). (Entered: 11/04/2014) |
| 11/05/2014 | | | Hearing Held; (related document(s): 43 Motion to Withdraw as Attorney filed by Maxi-Aids, Inc., Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky) Appearance : Michael A Miranda, Brian Hufnagel; MOTION GRANTED, SUBMIT ORDER (smarcus) (Entered: 11/05/2014) |
| 11/05/2014 | | | Hearing Held; (related document(s): 39 Motion to Reconsider filed by Ahron Berlin, 40 Order to Schedule Hearing (Generic)) Appearances: Ahron Berlin, Brian Hufnagel; MOTION DENIED, PLAINTIFF TO SUBMIT ORDER (smarcus) (Entered: 11/05/2014) |

| | | | |
|---|---|---|---|
| 11/07/2014 | <u>49</u><br>(2 pgs) | 152.244<br>KB | Order Denying Motion To Reconsider in its entirety. (Related Doc #<u>39</u>) Signed on 11/7/2014. (sld) (Entered: 11/10/2014) |
| 11/20/2014 | <u>50</u><br>(15 pgs) | 0.512805<br>MB | Notice of Appeal to District Court. . Fee Amount $298 Filed by Ahron Berlin (RE: related document(s)<u>36</u>Opinion/Decision for External Web Page, <u>37</u>Judgment). Appellant Designation due by 12/4/2014. (mem) (Entered: 11/20/2014) |
| 11/20/2014 | <u>51</u><br>(6 pgs) | 202.42<br>KB | Notice of Appeal to District Court. . Fee Amount $298 Filed by Ahron Berlin (RE: related document(s)<u>49</u> Order on Motion to Reconsider). Appellant Designation due by 12/4/2014. (mem) (Entered: 11/20/2014) |
| 11/20/2014 | | | Receipt of Appeal Filing Fee - $298.00. Receipt Number 309838. (MM) (admin) (Entered: 11/20/2014) |
| 11/20/2014 | | | Receipt of Appeal Filing Fee - $298.00. Receipt Number 309838. (MM) (admin) (Entered: 11/20/2014) |
| 11/21/2014 | <u>52</u><br>(2 pgs; 2 docs) | 2.08884<br>MB | NOTICE NOT GENERATED SEE CORRECTED ENTRY BELOW Notice to Parties of requirements, deadlines (RE: related document(s)<u>50</u> Notice of Appeal filed by Defendant Ahron Berlin) (sld) Modified on 11/21/2014 (sld). (Entered: 11/21/2014) |
| 11/21/2014 | <u>53</u><br>(2 pgs; 2 docs) | 2.088732<br>MB | NOTICE NOT GENERATED SEE CORRECTED ENTRY BELOW Court's Service List (RE: related document(s)<u>52</u> Notice to Parties) (sld) Modified on 11/21/2014 (sld). (Entered: 11/21/2014) |
| 11/21/2014 | <u>54</u><br>(2 pgs; 2 docs) | 2.09083<br>MB | Notice to Parties of requirements, deadlines (RE: related document(s)<u>51</u> Notice of Appeal filed by Defendant Ahron Berlin) (sld) (Entered: 11/21/2014) |
| | <u>55</u><br>(2 pgs; 2 docs) | 2.090944<br>MB | Notice to Parties of requirements, deadlines (RE: related document(s)<u>50</u> Notice of Appeal filed by Defendant Ahron Berlin) (sld) |

| | | | |
|---|---|---|---|
| 11/21/2014 | | | (Entered: 11/21/2014) |
| 11/21/2014 | 56 (1 pg) | 77.274 KB | Order Granting Motion for Miranda Sambursky to Withdraw As Attorney for the plaintiffs. (Related Doc # 43) Signed on 11/21/2014. (sld) (Entered: 11/21/2014) |
| 11/23/2014 | 57 (2 pgs) | 79.143 KB | BNC Certificate of Mailing with Application/Notice/Order Notice Date 11/23/2014. (Admin.) (Entered: 11/24/2014) |
| 11/23/2014 | 58 (2 pgs) | 80.591 KB | BNC Certificate of Mailing with Application/Notice/Order Notice Date 11/23/2014. (Admin.) (Entered: 11/24/2014) |
| 12/05/2014 | 59 🖼 (10 pgs) | 454.782 KB | Appellant Designation of Contents For Inclusion in Record On Appeal & Statement of Issues Filed by Ahron Berlin (RE: related document(s)50Notice of Appeal filed by Defendant Ahron Berlin). Appellee designation due by 12/19/2014. Transmission of Designation Due by 1/5/2015. (cjm) (Entered: 12/05/2014) |
| 12/05/2014 | 60 🖼 (10 pgs) | 456.195 KB | Appellant Designation of Contents For Inclusion in Record On Appeal & Statement of Issues Filed by Ahron Berlin (RE: related document(s)51Notice of Appeal filed by Defendant Ahron Berlin). Appellee designation due by 12/19/2014. Transmission of Designation Due by 1/5/2015. (cjm) (Entered: 12/05/2014) |
| 12/05/2014 | 61 (1 pg) | 81.888 KB | Certificate of Service Filed by Ahron Berlin (related document(s)59 🖼 Appellant Designation & Statement of Issues filed by Defendant Ahron Berlin, 60 🖼 Appellant Designation & Statement of Issues filed by Defendant Ahron Berlin) (cjm) (Entered: 12/05/2014) |
| | 62 (1 pg) | | Transmittal of Record on Appeal to District Court (RE: related document(s)1 Complaint filed by Plaintiff Elliot Zaretsky, 2 Summons and Notice of Pre-Trial Conference (Auto), 3Affidavit/Certificate of Service filed by Plaintiff Elliot Zaretsky, 4 Answer to Complaint filed by Defendant Ahron |

47.06856
MB

Berlin,6 Motion for Summary Judgment filed by Plaintiff Elliot Zaretsky, 7Letter of Adjournment filed by Plaintiff Elliot Zaretsky, 8 Letter filed by Defendant Ahron Berlin,9 Letter filed by Plaintiff Elliot Zaretsky, 10Motion for Summary Judgment filed by Defendant Ahron Berlin,11 Memorandum of Law in Support filed by Defendant Ahron Berlin,12 Reply filed by Plaintiff Elliot Zaretsky, 13Response filed by Defendant Ahron Berlin,14 Pre-Trial Order, 15Motion to Withdraw as Attorney filed by Plaintiff Elliot Zaretsky, 16 Order to Schedule Hearing (Generic), 17Affidavit/Certificate of Service filed by Plaintiff Elliot Zaretsky, 18Response filed by Plaintiff Elliot Zaretsky,20 Affirmation in Opposition filed by Defendant Ahron Berlin,21 Notice of Appearance filed by Plaintiff Elliot Zaretsky, 22 Joint Pre-Trial Memorandum filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky, 25 Joint Pre-Trial Memorandum filed by Defendant Ahron Berlin, 26 Statement filed by Defendant Ahron Berlin, 29 ℞ Order (Generic), 30 Court's Certificate of Mailing, 31Exhibit filed by Defendant Ahron Berlin,32 Transcript Court Ordered (All Other Judges)(AP), 33 BNC Certificate of Mailing with Notice of Filing of Official Transcript (AP),34 Court's Certificate of Mailing, 36Opinion/Decision for External Web Page, 37Judgment, 39 Motion to Reconsider filed by Defendant Ahron Berlin,40 Order to Schedule Hearing (Generic), 41Letter filed by Defendant Ahron Berlin, 43 Motion to Withdraw as Attorney filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky, 44 Declaration filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky, 46 ℞ Objection filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky, 47Affidavit/Certificate of Service filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold

| | | | |
|---|---|---|---|
| 01/05/2015 | | | Zaretsky, Plaintiff Shirley Zaretsky, 48 ℞Affidavit in Support filed by Defendant Ahron Berlin, 49 Order on Motion to Reconsider, 50Notice of Appeal filed by Defendant Ahron Berlin,51 Notice of Appeal filed by Defendant Ahron Berlin, 55 Notice to Parties, 59 ℞ Appellant Designation & Statement of Issues filed by Defendant Ahron Berlin) (sld) (Entered: 01/05/2015) |
| | 63 (1 pg) | 43.859094 MB | Transmittal of Record on Appeal to District Court (RE: related document(s)1 Complaint filed by Plaintiff Elliot Zaretsky, 2 Summons and Notice of Pre-Trial Conference (Auto), 3Affidavit/Certificate of Service filed by Plaintiff Elliot Zaretsky, 4 Answer to Complaint filed by Defendant Ahron Berlin,6 Motion for Summary Judgment filed by Plaintiff Elliot Zaretsky, 7Letter of Adjournment filed by Plaintiff Elliot Zaretsky, 9 Letter filed by Plaintiff Elliot Zaretsky,10 Motion for Summary Judgment filed by Defendant Ahron Berlin,11 Memorandum of Law in Support filed by Defendant Ahron Berlin,12 Reply filed by Plaintiff Elliot Zaretsky, 13Response filed by Defendant Ahron Berlin,15 Motion to Withdraw as Attorney filed by Plaintiff Elliot Zaretsky, 16 Order to Schedule Hearing (Generic), 18 Response filed by Plaintiff Elliot Zaretsky, 20 Affirmation in Opposition filed by Defendant Ahron Berlin,21 Notice of Appearance filed by Plaintiff Elliot Zaretsky, 24 Order on Motion to Withdraw as Attorney, 25 Joint Pre-Trial Memorandum filed by Defendant Ahron Berlin, 26 Statement filed by Defendant Ahron Berlin, 27 Notice of Appearance filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky,31 Exhibit filed by Defendant Ahron Berlin,32 Transcript Court Ordered (All Other Judges) (AP), 33 BNC Certificate of Mailing with Notice of Filing of Official Transcript (AP),34 Court's Certificate of Mailing, 35 BNC Certificate of Mailing with Application/Notice/Order,36 Opinion/Decision for External Web Page, 37Judgment, 39 Motion to Reconsider |

| | | | |
|---|---|---|---|
| 01/05/2015 | | | filed by Defendant Ahron Berlin,40 Order to Schedule Hearing (Generic), 44Declaration filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky,46 ℝ Objection filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky,47 Affidavit/Certificate of Service filed by Plaintiff Maxi-Aids, Inc., Plaintiff Elliot Zaretsky, Plaintiff Harold Zaretsky, Plaintiff Shirley Zaretsky, 48 ℝAffidavit in Support filed by Defendant Ahron Berlin, 49 Order on Motion to Reconsider, 50Notice of Appeal filed by Defendant Ahron Berlin,51 Notice of Appeal filed by Defendant Ahron Berlin, 54 Notice to Parties, 60 ℝ Appellant Designation & Statement of Issues filed by Defendant Ahron Berlin,61 Affidavit/Certificate of Service filed by Defendant Ahron Berlin) (sld) (Entered: 01/05/2015) |
| 01/13/2015 | 64 (2 pgs) | 59.322 KB | Notice of Docketing Record on Appeal to District Court. Civil Action Number: 15-CV-00014 District Court Judge Joseph F Bianco assigned. (RE: related document(s)50 Notice of Appeal filed by Defendant Ahron Berlin) (sld) Modified on 2/25/2015 - 01/16/2015 - Case reassigned to Judge Joan M. Azrack. Judge Joseph F. Bianco no longer assigned to the case. (amp). (Entered: 01/13/2015) |
| 01/23/2015 | 65 (3 pgs) | 60.898 KB | Notice of Docketing Record on Appeal to District Court. Civil Action Number: 15-CV-00015 District Court Judge Joanna Seybert assigned. (RE: related document(s)51 Notice of Appeal filed by Defendant Ahron Berlin) (sld) (Entered: 01/23/2015) |
| | 66 (30 pgs; 3 docs) | | Transcript & Notice regarding the hearing held on 07/22/13. Pursuant to the new policy adopted by the Judicial Conference, transcripts are available for inspection only at the Office of the Clerk or may be purchased from the court transcriber. [Please see the courts website for contact information for the Transcription Service Agency]. (RE: related |

| | | | |
|---|---|---|---|
| 03/25/2015 | | 269.88 KB | document(s) 2 Summons and Notice of Pre-Trial Conference (Auto), 6Motion for Summary Judgment, 10 Motion for Summary Judgment). Notice of Intent to Request Redaction Due By 04/1/2015. Redaction Request Due By 04/15/2015. Redacted Transcript Submission Due By 04/27/2015. TRANSCRIPT ACCESS WILL BE ELECTRONICALLY RESTRICTED THROUGH 06/23/2015 AND MAY BE VIEWED AT THE OFFICE OF THE CLERK. (Veritext) (Entered: 03/25/2015) |
| 03/25/2015 | 67 (26 pgs; 3 docs) | 175.482 KB | Transcript & Notice regarding the hearing held on 11/05/14. Pursuant to the new policy adopted by the Judicial Conference, transcripts are available for inspection only at the Office of the Clerk or may be purchased from the court transcriber. [Please see the courts website for contact information for the Transcription Service Agency]. (RE: related document(s) 40 Order to Schedule Hearing (Generic), 43 Motion to Withdraw as Attorney). Notice of Intent to Request Redaction Due By 04/1/2015. Redaction Request Due By 04/15/2015. Redacted Transcript Submission Due By 04/27/2015. TRANSCRIPT ACCESS WILL BE ELECTRONICALLY RESTRICTED THROUGH 06/23/2015 AND MAY BE VIEWED AT THE OFFICE OF THE CLERK. (Veritext) (Entered: 03/25/2015) |
| 03/27/2015 | 68 (2 pgs) | 5.782 KB | BNC Certificate of Mailing with Notice of Filing of Official Transcript (AP) Notice Date 03/27/2015. (Admin.) (Entered: 03/28/2015) |
| 03/27/2015 | 69 (2 pgs) | 5.767 KB | BNC Certificate of Mailing with Notice of Filing of Official Transcript (AP) Notice Date 03/27/2015. (Admin.) (Entered: 03/28/2015) |

Appendix  A - 18

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

                                                        Chapter 7

AHRON BERLIN,

                                                        Case No. 12-74600

                        Debtor.
-----------------------------------------------------------------X

ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY AND MAXI-AIDS, INC.

                        Plaintiffs.              Adv. Pro. No.:

        -against-

AHRON BERLIN,

                        Defendant.
-----------------------------------------------------------------X

## COMPLAINT OBJECTING TO DISCHARGEABILITY
## OF DEBT PURSUANT TO 11 U.S.C.§ 523

        Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky and Maxi-aids, Inc.. (separately,

"Elliot", "Harold", "Shirley" and "Maxi", and collectively, the "Plaintiffs"), by and through their

counsel, The Law Offices of Michael G. Mc Auliffe, Esq., as and for their complaint against

Ahron Berlin, respectfully alleges, upon information and belief:

        1.      On or about May 15, 2012, (the "Filing Date"), Ahron Berlin (the "Debtor") filed

a voluntary petition for relief pursuant to Chapter 13 of Title 11 of the United States Code (the

"Bankruptcy Code").

        2.      On or about June 19, 2012, the case was converted to one under Chapter 7 of the

Bankruptcy Code.

        3.      The Plaintiffs are the holders of judgments against the Debtor in the aggregate

sum of $1,290,000.00, plus interest, attorneys fees and other chargeable items.

                                        1

4. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and I.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 157 and Section 523 of the Bankruptcy Code, as well as Rule 4007 of the Federal Rules of Bankruptcy Procedure as this action arises in and under the Debtor's pending Chapter 7 case.

7. At all times relevant herein, Elliot is an individual residing in the state of New York at 2 Bay Club Drive, Bayside, NY 11360.

8. At all times relevant herein, Harold is an individual residing in the state of New York at 66 Phipps Lane, Plainview, NY 11803.

9. At all times relevant herein, Shirley is an individual residing in the state of New York, at 2 Bay Club Drive, Bayside, NY 11360.

10. At all times relevant herein, Maxi is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 42 Executive Boulevard, Farmingdale, NY 11735.

11. Upon information and belief, at all times relevant herein, the Debtor and defendant herein is an individual residing in the state of New York at 1909 New York Avenue, Brooklyn, New York 11210.

## BACKGROUND

12. Elliot and Shirley are married, and are the parents of Harold.

13. Upon information and belief, the Debtor is the father of Feige Zaretsky ("Feige").

14. Harold and Feige were married and subsequently divorced pursuant to a Judgment of Divorce.

15. The underlying divorce action between Harold and Feige was acrimonious and

2

vigorously contested by the parties.

16.     Subsequent to the entry of the Judgement of Divorce, the Debtor and his daughter sent voluminous emails to various third parties which contained statements which they knew to be false about each of the Plaintiffs which false statements were made with the malicious and willful intent to defame, injure and disparage the Plaintiffs and their good reputations (the "Willful and Malicious E-mails").

17.     Thereafter, the Plaintiffs commenced an action entitled Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky and Maxi-Aids, Inc. v. Aaron Berlin and Feige Zaretsky, in the Supreme Court for the State of New York County of Nassau, bearing Index No. 17869/2008 (the "Defamation Action"), which action sought redress for the substantial harm suffered by the Plaintiffs as a result of the Willful and Malicious E-mails.  A copy of the Complaint in the Defamation Action is annexed hereto at Exhibit "A".

18.     By Order dated January 9, 2009 and entered on January 14, 2009 (the "January 9, 2009 Order", a copy of which is annexed hereto at Exhibit "B"), the Court in the Defamation Action granted the Plaintiffs' unopposed motion summary judgment on the causes of action in their Complaint in that action.

19.     Thereafter, a hearing on damages was conducted before Lawrence M. Schaffer, Special Referee, on May 7, 2009.

20.     On November 2, 2009, the Court in the Defamation Action issued an Order that was entered on November 6, 2009 (the "November 2, 2009 Order", a copy of which is annexed hereto at Exhibit "C"), which incorporated the report of the Special Referee and found that each of the Plaintiffs had proved that they had been damaged by the libelous statements of the Debtor and his daughter as follows: (a) Elliot in the sum of $380,000.00; (b) Harold in the sum of $380,000.00; (c) Shirley in the sum of $150,000.00 and (d) Maxi in the sum of $380,000.00.

3

Appendix  A - 21

21.     On July 27, 2010 the Defamation Court issued an Order entered on July 30, 2010 (the "July 27, 2010 Order", a copy of which is annexed hereto at Exhibit "D"), which denied the Debtor's motion to vacate their default.

22.     On September 13, 2010 the Defamation Court entered an Order which was entered on September 16, 2010 (the "September 13, 2010 Order" a copy of which is annexed hereto at Exhibit "E"), which, among other things, denied the Debtor's order to show cause to vacate his default.

23.     The September 13, 2010 Order stated, in pertinent part, that:

> "Finally, defendants' motion (009) by order to show cause to vacate various orders against them is denied.  Defendants made a prior motion for the same relief which was denied by order of this Court (Feinman, J.) dated July 27, 2010 and entered July 30, 2010.  This decision is law of the case herein and insofar as this Court is aware, has not been appealed, and must stand."

24.     The Plaintiffs sought and obtained several Orders in the Defamation Court holding the Debtor in contempt for failure to comply with subpoenas and other post-judgment enforcement demands, and assessing monetary fines against the Debtor.  Copies of these Orders, one dated April 30, 2010 and entered May 5, 2010 (the "April 30, 2010 Order") and another dated August 25, 2011 and entered on August 29, 2011 (the "August 25, 2011 Order") are collectively annexed hereto at Exhibit "F".

25.     Thereafter, the Debtor moved by way of order to show cause before the Defamation Court for an Order, among other things, vacating his default on the summary judgment motion, dismissing the Complaint for failure to state a cause of action, vacating the findings of the special referee and vacating the judgments entered therein.

26.     In response to the aforesaid order to show cause, the Defamation Court issued an Order dated December 22, 2011 and entered December 27, 2011 (the "December 22, 2011 Order", a copy of which is annexed hereto at Exhibit "G"), which denied the relief requested by the Debtor.

4

27.     The December 22, 2011 Order stated, in pertinent part, that:

> "Simply put, this motion is merely a repetition of the same unsuccessful arguments defendants have raised several times before.  Defendants have filed numerous Orders to Show Cause and Notices of Appeal in this Court and have filed Orders to Show Cause in the Appellate Division, but they have not perfected any appeals to that Court."

28.     The December 22, 2011 Order further stated that:

> "The Court, while concerned with the duplicative and repetitive conduct of much of the defendants' filings, does not now believe that monetary sanctions or counsel fees are a meaningful deterrent herein.  However, defendants continue to advance the same baseless claims and arguments in successive motions seeking relief from an order and judgment entered over two (2) years ago....Defendants are prohibited from filing any motions or orders to show cause in the actions or proceedings involving these parties now pending in this Court without prior approval of the Court....This relief is necessary due to the defendants' misuse of the right to file numerous duplicative and baseless motions and the resultant burden on the non-judicial staff and the need to protect against any abuse of the judicial process."

29.     Upon information and belief, none of the appeals of the Orders referenced herein have been perfected, and the time to do so has expired.

## AS AND FOR THE PLAINTIFFS' FIRST
## CAUSE OF ACTION AGAINST THE DEBTOR

30.     The Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "29", inclusive, with the same force and effect as if set forth at length herein.

31.     As is set forth above, and upon information and belief, the Debtor's Willful and Malicious E-mails were sent by the Debtor who knew the contents thereof to be false and who sent said E-mails with the willful and malicious intent to injure the Plaintiffs.

32.     As a direct and proximate result of the Debtor's dissemination of the Willful and Malicious E-mails, the Plaintiffs have suffered damages.

33.     The Defamation Court has found that the Willful and Malicious E-Mails were

5

libelous and entered judgment against the Debtor in favor of Elliot in the sum of $380,000.00.

34.    The Defamation Court has found that the Willful and Malicious E-Mails were libelous and entered judgment against the Debtor in favor of Harold in the sum of $380,000.00.

35.    The Defamation Court has found that the Willful and Malicious E-Mails were libelous and entered judgment against the Debtor in favor of Shirley in the sum of $150,000.00.

36.    The Defamation Court has found that the Willful and Malicious E-Mails were libelous and entered judgment against the Debtor in favor of Maxi in the sum of $380,000.00.

37.    By virtue of the foregoing, the Plaintiffs are entitled to a judgment declaring that their claims against the Debtor are non-dischargeable pursuant to Section 523(a)(6) of the Bankruptcy Code.

**WHEREFORE,** the Plaintiffs respectfully pray for judgment as requested in the first cause of action herein, together with such other, further and different relief as this Court deems just and proper.

Dated: Melville, New York
      September 24, 2012

                            LAW OFFICES OF MICHAEL G. MC AULIFFE
                            Counsel to the Plaintiffs

          By      */s/ Michael G. Mc Auliffe*
                            Michael G. Mc Auliffe, Esq.
                            68 South Service Road, Suite 100
                            Melville, New York 11747
                            (631) 465-0044

E:\Zoretsky v Berlin\adversary complaint\complaint.wpd

6

SCAN

## SHORT FORM ORDER

### SUPREME COURT - STATE OF NEW YORK
### COUNTY OF NASSAU

Present:

### Hon. Thomas Feinman

Justice

---

| | |
|---|---|
| ELLIOT ZARETSKY, HAROLD ZARETSKY, SHIRLEY ZARETSKY and MAXI-AIDS INC., | TRIAL/IAS, PART 18<br>NASSAU COUNTY |
| Plaintiffs, | INDEX NO. 17869/08 |
| - against - | MOTION SUBMISSION<br>DATE: 12/5/08 |
| AARON BERLIN and FEIGE ZARETSKY, | MOTION SEQUENCE<br>NO. 1 |
| Defendants. | |

---

The following papers read on this motion:

| | |
|---|---|
| Notice of Motion and Affidavits ...................... | X |
| Affirmation in Opposition................................. | N/A |
| Reply Affirmation........................................... | N/A |

Plaintiff's unopposed motion for summary judgment is granted.

A hearing is required on the issue of damages.

Subject to the approval of the Justice there presiding and **provided a note of issue has been filed at least ten (10) days prior thereto**, this matter shall appear on the calendar of CCP for the **4th day of March, 2009 at 9:30 a.m.**

A copy of this order shall be served on the Calendar Clerk and accompany the notice of issue when filed. **The failure to file a note of issue or appear as directed may be deemed an abandonment of the claims giving rise to the hearing.**

The directive with respect to a hearing is subject to the right of the Justice presiding in CCP to refer the matter to a Justice, Judicial Hearing Officer or a Court Attorney/Referee as he or she deems appropriate. In the event that the matter is referred to a Judicial Hearing Officer (JHO) or a Court Attorney/Referee, such JHO or Court Attorney/Referee is given the jurisdiction to hear and report all issues to the undersigned and/or to hear and resolve all issues.

Appendix A - 25

Notwithstanding anything to the contrary, attorney for movant shall serve a copy of this order, with notice of entry, on the **defendants by regular and certified mail**.

ENTER:

J.S.C.

ENTERED

JAN 1 4 2009

NASSAU COUNTY
COUNTY CLERK'S OFFICE

Dated: January 9, 2009

cc: Law Offices of Michael D. Solomon
    Aaron Berlin
    Feige Zaretsky

Appendix   A - 26

SCAN

## SHORT FORM ORDER

### SUPREME COURT - STATE OF NEW YORK
### COUNTY OF NASSAU

Present:

**Hon. Thomas Feinman**

Justice

---

| | |
|---|---|
| ELLIOT ZARETSKY, HAROLD ZARETSKY, SHIRLEY ZARETSKY and MAXI-AIDS INC., | TRIAL/IAS, PART 18<br>NASSAU COUNTY |
| Plaintiffs, | INDEX NO. 17869/08 |
| - against - | |
| AARON BERLIN and FEIGE ZARETSKY, | |
| Defendants. | |

---

As per this Court's order dated January 9, 2009, the plaintiff's unopposed motion for summary judgment was granted, and the matter was scheduled to appear for a hearing on the issue of damages on March 4, 2009 at the Calendar Control Part (CCP).

This matter was referred by CCP to Lawrence M. Schaffer, Special Referee. A hearing was held May 7, 2009.

As per the report of Special Referee Lawrence M. Schaffer dated October 28, 2009:

Elliot Zaretsky established that he sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon the initial email received by Latanya Thompson. Elliot Zaretsky established that additional libelous statements damaged Elliot Zaretsky's reputation in the amount of Eighty Thousand and 00/100 Dollars, ($80,000.00), ($50,000.00 on the second time an email was sent and $10,000.00 each additional time). Elliot Zaretsky established that he sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon a libelous email sent by defendant, Aaron Berlin, received by "Angela", an employee of Maxi-Aids. Elliot Zaretsky established that he sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon various libelous emails sent by defendant, Feige Zaretsky.

Appendix   A - 27

Harold Zaretsky established that he sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon the initial email received by Latanya Thompson. Harold Zaretsky established that additional libelous statements damaged Harold Zaretsky's reputation in the amount of Eighty Thousand and 00/100 Dollars, ($80,000.00), ($50,000.00 on the second time an email was sent and $10,000.00 each additional time). Harold Zaretsky established that he sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon a libelous email sent by the defendant, Aaron Berlin, received by "Angela". Harold Zaretsky established that he sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon various libelous emails sent by defendant, Feige Zaretsky.

Shirley Zaretsky established that she sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon the initial email received by Latanya Thompson. Shirley Zaretsky established that the second email of the libelous statements further damaged Shirley Zaretsky's reputation in the amount of Fifty Thousand and 00/100 Dollars, ($50,000.00)

Maxi-Aids established that it sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon the initial email received by Latanya Thompson. Maxi-Aids, established that additional libelous statements did have additional damaging effect and did further damage Maxi-Aids reputation in the amount of Eighty Thousand and 00/100 Dollars, ($80,000.00), ($50,000.00 the second time an email was sent and $10,000.00 each additional time). Maxi-Aids, established that it sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), damages based upon an libelous email sent by the defendant, Aaron Berlin, received by "Angela". Maxi-Aids established that it sustained One Hundred Thousand and 00/100 Dollars, ($100,000.00), in damages based upon various libelous emails sent by defendant, Feige Zaretsky.

Upon the foregoing report and recommendations contained therein, it is hereby

ORDERED that the plaintiff, Elliot Zaretsky, is hereby permitted to enter judgment jointly and severally as against the defendants, Aaron Berlin and Feige Zaretsky, in the amount of Three Hundred Eighty Thousand and 00/100 Dollars, ($380,000.00), and it is hereby further

ORDERED that the plaintiff, Harold Zaretsky, is hereby permitted to enter judgment jointly and severally as against the defendants, Aaron Berlin and Feige Zaretsky, in the amount of Three Hundred Eighty Thousand and 00/100 Dollars, ($380,000.00), and it is hereby further

ORDERED that the plaintiff, Shirley Zaretsky, is hereby permitted to enter judgment against the defendant, Aaron Berlin and Feige Zaretsky, in the amount of One Hundred Fifty Thousand and 00/100 Dollars, ($150,000.00), and it is hereby further

ORDERED that the plaintiff, Maxi-Aids, is hereby permitted to enter judgment jointly and severally as against the defendants, Aaron Berlin and Feige Zaretsky, in the amount of Three Hundred Eighty Thousand and 00/100 Dollars, ($380,000.00).

ENTER:

_____
J.S.C.

Dated: November 2, 2009

cc: Law Offices of Michael D. Solomon
    Aaron Berlin
    Feige Zaretsky

**ENTERED**

NOV 0 6 2009

NASSAU COUNTY
COUNTY CLERK'S OFFICE

Appendix A - 29

**SHORT FORM ORDER**

## SUPREME COURT - STATE OF NEW YORK
## COUNTY OF NASSAU

Present:

**Hon. Thomas Feinman**

Justice

|  |  |
|---|---|
| ELLIOT ZARETSKY, HAROLD ZARETSKY, SHIRLEY ZARETSKY and MAXI-AIDS INC., | TRIAL/IAS, PART 15 NASSAU COUNTY |
| Plaintiffs, | INDEX NO. 17869/08 |
| - against - | **X   X   X** |
| AARON BERLIN and FEIGE ZARETSKY, | MOTION SUBMISSION DATE: 6/11/10 |
| Defendants. | MOTION SEQUENCE NO. 4 |

The following papers read on this motion:

| | |
|---|---|
| Notice of Motion and Affidavits...................... | X |
| Affirmation in Opposition................................ | X |
| Reply Affirmation............................................ | X |

The defendants' motion to vacate defendants' default is denied.

ENTER:

_____
J.S.C.

Dated: July 27, 2010

cc: Law Offices of Solomon & Herrera, PLLC
  Aaron Berlin
  Feige Zaretsky

**ENTERED**

JUL 3 0 2010

**NASSAU COUNTY
COUNTY CLERK'S OFFICE**

Appendix   A - 30

�__

# SHORT FORM ORDER
## SUPREME COURT - STATE OF NEW YORK

Present:
### HON. EDWARD W. MC CARTY, III
Justice.

ELLIOT ZARETSKY, HAROLD ZARETSKY, SHIRLEY
ZARETSKY and MAXI-AIDS, INC.

Plaintiff(s).

-against-

AARON BERLIN and FEIGE ZARETSKY.

Defendant(s).

TRIAL/IAS, PART 1
NASSAU COUNTY

INDEX NO.: 17869-08

MOTION DATE: 08/16/10
MOTION SEQ.: #007,008 &
#009

The following papers read on this motion:
    Notice of Motion/Order to Show Cause........XXX
    Cross-Motion.............................................
    Answering Affidavits.....................................XXX
    Replying Affidavits.........................................XXX

    Motion (#007) by order to show cause by plaintiffs for an order pursuant to CPLR
5251 punishing Dora Berlin by fine or imprisonment, or both, for contempt, on the
ground that she refused or willfully neglected to obey the subpoena served upon her,
and for fine and/or sanctions in the form of legal fees in connection with the finding of
contempt; motion (#008) by plaintiffs for an order pursuant to CPLR 5226 directing
defendant Feige Zaretsky to pay monthly installments of no less than $5,000 per month
to plaintiffs Elliot Zaretsky, Shirley Zaretsky and Maxi-Aids, Inc. until the judgment
entered herein, plus interest, costs, reasonable attorneys' fees and expenses of this
motion have been paid; and motion (#009) by order to show cause by defendants *pro
se* for an order pursuant to CPLR 5015(a)(3): (1) vacating the order of this Court
(Feinman, J.) dated January 9, 2009 and entered January 14, 2009, which granted
plaintiffs summary judgment against defendants; (2) vacating the order of this Court
(Feinman, J.) dated November 2, 2009 and entered November 6, 2009, which
confirmed the findings of Special Referee Schaffer in his report dated October 28,
2009, and which ordered plaintiffs may enter judgment against defendants in the
amount of $1,290,000; (3) vacating the order of this Court dated May 26, 2010 which
directed the Nassau County Sheriff to sell defendant Feige Zaretsky's interest in the
premises located at 10 Chestnut Drive, Plainview, New York; (4) vacating any other
orders of this Court that flowed against defendants as a result of the Court order issued

on January 9, 2009; (5) permitting defendants to serve an amended answer to the instant complaint within 14 days, and compelling plaintiffs to accept same, are decided as set forth herein.

With regard to plaintiff's motion (#007) by order to show cause seeking to hold non-party Dora Berlin in contempt, while Ms. Berlin did appear for deposition as directed in the subpoena timely and properly served upon her, she was uncooperative and refused to answer any of the questions put to her. Ms. Berlin's behavior rises to the level of contempt and plaintiffs' motion (#007) to hold her in contempt is hereby granted. Ms. Berlin may purge her contempt by appearing for deposition on <u>October 20, 2010</u> at <u>2:00 p.m.</u> at the offices of Cullen & Dykman, 177 Montague Street, Brooklyn, New York 11201. In the event that Ms. Berlin shall fail to appear, or fail to answer the questions put to her, plaintiffs may renew their motion for contempt and seek punishment by fine against her in the full amount allowed by statute.

Regarding plaintiffs' motion (#008) for an order pursuant to CPLR 5226 directing defendant Feige Zaretsky to make installment payments, since plaintiffs acknowledge that such payments would have to be made from maintenance and child support payments received by Ms. Zaretsky, a determination must be made as to Ms. Zaretsky's reasonable requirements pursuant to CPLR 5205(d)(3). This matter is hereby transferred to the Matrimonial Part of Supreme Court, Nassau County for a determination of Feige Zaretsky's reasonable requirements pursuant to CPLR 5205(d)(3). (See, <u>Matter of Balanoff v. Niosi</u>, 16 A.D.3d 53, 64).

Finally, defendants' motion (#009) by order to show cause to vacate various orders against them is denied. Defendants made a prior motion for the same relief which was denied by order of this Court (Feinman, J.) dated July 27, 2010 and entered July 30, 2010. This decision is law of the case herein and insofar as this Court is aware, has not been appealed, and must stand.

Motion (#007) is granted, to the extent that Ms. Berlin is found in contempt, but may purge such contempt as directed herein.

Motion (#008) is hereby transferred to the Matrimonial Part of this Court for further determination as specified herein.

Motion (#009) is denied.

Date: September 13, 2010

EDWARD W. McCARTY III
J.S.C.

# ENTERED

SEP 16 2010

NASSAU COUNTY
COUNTY CLERK'S OFFICE

2

Appendix   A - 32

JAN-9-2012  05:09A FROM:

TO:5792429                                    P.2/7

SHORT FORM ORDER
### SUPREME COURT - STATE OF NEW YORK

Present:

### HON. STEVEN M. JAEGER,
Acting Supreme Court Justice

| | |
|---|---|
| ELLIOT ZARETSKY, HAROLD ZARETSKY, SHIRLEY ZARETSKY and MAXI-AIDS INC., | TRIAL/IAS, PART 43 NASSAU COUNTY INDEX NO.: 17869-08 |
| Plaintiffs, | MOTION SUBMISSION DATE: 11-7-11 |
| -against- | MOTION SEQUENCE NOS. 17 and 18 |
| AARON BERLIN and FEIGE ZARETSKY, | |
| Defendants. | |

The following papers read on this motion:

| | |
|---|---|
| Order to Show Cause and Affidavits in Support | X |
| Notice of Cross-Motion, Affirmation and Exhibits | X |
| Defendants' Affidavit in Reply to the Instant Show Cause and In Opposition to Plaintiffs' Cross-Motion | X |

Defendants pro se move by Order to Show Cause dated September 28, 2011 for the following relief:

1.   Leave to renew and reargue the decision dated August 24, 2011 denying recusal, and other related relief.

2.   Vacating the order dated January 9, 2009 granting plaintiff's motion for summary judgment upon default.

3.   Dismissing the complaint for failure to state a cause of action and as frivolous.

4.   Vacating the findings in the Report of the Referee herein dated October 28, 2009.

Appendix  A - 33

Case 2:15-cv-00014-JMA   Document 10-1   Filed 06/30/15   Page 37 of 264 PageID #: 2023

Case 8-12-08371-reg   Doc 1-8   Filed 09/24/12   Entered 09/24/12 13:11:28
Case 8-12-74600-reg   Doc 30-2   Filed 08/06/12   Entered 08/06/12 12:29:05

JAN-9-2012  09:09A FROM:                                    TO:5732489              P.3/7

5.    Vacating the Judgment herein entered on or about December 1, 2009.

6.    Vacating the prior orders for discovery and for contempt.

7.    Vacating the Note of Issue previously filed herein on or about February
      10, 2009 for failure to comply with Part 202 of the Uniform Civil Rules.

8.    Compelling plaintiff to accept the defendant's verified amended Answer.

      A temporary stay of all orders relating to post-judgment discovery and contempt
was granted pending determination of this motion.

      Plaintiffs oppose all of said relief and cross-move for sanctions, attorneys' fees,
for an order prohibiting defendants from filing further motions without permission of the
Court, and for an order directing defendants "to disclose the ghostwriter of their
motions".

Renewal/Reargument of the Recusal Decision

      Defendants have, in support of their motion for leave to renew or reargue this
Court's prior order dated August 24, 2011, simply repeated the voluminous arguments
set forth in their prior moving papers. Defendants go on to state that the Court
overlooked or misapprehended the facts or the law. Defendants continue to argue that
the Court's decision itself constitutes new facts sufficient to grant renewal or, in the
alternative, request that the Court refer all the allegations in this action and the action
previously pending before Justice Lally (Index No. 8488/10) "to be investigated by the
Federal Bureau of Investigation".

2

Case 2:15-cv-00014-JMA   Document 10-1   Filed 06/30/15   Page 38 of 264 PageID #: 2024

Case 8-12-08371-reg   Doc 1-8   Filed 09/24/12   Entered 09/24/12 13:11:28
Case 8-12-74600-reg   Doc 30-2   Filed 08/06/12   Entered 08/06/12 12:29:05

JAN-9-2012  09:10A FROM:                                    TO:5792409                    P.4/7

The Court finds that no legal or factual basis exists to justify any of the requested relief. The request for leave to renew or reargue the Court's prior denial of the recusal motion is hereby denied.

<u>Motion to Vacate the Prior Order and Judgments</u>

Defendants seek to vacate the order (Feinman, J.) dated January 9, 2009, granting summary judgment to plaintiffs; to vacate the Report of the Referee dated October 28, 2009; to vacate the Judgment entered herein on or about December 1, 2009; and for other and further relief.

Plaintiffs oppose all the requested relief.

Defendants' current motion pursuant to CPLR 5015 is at least the fourth such motion seeking to vacate the prior orders and money judgment, but apparently the first to specifically seek relief under CPLR 5015(a)(1). Defendants allege that they are moving within the one-year statutory period. Plaintiffs contend that this is baseless and untrue.

The summary judgment order dated January 9, 2009, required service of a copy of the order, with notice of entry, on the defendants by regular and certified mail. Defendants claim such service provision was not complied with and that no affidavit of service was filed until on or about May 23, 2011, when defendants served plaintiff's counsel with said order with notice of entry and filed an affidavit of service. Defendants contend that the statutory period did not begin to run until said date, and therefore, the instant motion is timely.

3

Appendix   A - 35

Case 8-12-08371-reg   Doc 1-8   Filed 09/24/12   Entered 09/24/12 13:11:28
Case 8-12-74600-reg   Doc 30-2   Filed 08/06/12   Entered 08/06/12 12:29:05

JAN-3-2012  09:10A FROM:                                          TO:5732109                    P.5 7

However, plaintiffs argue that this is inaccurate.  Plaintiffs have submitted copies of the Order with Notice of Entry and affidavits of service dated February 4, 2009.  It is noted that defendants have raised this service issue before this Court in the prior motion to vacate denied by order dated August 25, 2011 and in applications to other Justices of this Court.

Moreover, the affidavits of service of the Order with Notice of Entry were entered into evidence at the inquest held by the Referee.  Plaintiffs were under no obligation to separately file this proof of service with the Court or Clerk.

Accordingly, the motion to vacate the order dated January 9, 2009, the Referee's Report, and the Judgment entered on December 1, 2009 are denied as untimely pursuant to CPLR 5015(a)(1).  All other requests for relief under CPLR 5015 are denied as the several orders previously denying such relief are law of the case.

It is improper for this Court to review its prior orders or those of other judges of coordinate jurisdiction without an adequate legal or factual basis under CPLR 5015.  Simply put, this motion is merely a repetition of the same unsuccessful arguments defendants have raised several times before.   Defendants have filed numerous Orders to Show Cause and Notices of Appeal in this Court and have filed Orders to Show Cause in the Appellate Division, but they have not perfected any appeals to that Court.  Defendants might be better advised to raise these arguments before an appellate court, rather than continue to unsuccessfully seek the same relief before this Court.

4

Appendix  A - 36

Case 2:15-cv-00014-JMA   Document 10-1   Filed 06/30/15   Page 40 of 264 PageID #: 2026

Case 8-12-08371-reg     Doc 1-8     Filed 09/24/12     Entered 09/24/12 13:11:28
Case 8-12-74600-reg     Doc 30-2    Filed 08/06/12     Entered 08/06/12 12:29:05

JAN-3-2012  09:10A FROM:                                TO:5792409                    P.6/7

Insofar as defendants seek to dismiss the complaint, to compel plaintiffs to accept the amended Answer, and to strike the Note of Issue, said claims are denied as academic given the denial of the motion to vacate the Judgment herein.  Further, insofar as defendants seek to vacate the prior orders concerning post-judgment discovery and contempt, said motion is denied both as academic and without other legal or factual basis in the moving papers.

All other requests for relief in the Order to Show Cause not addressed herein are denied.

Plaintiffs' Cross-Motion for Sanctions

The cross-motion is disposed of as follows: defendants pro se have filed numerous motions before this Court and other Justices since the Judgment was entered in 2009.  Defendants appear to be engaged in a pattern of dilatory conduct and harassment of plaintiffs and their counsel.  Defendants have engaged in repetitive and sometimes frivolous motion conduct that overly burdens their adversaries and the judicial system.  Monetary sanctions and reasonable counsel fees are requested by plaintiffs as well as a prohibition against further motion practice.

The Court, while concerned with the duplicative and repetitive conduct of much of the defendants' filings, does not now believe that monetary sanctions or counsel fees are a meaningful deterrent herein.  However, defendants continue to advance the same baseless claims and arguments in successive motions seeking relief from an order and judgment entered over two (2) years ago.

5

Appendix  A - 37

JAN-5-2012  35:11A FROM:                                    TO:5792429                    P.7~7

Accordingly, the cross-motion is granted solely to the following extent:

Defendants are prohibited from filing any motions or orders to show cause in the actions or proceedings involving these parties now pending in this Court without prior approval of the Court. The Clerk of this Court is directed to not accept for filing any motion or order to show cause by defendants under Index Nos. 17860-08, 8498-10, and 13954-10 without prior written approval of the Court. This relief is necessary due to the defendants' misuse of the right to file numerous duplicative and baseless motions and the resultant burden on the non-judicial staff and the need to protect against any abuse of the judicial process. Taabbar v. Auld, 28 AD3d 233; Sud v. Sud, 227 AD2d 319; Spremo v. Babchik, 216 AD2d 382; Faison v. State, 176 Misc.2d 808.

The temporary stay of all orders in this action relating to post-judgment discovery and contempt is hereby vacated.

Dated: December 22, 2011

_____
STEVEN M. JAEGER, A.J.S.C.

ENTERED

DEC 27 2011

NASSAU COUNTY
COUNTY CLERK'S OFFICE

6

𝔖

**SHORT FORM ORDER**

## SUPREME COURT - STATE OF NEW YORK
## COUNTY OF NASSAU

Present:

   **Hon. Thomas Feinman**
                    Justice

---

ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY and MAXI-AIDS INC.,

                    Plaintiffs,

     - against -

AARON BERLIN and FEIGE ZARETSKY,
                    Defendants.

TRIAL/IAS, PART 15
NASSAU COUNTY

INDEX NO. 17869/08

---

   On the Court's own motion recusing itself from hearing this matter, it is hereby

   ORDERED that this matter will be forwarded to the Differentiated Case Management Office
for purposes of reassignment to another Justice of this Court pursuant to the Rules for New York
State Trial Courts Sec202.3(b).

                    ENTER

                                                    THOMAS FEINMAN
                                                        J.S.C.
                    _____
                              J.S.C.

Dated: August 9, 2010

                    **ENTERED**

                    AUG 16 2010

                    NASSAU COUNTY
              COUNTY CLERK'S OFFICE

Appendix   A - 39

# SUPREME COURT-STATE OF NEW YORK
# COUNTY OF NASSAU

PRESENT:        **LAWRENCE M.  SCHAFFER,**
                           Special  Referee

_____

**ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY and MAXI-AIDS**
                                    Plaintiffs,

                -against-                                    **HEAR AND REPORT
                                                               Index No.17869/08**

**AARON BERLIN and FEIGE ZARETSKY**
                                    Defendants.
_____

This matter is before the undersigned pursuant to a referral from CCP. The decision and order (Feinman, J.) granting summary judgment stated, "[I]n the event the matter is referred to a Judicial Hearing Officer (JHO) or a Court Attorney/Referee, such JHO or Court Attorney/Referee is given the jurisdiction to hear and report all issues to the undersigned and /or to hear and resolve all issues." This constitutes my report pursuant to such order.

On a default inquest the only determination left to the court is the assessment of damages. Such is also the direction pursuant to the referral order. All traversable allegations in the complaint are deemed admitted. Liability as to the allegations and their veracity, is established by the default of the defendant. Though defendants were given notice that they could appear to dispute the appropriate damage award, subsequent to their default, they failed to appear and dispute any of the testimony with regard to the amount of damages suffered by the plaintiffs. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements, but does not admit the plaintiffs' conclusion as to damages which is to be established at trial (see, *Rokina Optical Co., Inc. v. Camera King, Inc.*, 63 N.Y. 2d 728) .

At the trial of this matter, Elliot Zaretsky testified how hurtful the emails about him were. He testified to the heart problems he developed, the fibrillation of the upper chambers of his heart, his inability

to sleep and that he began to use Ambien and Benadryl. He testified that he had suffered great humiliation and embarrassment as a result of the emails, and that he has received numerous phone calls concerning the libel. He testified that he and his company Maxi Aids' goodwill had been jeopardized and maligned by the malicious emails. He also indicated that he had been contacted by State agencies, with whom he does business, that they had knowledge of said emails.

Elliot Gottlieb, a Certified Public Accountant testified as to the loss of web and mail order income of Maxi Aids, since the publication of these emails. He testified that Maxi-Aids lost approximately $1,623,389.00 in income, twenty five percent(25%) or $400,000 of which is loss in the web order and mail order income. The testimony attributing this loss in income to the dissemination of the false, malicious and defamatory statements, was unrebutted.

Latanya Thompson, an employee of Maxi-Aids testified that based upon the emails she received, she questioned herself, if plaintiffs would act in such a way toward their real family, how would they act towards her who was part of their work family. She further testified that at two separate conventions, following the dissemination of the emails, she witnessed professional colleagues shying away from the Maxi-Aids booth and that fewer people sought information from them. It was evident to Ms. Thompson that the emails had been published to more people than just her.

Larry DiBlasi, another Maxi-Aids employee testified, that after the emails made the rounds at Maxi-Aids, morale was at a low there and that he had to explain to employees what was going on. He also received forty to fifty phone calls from customers, regarding the content of the emails.

Harold Zaretsky, who is deaf, testified, that in his insular, close knit deaf community, people have shied away from him, leaving him embarrassed and humiliated since the publication of these emails. He indicated that the emails put him into a state of depression. He also testified that at a convention, held following the dissemination of said emails, customers and colleagues who would normally stop by the Maxi-Aids booth, shied away and avoided him. Harold has been characterized in said emails as mentally incompetent, vindictive, a contemptuous man with no regard for his children. These statements have resulted in his feeling deep embarrassment, humiliation, depression and sleeplessness.

Shirley Zaretsky testified that the libelous statements have taken an emotional toll upon her. She has been distraught and sleepless since the statements concerning her were disseminated.

2

In assessing the damages I have reviewed the causes of action. The plaintiff has listed 23 separate causes of action and seeks counsel fees, costs and disbursements as a 24th demand for judgment. The cause of action for counsel fees, costs and disbursements should be denied, as this is a tort action and no basis for the award of counsel fees has been proffered.

Elliot Zaretsky's causes of action 1,2,3,4 and 5 all seek relief for libelous emails sent by defendant, Berlin, that were received by Latanya Thompson. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. Plaintiff established that Elliot Zaretsky did sustain $100,000 in damages based upon the initial email received by Latanya Thompson. Subsequent emails included items of a different and at times of the same or similar nature. Plaintiff failed to establish that each subsequent and individual email of the libelous statements, further damaged Elliot Zaretsky's reputation to the extent of an additional $100,000 in damages, as sought in the complaint. Plaintiff did establish that the additional statements did have additional damaging effect and did further damage Elliot Zaretsky's reputation, in the amount of $80,000($50,000 the 2nd time an email was sent and $10,000 each additional time.)

Elliot Zaretsky's 6th cause of action seeks relief for a libelous email sent by defendant, Berlin, that was received by "Angela", an employee of Maxi Aids. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Elliot Zaretsky did sustain $100,000 in damages based upon the email received by "Angela."

Elliot Zaretsky's 7th cause of action seeks relief for libelous emails sent by defendant, Feige Zaretsky, that were published to various people at diverse email addresses. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Elliot Zaretsky did sustain $100,000 in damages based upon these emails sent to the various email addresses.

Harold Zaretsky's causes of action 1,2,5,6 and 7 all seek relief for libelous emails sent by defendant Berlin that were received by Latanya Thompson. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Harold Zaretsky did sustain $100,000 in damages based upon the initial email received by Latanya Thompson. Subsequent emails included items of a different and at times of the same or similar nature. Plaintiff failed to establish that each subsequent and individual email of the

3

Appendix  A - 42

libelous statements further damaged Harold Zaretsky's reputation to the extent of an additional $100,000 in damages as sought in the complaint. Plaintiff established that the additional statements did have additional damaging effect and did further damage Harold Zaretsky's reputation in the amount of $80,000($50, 000 the 2nd time an email was sent and $10,000 each additional time.)

Harold Zaretsky's 4th cause of action seeks relief for a libelous email sent by defendant, Berlin, that was received by "Angela. " Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Harold Zaretsky did sustain $100,000 in damages, based upon these emails received by "Angela."

Harold Zaretsky's 3rd cause of action seeks relief for libelous emails sent by defendant, Feige Zaretsky, that were published to various people at diverse email addresses. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Harold Zaretsky did sustain $100,000 in damages based upon these emails sent to the various email addresses.

Shirley Zaretsky's causes of action 1 and 2 seek relief for libelous emails sent by defendant, Berlin, that were received by Latanya Thompson. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Shirley  Zaretsky did sustain $100,000 in damages based upon the initial email received by Latanya Thompson. Plaintiff failed to establish that the second email of the libelous statements further damaged Shirley Zaretsky's reputation to the extent of an additional $100,000 as sought in the  complaint. Plaintiff established that the second email did further damage Shirley Zaretsky's reputation in the amount of $50,000.

Maxi-Aids' causes of action 1,2,3,6 and  7 all seek relief for libelous emails sent by defendant, Berlin, that were received by Latanya Thompson. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Maxi-Aids did sustain $100,000 in damages, based upon the initial email received by Latanya Thompson. Subsequent emails included items of a different and at times of the same or similar nature. Plaintiff failed to establish that each subsequent and individual email of the libelous statements further damaged  Maxi-Aids to the extent of an additional $100,000 as sought in the complaint. Plaintiff established that the additional statements did have additional damaging effect and did further damage Maxi-Aids reputation in the amount of $80,000($50, 000 the 2nd time an email was

4

sent and $10,000 each additional time.)

Maxi-Aids' 5th cause of action seeks relief for a libelous email sent by defendant Berlin that was received by "Angela." Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Maxi-Aids did sustain $100,000 damages based upon this email received by "Angela."

Maxi-Aids 4th cause of action seeks relief for libelous emails sent by defendant Feige Zaretsky that were published to various people at diverse email addresses and to Latanya Thompson. Defendant's default establishes defendant's liability with regard to the allegations of publishing these false, malicious and defamatory statements. The plaintiff established that Maxi-Aids did sustain $100,000 damages based upon these emails sent to the various email addresses.

Inasmuch as the emails were jointly composed by the defendants, as evidenced by use of the words "we" and "us" and other indicia of joint composition, then published and republished by both defendants, they should be held jointly and severally liable.

It is recommended to the Court that plaintiff, Elliot Zaretsky, be permitted to enter judgment jointly and severally as against the defendants, Aaron Berlin and Feige Zaretsky, in the amount of $380,000.

It is recommended to the Court that plaintiff, Harold Zaretsky, be permitted to enter judgment jointly and severally as against the defendants, Aaron Berlin and Feige Zaretsky, in the amount of $380,000.

It is recommended to the Court that plaintiff, Shirley Zaretsky, be permitted to enter judgment against defendant Aaron Berlin and Feige Zaretsky in the amount of $150,000.

It is recommended to the Court that plaintiff, Maxi-Aids, be permitted to enter judgment jointly and severally as against the defendants, Aaron Berlin and Feige Zaretsky, in the amount of $380,000.

Dated:  10 28 09
        Mineola, New York

Lawrence M. Schaffer, Referee

ENTERED

NOV 02 2009

NASSAU COUNTY
COUNTY CLERK'S OFFICE

5

Appendix  A - 44

*To Be Argued By:*
AARON BERLIN and
FEIGE ZARETZKY
*(Time Requested: 15 Minutes)*

# New York State Supreme Court

APPELLATE DIVISION — SECOND DEPARTMENT

ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY and MAXI-AIDS INC.                Docket No. 2010-10354

Plaintiffs-Respondents

-against-

AARON BERLIN, FEIGE ZARETSKY,

Defendants-Appellants

## BRIEF FOR DEFENDANTS -APPELLANTS

AARON BERLIN & FEIGE ZARETZKY
Defendants-Appellants
*1909 New York Avenue*
*Brooklyn NY 11210*
*1-917-803-4155*

*Nassau County Clerk's Index No.  17869-08*

Appendix  A - 45

*To be Argued by:*
MICHAEL D. SOLOMON
*(Time Requested: 15 Minutes)*

# New York Supreme Court
## Appellate Division – Second Department

**Docket No.:**
**2010-10359**

ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY and MAXI-AIDS INC.,

*Plaintiffs-Respondents,*

– against –

AARON BERLIN, FEIGE ZARETSKY,

*Defendants-Appellants.*

## BRIEF FOR PLAINTIFFS-RESPONDENTS

LAW OFFICES OF
SOLOMON & HERRERA, PLLC
*Attorneys for Plaintiffs-Respondents*
2950 Hempstead Turnpike
Levittown, New York 11756
(516) 579-6200

Nassau County Clerk's Index No. 17869/08

Appendix  A - 46

*To Be Argued By:*
AARON BERLIN & FEIGE ZARETSKY
*Requested: 15 Minutes*

# New York Supreme Court

## APPELLATE DIVISION — SECOND DEPARTMENT

ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY and MAXI-AIDS INC.

*Docket No:*
2010-10359

Plaintiffs -Respondents

against-

AARON BERLIN, FEIGE ZARETSKY,

Defendants.-Appellants

# REPLY BRIEF FOR DEFENDANTS. --APPELLANTS

AARON BERLIN, FEIGE ZARETSKY
Defendants.-Appellants
*1909 New York Avenue*
*Brooklyn NY 11210*
*1917-803-4155*

*Nassau County Clerk's Index No.* **17869-08**

Appendix  A - 47

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

M124346
E/sl

A. GAIL PRUDENTI, P.J.
RANDALL T. ENG
L. PRISCILLA HALL
SHERI S. ROMAN, JJ.

---

2010-10359                                       DECISION & ORDER ON MOTION

Elliot Zaretsky, et al., respondents,
v Aaron Berlin, et al., appellants.

(Index No. 17859/08)

---

Motion by the appellants on appeals from an order of the Supreme Court, Nassau County, entered September 16, 2010, inter alia, to stay enforcement of a judgment of the same court dated December 1, 2009, pending hearing and determination of appeals from the order, and to enlarge the time to perfect the appeals from the order. Cross motion by the respondents to impose a sanction upon the appellants.

Upon the papers filed in support of the motion and the cross motion, and the papers filed in opposition thereto, it is

ORDERED that the branch of the motion which is to enlarge the time to perfect the appeals from the order is granted, the appellants' time to perfect the appeal is enlarged until October 11, 2011, and the joint record or appendix on the appeals and the appellants' respective briefs must be served and filed on or before that date; and it is further,

ORDERED that no further enlargement of time shall be granted; and it is further,

ORDERED that the motion is otherwise denied; and it is further,

ORDERED that the cross motion is denied.

PRUDENTI, P.J., ENG, HALL and ROMAN, JJ., concur.

ENTER:

*Matthew G. Kiernan*

Matthew G. Kiernan
Clerk of the Court

August 10, 2011

ZARETSKY v BERLIN

Appendix   A - 48

```
 1    UNITED STATES BANKRUPTCY COURT

 2    EASTERN DISTRICT OF NEW YORK

 3    - - - - - - - - - - - - - - - - - - - - - - - - - x

 4    In the Matter of:

 5

 6    AHRON BERLIN,                Case No. 12-74600-reg

 7

 8            Debtor.

 9

10    - - - - - - - - - - - - - - - - - - - - - - - - - x

11    ZARETSKY,

12            Plaintiff,

13        v.                       Adv. Case No. 12-08371-reg

14    BERLIN,

15            Defendant.

16    - - - - - - - - - - - - - - - - - - - - - - - - - x

17

18            U.S. Bankruptcy Court

19            Long Island Federal Courthouse

20            Central Islip, New York

21

22            July 22, 2013

23            9:52 AM

24

25
```

Appendix  A - 49

```
 1                    P R O C E E D I N G S

 2             THE CLERK:  Zaretsky versus Berlin.

 3             MR. MCAULIFFE:  Good morning, Your Honor, Michael

 4   McAuliffe on behalf of --

 5             THE COURT:  Hold it.

 6             MR. MCAULIFFE:  -- the Zaretsky parties.

 7             THE COURT:  Hold it.  Hold it.

 8        (Pause)

 9             THE COURT:  Appearances.

10             MR. MCAULIFFE:  Good morning, Your Honor, Michael

11   McAuliffe on behalf of the Zaretsky parties.

12             MR. BERLIN:  Mr. Berlin.  Ahron Berlin.  A-H --

13             THE COURT:  Can you speak louder, sir, please.

14             MR. BERLIN:  Yeah.  My name is Ahron Berlin.

15             THE COURT:  And you're representing yourself.

16             MR. BERLIN:  Yes.

17             THE COURT:  Okay.

18             MR. MCAULIFFE:  Your Honor, we have three matters

19   on the calendar today.  Excuse me.  The first being my

20   client's motion for summary judgment, we have a final

21   pretrial in the adversary, and I believe the Court is

22   carrying it as a defendant's cross-motion.

23             In sum, Judge, I believe our motion is well

24   supported by the record from the State Court.  As outlined

25   in your Rule 7056 statement we believe that there are no
```

**Appendix  A - 50**

1   material facts as to which any genuine issue needs to be

2   tried.

3           In the State Court action there was a defamation

4   lawsuit commenced by my clients against Mr. Berlin and his

5   daughter, who is not a party in this action at all.  There

6   was a motion made for summary judgment, which was granted on

7   default, and it resulted in a scheduling of an inquest

8   before a referee.  The referee did conduct the inquest in

9   2009, there was a report prepared, it's annexed as Exhibit F

10  to our motion.

11          Essentially we believed that that report and the

12  record in this State Court permits Your Honor to determine

13  that the claims here are non-dischargeable pursuant to

14  523(a)(6) as a willful malicious tort.  Essentially it's an

15  intentional tort of defamation.

16          The referee found that the emails in question,

17  which were annexed to our papers, were willful and

18  malicious, and they find them to be liabless (sic).

19          We've also noted that collateral estoppel should

20  prevent a party from relitigating an issue which has been

21  decided against them, and the two main requirements being

22  the party asserting collateral estoppel must prove that the

23  identical issue was necessarily decided in the prior action,

24  and is decisive in this action.

25          And the second element, Your Honor, is that the

1    party to be precluded has had a full and fair opportunity to

2    contest the prior determination.

3         We've also noted in our memo of law that the

4    doctrine of collateral estoppel does apply to

5    dischargeability actions such as the present matter.

6         We would submit that the motion should be granted.

7         If I could just briefly go into some issues raised

8    by Mr. Berlin and some papers filed last week.  He's

9    claiming that I tried to deprive him of his right to file a

10   reply, and he claims that I've attempted to deceive this

11   Court with regard to the status of certain appeals.

12        First of all, Judge, I could submit that we had a

13   conference in which a briefing schedule was agreed to, I

14   filed a letter -- I was directed to file a letter on

15   June 11th with the Court, I provided that on notice to

16   Mr. Berlin, it provided for an agreed briefing schedule.

17        I received a call from him last week in which he

18   complained that he had no opportunity for a reply.  I told

19   him I had no authority to change the briefing schedule, but

20   that I could provide him with my opposition papers early.

21   The deadline had provided for July 18, which was last

22   Thursday, I provided him with my papers on June 15th my

23   email, and they were also filed that day.

24        As to the appeals, Judge, I've reviewed as best I

25   could the court records maintained by the Office of Court

1        MR. BERLIN:  Okay.

2        THE COURT:  Whatever allegations of fraud,

3    misbehavior, you're always free to go back to the State

4    Court into the State Court system and seek a revocation of

5    that order, if you have time, I don't know.

6        All I'm dealing with is one issue, whether the

7    findings of the State Court and the order entered are

8    sufficient for me to find under 523(a)(6) that what's called

9    collateral estoppel where there's no purpose to go on with

10   this.  That's the only thing I want to hear.  Go ahead.

11       MR. BERLIN:  The finding of the State Court was

12   actually as its known it was a default and it was not even A

13   default judgment, it was a -- it's a summary judgment that's

14   brought illegally, impermissible, the entire action was

15   impermissible, (indiscernible) official the judgment, the

16   decision of the judgment is so -- it says

17   (indiscernible)post judgment -- summary judgment is

18   granted --

19       THE COURT:  But the court -- sir, the court

20   entered a judgment.  There is a judgment against you.  You

21   may not like it, you may not accept it, you may not believe

22   in it, but as a matter of law it exists.  So it's a complete

23   waste of your time and my time for you to explain to me why

24   I'm not going view that as an enforceable judgment.

25       MR. BERLIN:  All the circuits, all the same

1    opinion, if there's a question of fraud the equity power of

2    the Bankruptcy Court is to and should be coming in and --

3                THE COURT:  No, the Bankruptcy Court has no

4    authority in my belief, and I've written about this under

5    what's called the Rooker-Feldman Doctrine, to look behind

6    the State Court judgment.  You were perfectly free to have

7    that argument in State Court.  You're not precluded from

8    having it, you're just precluded from having it here.

9                MR. BERLIN:  If the State Court showed

10   (indiscernible) and proof that they did not wanted to honor

11   the rights from extrinsic where there's a federal problem

12   and they showed extrinsic fraud was from the beginning, from

13   the first step to the end, the Federal Court has to come in,

14   I have a right that's independent action to start with in

15   any court, any time, because this entire action was based on

16   extrinsic fraud.

17               THE COURT:  Your reading of the law and mine are

18   different, that's okay, but for the moment mine is going to

19   prevail.

20               So again, if you want to go back to State Court

21   and if you can vacate that judgment be my guest.

22               What I'm dealing with is a judgment that was

23   entered, exists on the record, there's nobody who's revoked

24   it, and I'm asking you simply why isn't that judgment

25   preclusive of any other argument in this court relative to

1    523(a)(6)?

2         MR. BERLIN:  Even in Koffman (ph) the federal --

3    the circuit -- the Second Circuit (indiscernible) says

4    collateral estoppel does not go under default.  It says --

5         THE COURT:  Your argument is collateral -- sir,

6    your argument is that a judgment entered in State Court

7    based on a default judgment --

8         MR. BERLIN:  Yes.

9         THE COURT:  -- has no collateral estoppel value?

10        MR. BERLIN:  That's the simple language in all the

11   Court of Appeals in State of New York.

12        THE COURT:  Well it's close, but it's the

13   opposite.  All of those decisions that I've read hold that a

14   default judgment entered where a party had the right to

15   proceed and chose not to is as binding as any other.

16        Now you can go back again, I'm not precluding you,

17   go back to State Court.  But in front of me that's a binding

18   judgment.  I understand your argument, we just disagree.

19   It's okay.

20        MR. BERLIN:  Okay.  I have an appeal pending -- I

21   have four appeals pending in State Court?

22        THE COURT:  You have appeals -- we if you have the

23   appeals pending --

24        MR. BERLIN:  Yes.

25        THE COURT:  -- and if you win those appeals then

1    the landscape will change.  I'm not arguing that --

2              MR. BERLIN:  I can continue to make the -- to go

3    on with the appeal, the appeal is on, just --

4              THE COURT:  Go ahead, I'm not stopping you.

5              MR. BERLIN:  I have six appeals pending.

6              THE COURT:  You can have 600, I'm just asking you

7    sitting here today I have a valid order of that court until

8    the State Court does something to effect that why isn't that

9    judgment against you --

10             MR. BERLIN:  The simple --

11             THE COURT:  -- dispositive of this whole issue?

12             MR. BERLIN:  The simple language is because the

13   Bankruptcy Court has the power whenever it comes in fraud

14   rights -- (indiscernible) this is the simple agreement, and

15   all the circuits, none of them -- even the Second Circuit

16   was only arguing because they were disregarding the

17   preclusive effect, not because -- because they said that she

18   didn't claim fraud, she just claimed that this doesn't make

19   sense, the judgment.

20             THE COURT:  Do you believe -- sir, do you believe

21   that what the State Court found -- for the moment accept

22   they found it -- is dispositive -- do you understand what

23   I'm talking about when I say dispositive?

24             MR. BERLIN:  Yes.

25             THE COURT:  Okay.

1           MR. BERLIN:  Yes.

2           THE COURT:  I'm just -- I want to make sure.

3      Okay.  Is dispositive of a 523(a)(6) argument.  Yes or no?

4           MR. BERLIN:  I don't know.  I don't --

5           THE COURT:  No?

6           MR. BERLIN:  I don't know what the question, I

7      don't understand, I'm not --

8           THE COURT:  Okay.  Let me try to put it in simple

9      terms.

10          If I accept everything is true that the State

11     Court found does that fully satisfy all the elements of

12     523(a)(6)?

13          MR. BERLIN:  No, because it's on the face --

14          THE COURT:  Okay.  Hold it, stop, you said no,

15     correct?

16          MR. BERLIN:  It depends.  If it's on the face

17     fraud -- on the face the language is fraud the findings of

18     fraud if they're (indiscernible) says that the testimony

19     from any of the (indiscernible) $300,000 without any proof

20     and any (indiscernible) it was just a joke, it doesn't make

21     sense, you see that the fraud is on the face --

22          THE COURT:  So you don't think that those

23     findings, even if accepted, would satisfy 523(a)(6).

24          MR. BERLIN:  If it's on the face fraud Bankruptcy

25     Court has the obligation to come in, it said, that's the

**Appendix  A - 59**

1   language of all the circuits, unless -- because --

2          THE COURT:  I'll take that as a no.

3          MR. BERLIN:  -- I have to be ignored.

4          THE COURT:  We'll take your answer as a no.  Don't

5   say anything.

6          The problem with the summary judgment,

7   Mr. McAuliffe, is as difficult as it is to get there,

8   weeding through Mr. Berlin's papers, he in his papers does

9   raise the question about whether the findings in the State

10  Court sufficiently find intent and fraud as required in

11  523(a)(6), so that there is an issue before the Court that

12  wouldn't allow for the granting of summary judgment.  I

13  agree with that.  Don't say anything.  I agree with that.

14         I think Mr. Berlin, much of his argument should be

15  shed away because it's not going to help him here, but the

16  argument as to whether or not that State Court decision and

17  the record in the State Court adequately demonstrates the

18  necessary element of intent and the other aspects of

19  523(a)(6), this Court is not prepared to find on a summary

20  judgment, and I think it's very difficult to normally do

21  that unless the State Court makes a record that just happens

22  to fit within it.  We don't have that here.

23         Correspondingly, the motion framed as a cross-

24  motion for summary judgment, which I'm not really sure it

25  is, but since it would have to accept as true everything the

Appendix  A - 60

1    plaintiff alleges, which by definition would mean you would

2    lose, Mr. Berlin, I can't grant the cross-motion.

3            So what we're left with is a trial.  The trial is

4    going to be a narrow trial.  There will be no discussion in

5    this trial about the conduct of any party from the judge to

6    the bailiff to the lawyers in State Court.  There will be no

7    discussion of anything in State Court other than the

8    question of whether or not the plaintiff in this case can

9    adequately make the record that your conduct, sir, where you

10   have been found subject to defamation that that defamation

11   under state law can be determined to be intent has 523(a)(6)

12   or he shows that independently.

13           So what we're down to is the Court is going to

14   deny both motions for summary judgment and we're going to

15   set a trial date.  Is everybody with me to this point?

16           MR. BERLIN:  Yes.

17           MR. MCAULIFFE:  Yes, sir.

18           THE COURT:  Okay.  Is there any discovery that

19   needs to be done in this case?

20           MR. BERLIN:  Yes.

21           THE COURT:  Wait.  He goes.

22           MR. MCAULIFFE:  Your Honor, prior to reaching this

23   procedural point in this matter I had deposed Mr. Berlin.  I

24   don't know how much can be gleaned from the deposition.

25   Discovery will be difficult, I'm anticipating that.

```
 1              THE COURT:  Look, if you're going to call him and
 2    you've taken it once I suspect that maybe just calling him
 3    may expedite this, but that's up to you.
 4              MR. MCAULIFFE:  In terms of discovery, Judge, the
 5    only stuff that I would potentially want to get, if I can
 6    get deeper into the State Court record to try to determine
 7    what transcripts are available.  I didn't get much
 8    assistance from my predecessor counsel in the State Court so
 9    I've had to get --
10              THE COURT:  Yeah, we don't have the record in
11    front of us so we don't know --
12              MR. MCAULIFFE:  Yeah.
13              THE COURT:  -- because you didn't submit it, but
14    -- look, we're not going try this case 'til -- what do we
15    have?
16         (Pause)
17              THE COURT:  This will take a day?
18              MR. MCAULIFFE:  Yeah.  Yes, sir.
19              THE COURT:  Sir?
20              MR. BERLIN:  Yes.  I have to figure out how much
21    discovery I have to make --
22              THE COURT:  All right.  Well, I'm going to give --
23              MR. BERLIN:  -- because I may be making --
24              THE COURT:  We're going to set a date of
25    November 5th, that gives you guys time.  You can either use
```

1    it or not use it.

2            MR. BERLIN:  I will try to make discovery to -- on

3    the judges (indiscernible).

4            THE COURT:  You can use the time any way you want,

5    but what I'm suggesting to you is you ought to be done,

6    because you're going trial on November 5th.

7            MR. BERLIN:  November 5th.

8            THE COURT:  That's sort of not an invitation, it's

9    an order.

10           MR. MCAULIFFE:  Judge, I have a procedural

11   question.

12           I understand Your Honor's ruling that we haven't

13   established our burden on the papers.  There are certain

14   factual issues which I don't know whether Your Honor feels

15   comfortable as determining having been established in that

16   State Court record.  For instance --

17           THE COURT:  What you can do is you can do a

18   pretrial.

19           MR. MCAULIFFE:  Okay.

20           THE COURT:  You can agree on facts or put in the

21   facts to the final pretrial that you believe are undisputed.

22   He may dispute them, you can just say we disagree but the

23   record shows X.

24           MR. MCAULIFFE:  Okay.  Thank you.

25           THE COURT:  At trial we can go through, before the

1    witnesses, what elements the Court would be bound to accept

2    and what not, but I don't want to do it today.

3        MR. MCAULIFFE:  I understand.  And I'm just

4    highlighting just to identify what I'm anticipating a

5    problem on, one of the ultimate issues as to whether these

6    emails were in fact actually drafted and sent by defendant.

7    I mean there is a record and there was determinations, but I

8    don't know how clear the determinations are.

9        THE COURT:  I suspect clarity is not going to be

10   in our cards.

11       MR. MCAULIFFE:  Yes.

12       THE COURT:  But it is where it is.

13       So what you're going to do is you guys are going

14   get together over the next couple of weeks, you're going to

15   agree on dates for when discovery will be finished.  After

16   discovery if you want to renew any motions -- dispositive

17   motions prior to the trial you can, and that's where we are.

18   But you're going trial on the 5th.  If somebody doesn't show

19   up they're probably going to lose.

20       MR. BERLIN:  I can bring in another motion for

21   this trial on November 5th?

22       THE COURT:  Bring any motion you want, but you're

23   going to trial on the 5th.  If you want to renew your

24   summary judgment motion, fine.

25       MR. BERLIN:  Yeah.  Yeah.

```
 1              THE COURT:  I don't -- okay.  But when we get to

 2     the 5th and you file the motion seeking for summary judgment

 3     and you say you want to adjourn the trial 'til I rule on

 4     that I'll tell you now it's not happening.  You're going

 5     trial on the 5th.

 6              MR. BERLIN:  So the motion is not going to be

 7     ruled any way.

 8              THE COURT:  Excuse me?

 9              MR. BERLIN:  If I make a motion it's not going to

10     get ruled on the motion.

11              THE COURT:  I'll rule on it -- well if I rule on

12     it before and there's no need for a trial then there won't

13     be a trial.

14              MR. BERLIN:  So --

15              THE COURT:  I wouldn't bet on that one.

16              MR. BERLIN:  -- I can make another motion.

17              THE COURT:  Again, you're free to make any motions

18     you want.

19              MR. BERLIN:  Because many, many case laws that

20     I've seen --

21              THE COURT:  Sir --

22              MR. BERLIN:  -- I have other opinion I

23     (indiscernible) for the Court.

24              THE COURT:  Well you won this motion, so we're --

25     I guess you're 50/50, you won one and lost one.
```

```
 1              MR. BERLIN:  I'll just make an amendment of my

 2   memorandum?

 3              THE COURT:  Excuse me?

 4              MR. BERLIN:  I want to make an amendment of my

 5   memorandum of the case law supporting my --

 6              THE COURT:  Fine.  Fine.

 7              MR. BERLIN:  And some -- clarify some more

 8   facts that --

 9              THE COURT:  I'm quite sure I understand why

10   because you defeated his motion for summary judgment, so

11   what are you fighting about?

12              MR. BERLIN:  What?

13              THE COURT:  You realize I denied his motion for

14   summary judgment, so what are we still -- what are you still

15   arguing about?

16              MR. BERLIN:  Because --

17              THE COURT:  You want me to grant you summary

18   judgment.

19              MR. BERLIN:  Yes.  Yes, for sure.  Absolutely.

20              THE COURT:  Okay.

21              MR. BERLIN:  Absolutely.

22              THE COURT:  That's fine.

23              MR. BERLIN:  And if I need more proof or more

24   support I'm going to do it.

25              THE COURT:  That's okay with me.
```

Appendix  A - 66

1              MR. BERLIN:  Okay.

2              THE COURT:  Any motions you want.

3              MR. BERLIN:  Okay.

4              THE COURT:  All right?

5              MR. MCAULIFFE:  Thank you, Your Honor.

6              THE COURT:  All right.  Look, this gets caught up

7    any place where either side -- sir, where either side is

8    being unduly difficult I want you to contact chambers.

9              MR. MCAULIFFE:  Yes, sir.

10             THE COURT:  All right?  Stalling -- never mind.

11             We'll see you -- we'll carry -- well there's

12   nothing to carry.  I'm going to deny both motions for

13   summary judgment.  Is there anything else on?

14             MR. MCAULIFFE:  There was just the follow-up

15   pretrial of the adversary.

16             THE COURT:  No, that -- I've resolved that.

17   You'll get within two weeks a final pretrial order, and if

18   either side doesn't cooperate then the other side submit it.

19   All right?

20             MR. MCAULIFFE:  Thank you, Judge.

21             THE COURT:  Have a good day.

22        (Whereupon these proceedings were concluded at 10:16

23   AM)

24

25

Appendix  A - 67

```
 1                    C E R T I F I C A T I O N

 2

 3       I, Dawn South, certify that the foregoing transcript is a

 4       true and accurate record of the proceedings.

 5

 6       Dawn South

 7       _____

 8       Dawn South

 9       AAERT Certified Electronic Transcriber CET**D-408

10

11

12

13       Date:  March 16, 2015

14

15

16

17

18

19

20

21

22       Veritext Legal Solutions

23       330 Old Country Road

24       Suite 300

25       Mineola, NY 11501
```

Elliot Zaretsky
2 Bay Club Drive, Apt. 3Z3
Bayside, N.Y.  11360

Offices of Michael G. McAuliffe, Esq.
68 South Service Road, Suite 100
Melville, New York 11747

Attn:    Attorney Michael G. McAuliffe

         Re:    Zaretsky v. Berlin
                Adv. Pro. No.: 12-08371 –reg

Please refrain from proceeding on Tuesday, November 5, 2013 in the chambers of Judge Grossman.

Thank you.

Sincerely,

Elliot Zaretsky

Elliot Zaretsky
2 Bay Club Drive, Apt. 323
Bayside, N.Y. 11360

Chambers of the Honorable Robert E. Grossman
United States Bankruptcy Court
290 Federal Plaza
Central Islip, N.Y. 11722-9013

Re:   Zaretsky v. Berlin
      Adv. Pro. No.: 12-08371 –reg

Dear Judge Grossman

My name is Elliot Zaretsky. I will be appearing in court on Tuesday, November 5, 2013, on a pro say basis. This case has been going on over four (4) years now and I hope and pray that we can resolve this in your courtroom on that date.

Thank you for your kind attention to this matter.

Respectfully,

Elliot Zaretsky

# Law Offices of Michael G. Mc Auliffe, Esq.

68 South Service Road, Suite 100
Melville, New York 11747
Telephone (631) 465-0044
Facsimile (631) 465-0045
mgmlaw@optonline.net

October 16, 2013

**Via Email and Regular Mail**

Elliot & Shirley Zaretsky
2 Bay Club Drive
Apt. 3Z3
Bayside, New York 11360

Harold Zaretsky
66 Phipps Lane
Plainview, NY 11753

Maxi-Aids, Inc.
42 Executive Drive
Farmingdale, NY 11735
Attn.: Elliot Zaretsky

Re:   **Zaretsky et al v. Berlin**
      **United States Bankruptcy Court**
      **Adv. Pro. No.: 812-8371-reg**

Dear Elliot, Shirley & Harold:

I am writing this letter as a follow up to my recent telephone calls, emails and letters regarding the above matter. As you know, my Firm has provided you with invoices related to the legal services rendered in connection with the adversary proceeding which reflect a significant past due balance from July. Elliot has expressed that he was not happy with the amount of the legal fees reflected on the invoices and has objected to remitting payment. Elliot has also advised that he is not satisfied with the legal services rendered to date. Unfortunately, notwithstanding our subsequent communications, we have been unable to reach an amicable resolution.

I acknowledge receipt of your letter to my attention wherein you directed me to refrain from performing any additional legal services on this matter. Additionally, I am in receipt of a copy of your letter apparently sent to Judge Grossman stating that you intend to proceed pro se at the trial scheduled for November 5, 2013 at 10:00 a.m. I have advised you that individuals may elect to proceed as their own counsel but a corporate entity such as Maxi-Aids, Inc. must have legal counsel.

Appendix   A - 71

Zaretsky,
October 16, 2013
page 2

As I notified you in my email from Friday October 11, 2013, given the present circumstances outlined above, I shall be filing an application to be relieved as counsel to the Plaintiffs in the above adversary proceeding. I also want to confirm that I have <u>again</u> furnished you with all of the papers previously submitted in this action. I have also provided you with a copy of the Final Pretrial Order and have explained to you that the Parties have been directed to submit a joint Pretrial Memorandum to Judge Grossman no later than October 29, 2013. A draft of the Joint Pretrial Memorandum should be provided to Mr. Berlin for his input no later than October 22, 2013. The Joint Pretrial Memorandum must be timely filed and this deadline cannot be ignored.

Please let me know whether you have any questions or comments.

Very truly yours,

Michael G. Mc Auliffe

MGM/as

C:\Documents and Settings\Michael\Favorites\Letters\Zaretsky, Elliot - October 16, 2013.wpd

Appendix   A - 72

# Elliot Zaretsky
## 2 Bay Club Drive, Apt. 3Z3
## Bayside, N.Y.  11360

October 22, 2013

Chambers of the Honorable Robert E. Grossman
United States Bankruptcy Court
290 Federal Plaza
Central Islip, N.Y.  11722-9013

*12 - 8371*

      Re:    Zaretsky v. Berlin
              Adv. Pro. No.: 12-74600 –REG

Dear Judge Grossman

    I, Elliot Zaretsky, my wife,  Shirley Zaretsky,  my son, Harold Zaretsky, and Maxi Aids, Inc., have
no objection to relieve attorney Michael G. McAuliffe in bankruptcy court in front of Honorable Judge
Grossman.

    Elliot Zaretsky will proceed with the case on November 5, 2013 prosay.

Respectfully

Elliot Zaretsky

Appendix  A - 73

```
 1   UNITED STATES BANKRUPTCY COURT

 2   EASTERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - - - - - - - - - x

 4   In the Matter of:

 5

 6   AHRON BERLIN,                    Case No. 12-74600-reg

 7

 8             Debtor.

 9

10   - - - - - - - - - - - - - - - - - - - - - - - - - x

11   ZARETSKY, ET AL.,

12                 Plaintiffs,

13          v.                       Adv. Case No. 12-08371-reg

14   BERLIN,

15                 Defendant.

16   - - - - - - - - - - - - - - - - - - - - - - - - - x

17

18                 U.S. Bankruptcy Court

19                 Long Island Federal Courthouse

20                 Central Islip, New York

21

22                 October 28, 2013

23                 10:25 AM

24

25
```

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  Matter number 21, Zaretsky versus
 3   Berlin.
 4          THE COURT:  All right.
 5          MR. MCAULIFFE:  Good morning, Your Honor, Michael
 6   McAuliffe in support of my application to be relieved as
 7   counsel in this adversary proceeding.
 8          MR. HEWITT:  Your Honor, my name is Robert Hewitt
 9   from Miranda Sambursky Slone Sklarin Verveniotis.  We -- if
10   you grant counsel's application we will be taking over the
11   prosecution of this matter for the plaintiffs.
12          THE COURT:  This thing is on for trial next week.
13          MR. HEWITT:  I know, Your Honor.
14          THE COURT:  Don't even ask.  But -- you can ask
15   but I'm going to deny it, so know if you come in you're
16   trying this on November 5th.
17          MR. HEWITT:  Okay, Your Honor.
18          Well, I will make the application for the
19   adjournment --
20          THE COURT:  That's fine, but I'm just telling you
21   up front so you understand.  I've told these guys this for
22   months because I normally expect counsel -- different
23   counsel to come in on the eve of trial and then I'm told I
24   need another two months.  I make very clear in these cases
25   that's not happening.
```

Appendix  A - 75

1          So you're welcome to join, you know, depending on

2     what I do with Mr. McAuliffe, but this case is going to be

3     tried on November 5th.

4          MR. HEWITT:  Okay.  I would like to make my

5     application for the record.

6          THE COURT:  That's fine, let you do whatever you

7     want to do.

8          MR. HEWITT:  I understand --

9          THE COURT:  But you know what the answer will be.

10         MR. HEWITT:  Okay.  Your Honor, from my review of

11    the docket sheet I believe this is the first time it's on

12    for trial.

13         THE COURT:  Okay.  Is that -- by now you've made

14    an appearance.  Just tell me who you are, don't -- just

15    name.  Name and serial number.

16         MR. BERLIN:  Ahron Berlin.

17         THE COURT:  You're the defendant.

18         MR. BERLIN:  I'm the defendant.

19         THE COURT:  Okay.  Sit.  Your motion.

20         MR. MCAULIFFE:  Your Honor, as noted in my

21    application there's been a breakdown with respect to my

22    relationship with the plaintiffs in this adversary

23    proceeding.

24         THE COURT:  From what I understand they don't want

25    you to represent them.

Appendix  A - 76

1         MR. MCAULIFFE:  That is correct, Judge.

2         THE COURT:  Now is this -- were you representing

3    Harold, Elliot, and the company?

4         MR. MCAULIFFE:  Correct, Judge, four plaintiffs.

5    It's Elliot Zaretsky, Shirley Zaretsky --

6         THE COURT:  Oh, Shirley Zaretsky.

7         MR. MCAULIFFE:  -- Harold Zaretsky, and Maxi-

8    Aides.

9         THE COURT:  And none of them want you.

10        MR. MCAULIFFE:  Apparently not, Judge.

11        THE COURT:  Okay.

12        MR. MCAULIFFE:  I believe our application is well

13   supported by the facts.

14        I also am aware that Mr. Eliot Zaretsky had

15   apparently sent a letter to chambers confirming that he had

16   no opposition, that initially saying he wanted to appear pro

17   se.  I received a call from counsel late last week and we've

18   been speaking since then.

19        THE COURT:  Yeah, I don't understand the

20   complication here.  I've got a lawyer who wants to withdraw

21   and his clients who are not the debtor want him to withdraw,

22   don't want to have him anymore.  So, I'm not sure I

23   understand what this is all about.

24        Why wouldn't I let your -- why wouldn't I -- why

25   am I not going to let him withdraw, Mr. Berlin, he's not

1    your lawyer, what do you care?

2         MR. BERLIN:  Yes.  First of all he supported his

3    application based that they're going to be pro se --

4         THE COURT:  Right.

5         MR. BERLIN:  -- that Elliot Zaretsky -- one of the

6    reasons -- one of the support of the two lawyers --

7         THE COURT:  As are you.  As are you.  You are pro

8    se.

9         MR. BERLIN:  Yes, so you can see now that this is

10   not the case.

11        THE COURT:  What's not the case?

12        MR. BERLIN:  I think that I -- you can see that he

13   just wanted to switch lawyers and he lied to the Court that

14   he wants to be pro se.  The application speaks constantly

15   that because Elliot Zaretsky wants to be representing

16   himself, which is not true.

17        THE COURT:  No, no, tell me why a litigant

18   shouldn't have the right to tell a lawyer I don't want you

19   representing me?  Where is it written in the law or the

20   constitution or anything that I can force you to have a

21   lawyer that you don't want?

22        MR. BERLIN:  If it happens a few days before trial

23   and you had enough reasons and time to know it before, so

24   this is enough --

25        THE COURT:  If it doesn't slow down the trial,

1    sir, why do I care if it's on the eve of trial?  And it's

2    not going to slow down the trial.

3            I understand your position.  If they were to stand

4    up, which they will, and say we now need time, which I will

5    deny, then you would be prejudiced, but you're not being

6    prejudiced.

7            So your objection is well taken if they were going

8    to get an adjournment because you would argue -- you have

9    argued you're being prejudiced then.  They're not getting an

10   adjournment.  So since they're not going to get the

11   adjournment either the Zaretsky's will represent themselves.

12   Now the company can't represent itself so it's got a

13   problem, but the rest of them have a right to represent

14   themselves.  Fine with me.

15           I'm not adjourning the trial.  So you'll have --

16   you'll be pro se, they'll be pro se.  It's my fondest wish

17   to have all pro ses in a trial.

18           MR. BERLIN:  I was expecting to prepare my

19   defense --

20           THE COURT:  Go ahead.

21           MR. BERLIN:  -- one way and now it's all of a

22   sudden --

23           THE COURT:  Why is your defense different if

24   they're represented by a lawyer or if they're pro se?

25           MR. BERLIN:  Because I have enough -- I should

1    have time to make my pretrial —— joint trial memorandum

2    together I'll decide the way it's supposed to be and they

3    interfere with this.

4         THE COURT:  They're not interfering with anything,

5    they're pro se, they're willing to do everything you are

6    willing to do.  You're pro se.  Their pro se is just as good

7    as your pro se.

8         MR. BERLIN:  I am pro se (indiscernible) pro se,

9    they became pro se just to commit another ——

10        THE COURT:  Well you're lucky.

11        MR. BERLIN:  —— pleading in the court.

12        THE COURT:  In theory you should be lucky unless

13   you think Mr. McAuliffe would be worse than pro se.  They're

14   now not represented by a lawyer.

15        MR. BERLIN:  I have enough reason to believe that

16   it's going to be worse than Mr. McAuliffe.  I ——

17        THE COURT:  Well then that's an advantage to you.

18   Then that's an advantage for you.

19        MR. BERLIN:  Okay.  If the Court understands that

20   this —— they have right to do it, this is a normal,

21   reasonable, they —— they are allowed to act, no problem.

22        THE COURT:  Okay.  I got it.  Thank you.

23        MR. BERLIN:  So what's the —— what is the action

24   —— what's going to be happening now?

25        THE COURT:  Well why don't you sit down and then

1    I'll make a decision.

2              MR. BERLIN:  Okay.

3              THE COURT:  Counsel?

4              MR. HEWITT:  Your Honor, I'm going to make an

5    application for adjournment on behalf of the plaintiffs.  I

6    don't mean any disrespect --

7              THE COURT:  No, no, please, go ahead.

8              MR. HEWITT:  -- and I realize you've already

9    said --

10             THE COURT:  There's always somebody losing, so

11   it's not -- don't take it personally.

12             MR. HEWITT:  Sure.  I was -- we were contacted

13   late last week by Elliot Zaretsky of his interest in us

14   taking over this case.  I contacted, as soon as I could,

15   Mr. McAuliffe on Thursday.  Friday I believe I contacted him

16   again.  I'm trying to get up to speed on this case, there's

17   a lot of documentation.

18             THE COURT:  You have to understand, the history of

19   this feud between these parties, which is both business and

20   very personal, goes back years through state court, maybe

21   even the federal court, I don't know, there have been up and

22   down, there are multiple parties involved, we have attempted

23   over time to see if they can reach some agreements, they're

24   not going to, and this trial will not even be the end of

25   this.

Appendix  A - 81

1          So early on, I think before Mr. McAuliffe even, I

2     made it very clear, and then when Mr. McAuliffe came in I

3     made it very clear, we have dates, we're sticking to them,

4     because regardless of what date we select on the eve of that

5     something else will happen, and you would not be the last

6     person in this.  So the best way to do it is to be done with

7     it.

8          Mr. Berlin is pro se, your clients will either be

9     represented by you or they won't, they'll do it pro se.  Now

10    they have to be advised that the company cannot obviously

11    represent itself, and since all four apparently have told

12    Mr. McAuliffe they want to get rid of him -- that's a

13    terrible way to put it -- they don't want him representing

14    them you may select one entity to represent, you may select

15    none, that's completely up to you.

16         But since I don't have any motion nor do I have to

17    approve anything, there's nothing in front of me now,

18    there's nothing substituting counsel or there's no document.

19    I understand what you're saying.

20         I'm going grant Mr. McAuliffe's relief because his

21    clients don't want him to represent him.  That's simple for

22    me.  I don't -- Mr. Berlin is not being prejudiced.  It's

23    not like another lawyer now on the eve of trial is going to

24    come in and we have to -- he would have to prepare his case

25    differently, quote/unquote, everything stays the same.  So

1    we're going try this case November 5th.

2              MR. HEWITT:  Your Honor, is there any way we can

3    even get a short adjournment?  We have not even -- I'm

4    picking up the file literally from him -- from his car

5    today.

6              THE COURT:  Read quickly.

7              MR. HEWITT:  There's a joint pretrial

8    memorandum --

9              THE COURT:  You've got a pro se defendant, okay,

10   in this case.

11             MR. HEWITT:  I understand.  The attorney --

12             THE COURT:  The answer is no.  The answer is no.

13   There's no adjournment, zero, none.

14             MR. HEWITT:  The attorney who's going to try the

15   case is not available November 5th unfortunately.

16             THE COURT:  Well then maybe you should have

17   considered that before you decided to take the case.  I mean

18   it seems odd you would have agreed to take the case if the

19   lawyer who's supposed to try it is unavailable on the date

20   of trial.

21             MR. HEWITT:  We were trying to figure out -- we --

22   I had hoped that we would be able to get the adjournment

23   since it was the first time the trial was on, and I had not

24   yet spoken to Mr. Berlin so I did not know his feelings at

25   the time about the matter.  Unfortunately, Michael Miranda,

1    who would be trying the case, has got a conciliation

2    agreement with the USC that he has to --

3              THE COURT:  I wish him all the luck in the world.

4    It's not my problem.

5              MR. HEWITT:  The trial briefs are due tomorrow.

6              THE COURT:  It's not my problem.  We're done.

7              MR. HEWITT:  All right.  I understand.

8              THE COURT:  So, I'm going to grant Mr. McAuliffe's

9    release.

10             Mr. Berlin, get in touch with the Zaretskys, their

11   apparently pro se now.  We have a trial starting

12   November 5th.  The documents pretrial are due.

13   Mr. McAuliffe, make sure your clients before you exit this

14   get in touch with Mr. Berlin, and you got a bunch of pro

15   ses --

16             MR. MCAULIFFE:  I will, sir.

17             THE COURT:  -- representing each other.

18             MR. MCAULIFFE:  Yes, sir.

19             THE COURT:  Now if counsel shows up at that trial

20   that's okay with me, you can represent him, but you're going

21   to represent them on November 5th if they substitute in.

22   Everybody has a right to counsel of their choice.

23             Mr. Berlin, do you understand what happened?  That

24   requires a yes or no.

25             MR. BERLIN:  Not exactly.

1               THE COURT:  Excuse me?

2               MR. BERLIN:  No.

3               THE COURT:  Okay.  Thank you all.  See you on the

4    5th.

5               MR. MCAULIFFE:  Thank you, Your Honor.

6               MR. HEWITT:  Thank you, Your Honor.

7          (Whereupon these proceedings were concluded at 10:37

8    AM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T I O N

2

3       I, Dawn South, certify that the foregoing transcript is a

4       true and accurate record of the proceedings.

5

6       Dawn South

7       _____

8       Dawn South
        AAERT Certified Electronic Transcriber CET**D-408
9

10

11

12

13

14

15      Date:   June 24, 2015

16

17

18

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501
```

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In Re:

                                Case No. 12-74600-reg

AHRON BERLIN

                Debtor.
--------------------------------------------------------------x  **NOTICE OF APPEARANCE**
ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY AND MAXI-AIDES, INC.

                    Plaintiffs,     Adv. Pro. No. 812-08371-reg

     -against-

AHRON BERLIN,

                  Defendant.
--------------------------------------------------------------x

     **PLEASE TAKE NOTICE** that Michael A. Miranda, a member of the firm of

MIRANDA SAMBURSKY SLONE SKLARIN VERVENIOTIS LLP, attorneys for the

plaintiffs, hereby appears on behalf of the plaintiffs in the above-entitled action.

     This appearance does not constitute a waiver of jurisdictional defenses by the defendants.

Dated: Mineola, New York
      October 28, 2013

                              MIRANDA SAMBURSKY SLONE
                              SKLARIN VERVENIOTIS LLP
                              Attorneys for Plaintiffs

                              Michael A. Miranda (MAM- 6413)
                              240 Mineola Boulevard
                              The Esposito Building
                              Mineola, New York 11501
                              (516) 741-7676
                              Our File No.: 13-544

TO:    all counsel of record - via ECF Filing

Appendix   A - 87

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | |
| | : | **CASE NO.:  812-74600-reg** |
| **AHRON BERLIN** | : | |
| | : | |
| | : | |
| ─────────────────────x | | |
| **ELLIOT ZARETSKY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| -against- | : | |
| | : | **Adv. Pro. No. 812-8371-reg** |
| **AHRON BERLIN** | : | |
| | : | |
| | : | |
| ─────────────────────x | | |

## JOINT PRE-TRIAL MEMORANDUM

1.    Names, addresses and telephone numbers of all witnesses

       Plaintiffs expect to present:

       Eliot Zaretsky, 42 Executive Blvd, Farmingdale NY 11735, 631-752-0521
       Harold Zaretsky, 42 Executive Blvd, Farmingdale NY 11735, 631-752-0521
       Shirley Zaretsky, 42 Executive Blvd, Farmingdale NY 11735, 631-752-0521
       Ahron Berlin, 1909 New York Avenue, Brooklyn, NY, 917-803-4155
       Feige Zaretsky

       Plaintiffs may call:

       Larry DiBlasi, 42 Executive Blvd, Farmingdale NY 11735
       Angela Giglio, 42 Executive Blvd, Farmingdale NY 11735, 631-752-0521
       Michael Solomon, 2950 Hempstead Turnpike, Levittown, NY 11756, 516-579-6200
       Edward Gottlieb, 9 Ivy Street, Farmingdale, NY 11735

       Defendants expect to call:

       Defendant Ahron Berlin

2.    List of witnesses whose testimony is expected to be presented by means of a
       deposition.

Appendix   A - 88

<u>Plaintiff</u>s:

None though Plaintiff intends to use the deposition transcript of Ahron Berlin dated March 20, 2013, as necessary for impeachment.

<u>Defendants:</u>

None stated.

3.      **A list of expert witnesses**

<u>Plaintiffs:</u>

None.

<u>Defendants:</u>

None stated.

4.      **(i) list of all exhibits stipulated to be admissible; (ii) plaintiff's proposed additional exhibits; (iii) defendant's proposed additional exhibits.**

(i)

<u>**Plaintiffs' Exhibits Stipulated to be Admissible To Which Defendant Did Not Object to their Admissibility**</u>

1.  Plaintiffs' Complaint in the case <u>Zaretsky v. Berlin, et al</u>, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 1)

2.  Plaintiff's Summary judgment motion in the case <u>Zaretsky v. Berlin, et al</u>, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 2)

3.  Decision of Judge Feinman dated January 8, 2009 and entered January 14, 2009, in the case <u>Zaretsky v. Berlin, et al</u>, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 3)

4.  Notice of Entry of Order dated  February 4, 2009 in the case <u>Zaretsky v. Berlin, et al</u>, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 4)

5.  Transcript of inquest held by Special Referee Lawrence M. Schaffer on May 7, 2009; (Pl 5)

6.  Referee's report dated October 28, 2009; (Pl 6)

Appendix  A - 89

7.  Judge Feinman's decision dated November 2, 2009 and entered November 9, 2009 in the case Zaretsky v. Berlin, et al, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 7)

8.  Judgment dated December 1, 2009 in the case Zaretsky v. Berlin, et al, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 8)

9.  Judge Feinman's decision dated April 20, 2010 and entered May 5, 2010 in the case Zaretsky v. Berlin, et al, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 9)

10.  Judge Feinman's decision dated July 27, 2010 and entered July 30, 2010 in the case Zaretsky v. Berlin, et al, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 10)

11.  Judge McCarty's decision dated September 13, 2010 and entered September 16, 2010 in the case Zaretsky v. Berlin, et al, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 11)

12.  Judge Jaeger's decision dated August 25, 2011 and entered August 29, 2011 in the case Zaretsky v. Berlin, et al, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 12)

13.  Judge Jaeger's decision dated December 22, 2011 and entered December 27, 2011 in the case Zaretsky v. Berlin, et al, Index No. 17869/08, Supreme Court State of New York, County of Nassau; (Pl 13)

14.  E-mail dated September 5, 2008 at 12:42 p.m. from asuper100@hotmail.com to bulkbuys@maxiaids.com; (Pl 14)

15.  E-mail dated September 5, 2008 at 1:33 pm from asuper100@hotmail.com to bulkbuys@maxiaids.com; (Pl 15)

16.  E-mail dated September 5, 2008 at 6:06 pm from asuper100@hotmail.com to bulkbuys@maxiaids.com; (Pl 16)

17.  E-mail dated September 6, 2008 at 11:51 p.m. from babyface2007@tmail.com to rsbroth@aol.com containing e-mail from poppy55@aol.com to jsimonreferee@aol.com dated September 3, 2008 at 11:04 p.m.; (Pl 17)

18.  E-mail dated September 9, 2008 at 10:45 a.m. from asuper100@hotmail.com to bulkbuys @maxiaids.com; (Pl 18)

19.  E-mail dated September 9, 2008 at 10:51 a.m. from asuper100@hotmail.com to bulkbuys@maxiaids.com; (Pl 19)

Appendix  A - 90

20. E-mail dated September 14, 2008 at 11:50 a.m. from blind_people@gmail.com to websales@maxiaids.com; (Pl 20)

21. Plaintiff's Request for Admissions dated January 17, 2013; (Pl 21)

22. Defendant's Answer to Request for Admissions dated February 5, 2013; (Pl 22)

23. Transcript of the deposition of Ahron Berlin dated March 20, 2013; (Pl 23)

24. Plaintiff Maxi Aid's income records 2006-2010; (Pl 25)

25. File including letters from customers. (Pl 26)

**Defendant's Exhibits Stipulated to be Admissible (though Plaintiffs dispute the characterizations provided by Defendant)**

Exhibit "A" is the "Emergency Request for Added Time" (which is the first response to plaintiffs/ creditors complaint asking for time ____ titled "Emergency Request for Added Time")in the action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No. 17869/2008;

Exhibit "B" is the copy of the "Motion for summary judgment" returnable December 5,   with all affidavits by plaintiffs in the action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No. 17869/2008;

Exhibit "C" is the opposition papers WITH RECIEPT to the plaintiffs' "Motion for summary judgment"  in the action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No. 17869/2008;

Exhibit "D" is Michael Solomon's Letter Dated December 12, 2008 (to the trial judge) rejecting defendants papers in opposition to the "Motion for summary judgment" for being untimely in the action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No. 17869/2008;

Exhibit "E" is the order of Judge Feinman dated January 9, 2009 with its notice of entry in the order Judge Feinman is granting summary judgment against debtor/defendant as unopposed motion in the

Appendix  A - 91

action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No. 17869/2008 PAGE 2 of 2 PAGES

Exhibit "F" is the  Copy of the order issued by Judge Thomas Feinman on November 2, 2009 in the action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No.17869/2008

Exhibit "G" is the  Copy of the first recusal order of Judge Feinman issued by Judge  Thomas Feinman dated August 9,  2010  in the action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No.17869/2008

Exhibit "H" is the  Copy of the second recusal order of Judge Feinman  issued by judge Thomas Feinman on September 3, 2010 in the action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No.17869/2008

(iii)

**Defendant's proposed additional exhibits (and characterizations of same) to which Plaintiffs' Object to the Admissibility**

Exhibit "I" is the Court record, of the arrest of Elliot Zaretsky in that record Elliot Zaretsky  asserted that he would not let  money go to Feige  Zaretsky  for child support etc. record of  IDV court State Supreme Court, County of Nassau

Exhibit "J" is the AFFIRMATION OF DAVID WACHOLDER in the action in the New York State Supreme Court, County of Nassau, entitled Elliot Zaretsky, Harold Zaretsky. Shirley Zaretsky and Maxi-Aids. Inc. v. Aaron Berlin and Feige Zaretsky, bearing Index No.17869/2008

5.    **Objections to admissibility of deposition transcript**

Plaintiffs are unaware of any deposition transcript defendant wishes to use but objects to the extent defendant seeks to use a deposition transcript rather than produce a live witness.

Defendant provided no objection.

5

6.     **Statement confirming the parties have exchanged copies of the exhibits**

All of Plaintiffs' exhibits were attached to the Complaint; the motion for summary judgment; Defendants; opposition to summary judgment; or were produced by Plaintiffs or defendant as part of discovery, and therefore should be in defendant's possession.

Defendant has not exchanged its proposed Exhibit I with Plaintiffs.

7.     **Facts which are admitted and which require no proof**

Defendant would only admit to the following:

Elliot Zaretsky and Shirley Zaretsky are married and are the parents of Harold Zaretsky. The defendant is the father of Feige Zaretsky, who was married and subsequently divorced from Harold Zaretsky.

8.     **The issues of fact which remain to be litigate**

Defendant refuses to admit the following facts which Plaintiffs believe should be admitted and should require no proof:

Plaintiffs commenced an action entitled Zaretsky v. Berlin, et al, Index No. 17869/08, Supreme Court State of New York, County of Nassau, which action sought redress for the substantial harm suffered by the Plaintiffs as a result of various e-mails alleged to have been sent by Defendant and Feige Zaretsky to various third-parties. The e-mails contained statements that it was alleged in the Complaint Defendant and Feige Zaretsky knew to be false about each of the Plaintiffs, which were alleged to have been made with the malicious and willful intent to defame, injure, and disparage the Plaintiffs and their reputations.

By Order dated January 9, 2009, and entered on January 14, 2009, the Court in that action granted the Plaintiffs' motion for summary judgment on all causes of action in their Complaint, without opposition from defendant or Feige Zaretsky. Thereafter, a hearing on damages was conducted before Lawrence M. Schaffer, Special Referee, on May 7, 2009 and a report was issued October 29, 2009. On November 2, 2009, the Court in that action issued an order which incorporated the report of the Special Referee and found that each of the Plaintiffs proved they had been damaged by the libelous statements of the Defendant and his daughter as follows: (a) Elliot in the sum of $380,000; (b) Harold in the sum of $380,000; (c) Shirley in the sum of $150,000; and (d) Maxi-Aids in the sum of $380,000.

On July 27, 2010, that court issued an order entered on July 30, 2010 which denied the Defendant's motion to vacate the default. On September 12, 2010, the Court entered an order which denied the Defendant's order to show cause to vacate his default. The Plaintiffs sought and obtained several Orders in the Defamation Court holding the Defendant in contempt for failing to comply with subpoenas and other post-judgment

6

Appendix   A - 93

enforcement demands, and assessing monetary fines against the Defendant. On December 22, 2011, the Court issued an order denying another attempt by Defendant to vacate the decision and judgment, and prohibiting the Defendant from filing any proceedings involving the matter without prior approval of the Court.

Plaintiffs assert that the factual allegations contained in the complaint in the underlying action, and in this adversary proceeding, are true. This includes that Defendant and his daughter sent the defamatory e-mails; that the e-mails were sent intentionally and without just cause; that the Defendant and his daughter intended to cause injury to Plaintiffs and did in fact cause injury; and acted willfully and maliciously to cause injury.

9.   **The issues of law to be determined**

   Plaintiffs assert that the issues of law include the following:

   Whether the $1.2 million in judgments from the defamation action are nondischargeable due to the fact they constitute willful and malicious injury under 11 U.S.C. §523(a)(6) based on the defamatory e-mails sent by Defendant and his daughter.

   Whether the decision granting summary judgment and subsequent inquest and judgment entered in the underlying defamation action are subject to res judicata and collateral estoppel before this Court for purposes of 11 U.S.C. §523(a)(6).

   Defendant provided a six page document in response to this entitled Defendant's Pre-Trial Memorandum which will be submitted separately.

10.   **Brief Statement summarizing Plaintiffs' case**

   The Defendant's debts to the Plaintiffs are nondischargeable pursuant to 11 U.S.C. §523(a)(6), as such debts result from willful and malicious injury.

   The e-mails were sent intentionally by Defendant and constitute a (1) a wrongful act, (2) done intentionally, (3) which necessarily caused injury, and (4) is done without just cause or excuse The Plaintiffs assert that the judgments in the amount of $1.29 million is nondischargeable as it was a willful and malicious injury to Plaintiffs by Defendant, as demonstrated by the nature of the statements made in the e-mails, and the rulings in the underlying action.

   The state court has already determined that the defendant and his daughter Feige Zaretsky defamed Plaintiffs by the sending of various e-mails. The Judgment was set in the amount of $1.2 million jointly and severally against Defendant and his daughter, following an inquest. Defendant has tried repeatedly to challenge the decision and judgment in state court, without success, and cannot challenge the determination before this Court.

   Defamation is an intentional tort under New York law. Therefore, "willful" has been

7

established by the decision and judgment below. To the extent that this Court finds it is not bound by the underlying court as to the issue of willfulness, Plaintiffs will prove that Defendants intentionally sent the e-mails with the intent to injure Plaintiffs and constituted willful injury.

Furthermore, the Referee's Report in the underlying action found that the Defendant and his daughter had liability for publishing false, malicious, and defamatory statements. To the extent that this Court finds it is not bound by the underlying court as to the issue of willfulness, Plaintiffs will prove that Defendants maliciously injured Plaintiffs, without just cause.

**Brief Statement summarizing Defendant's case:**

Defendant provided a six page document entitled Defendant's Pre-Trial Memorandum in response to this which will be submitted separately.

Dated: Mineola, New York
      October 29, 2013

              **MIRANDA SAMBURSKY SLONE**
              **SKLARIN VERVENIOTIS LLP**
              Attorneys for the Plaintiffs
              240 Mineola Boulevard
              Mineola, New York 11501
              (516) 741-7676

      By:_____
              Michael A. Miranda (MAM-6413)
              Robert Hewitt (RH 1548)

8

1             UNITED STATES BANKRUPTCY COURT

2              EASTERN DISTRICT OF NEW YORK

3   IN RE:                    )

4   Ahron Berlin,          )    Bankruptcy #12-74600 (REG)

5            Debtor.       )

6   _____)

7                      )

    Zaretsky, et al.,     )

8          Plaintiffs,    )    Adversary #12-08371 (REG)

9           vs.         )

10  Berlin,                 )

11          Defendant.     )

12  _____)

13  AMENDED TRANSCRIPT OF TRIAL ON SUMMONS AND NOTICE OF PRE-TRIAL

14                  CONFERENCE

      BEFORE THE HONORABLE ROBERT E. GROSSMAN

15      TUESDAY, NOVEMBER 5, 2013; 3:16 P.M.

           CENTRAL ISLIP, NEW YORK

16

17  FOR THE PLAINTIFF:

      Miranda Sambursky Slone

18     Sklarin Verveniotis, LLP

      By:  Robert Hewitt, Esq.

19     240 Mineola Blvd.-#1

      Mineola, NY 11501

20

    FOR THE DEFENDANT:

21     By:  Ahron Berlin, Pro se

      1901 New York Ave.

22     Brooklyn, NY 11210

23

24

25

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

Appendix A - 96

3

## Index

| Witnesses For The Plaintiff: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| Mr. E. Zaretsky | 15 | 74 | | | |
| Ms. F. Zaretsky | 83 | 93 | | | |

| EXHIBITS: | | | Marked | Received |
|---|---|---|---|---|
| P-1 | Complaint Filed In state Court | | 40 | 42 |
| P-2 | Motion For Summary Judgment | | 40 | 42 |
| P-3 | Not Identified | | 40 | 42 |
| P-4 | Not identified | | 40 | 42 |
| P-5 | Testimony Transcript | | 40 | 42 |
| P-6 | Referee's Hearing Report | | 40 | 42 |
| P-7 | Judge Feinman's Ruling | | 40 | 42 |
| P-8 | Not Identified | | 40 | 42 |
| P-9 | Not Identified | | 40 | 42 |
| P-10 | Not Identified | | 40 | 42 |
| P-11 | Not Identified | | 41 | 42 |
| P-12 | Not Identified | | 41 | 42 |
| P-13 | Not Identified | | 41 | 42 |
| P-14 | E-mail Sent To bulkbuys | | 41 | 42 |
| P-15 | E-mail Sent To bulkbuys | | 41 | 42 |
| P-16 | E-mail Sent To bulkbuys | | 41 | 42 |
| P-17 | E-mail Sent From poppy55 | | 41 | 42 |
| P-18 | E-mail Sent To bulkbuys | | 41 | 42 |
| P-19 | E-mail Sten To bulkbuys | | 41 | 43 |
| P-20 | E-mail Sent To websales | | 41 | 43 |
| P-21 | Not Identified | | 41 | 43 |
| P-22 | Not Identified | | 41 | 43 |
| P-23 | Not Identified | | 41 | 43 |
| P-24 | Not Identified | | 42 | 43 |
| P-25 | Not Identified | | 42 | 43 |
| | | | | |
| D-A | Complaint | | 47 | |
| D-B | Motion For Summary Judgment | | 108 | 108 |
| D-C | Not Identified | | 108 | 108 |
| D-I | Transcript | | 108 | 109 |
| D-J(b) | Affirmation of David Lockholder | | 109 | 109 |
| D-J(c) | Check | | 110 | 111 |
| D-J(g) | Affirmation By Nathan Galant | | 111 | |
| D-J(h) | Pleading | | 113 | 113 |
| D-J(j) | E-mail From David Lockholder | | 113 | 113 |
| D-J(d) | E-mail Lockholder to Berlin | | 114 | 114 |

Appendix  A - 97

4

**OPENING STATEMENTS:**

    **Mr. Hewitt**          8

**SUMMATIONS BY:**

    **Mr. Berlin**        98
    **Mr. Hewitt**    103

5

1              THE COURT:  Please be seated.

2              THE CLERK:  File on Zaretsky v. Berlin.

3              THE COURT:  All right, to start with, are there any

4     witnesses in the Courtroom?

5              MR. HEWITT:  Yes.

6              THE COURT:  Okay.  Do the lawyers want the witnesses

7     excluded, other than the one who will be on the stand, for any

8     reason?

9              MR. HEWITT:  I don't think it's necessary.

10             THE COURT:  Mr. Berlin?

11             MR. BERLIN:  Only he -- only he has a witness.

12             THE COURT:  He's the only guy with a witness.

13             MR. BERLIN:  No, he had the witness.  I don't have a

14    witness.

15             THE COURT:  You don't have any witnesses?

16             MR. BERLIN:  No.

17             THE COURT:  So then it doesn't matter.  But those

18    two people are not going to be witnesses?

19             MR. BERLIN:  No.

20             MR. HEWITT:  Feige, the daughter, I --

21             THE COURT:  She'll be one of your witnesses.

22             MR. HEWITT:  Will be one of my witnesses --

23             THE COURT:  And you --

24             MR. HEWITT:  -- plus my client.

25             THE COURT:  Okay.  Okay, let's start.

_____

6

1          MR. HEWITT:  Just so Your Honor knows, Feige is

2    deaf.

3          THE COURT:  Yes, we have an interpreter coming, but

4    since you put your other witness on first --

5          MR. HEWITT:  Sure.

6          THE COURT:  -- when that interpreter should be here

7    in plenty of time for Feige.  So I think what we do is we're

8    ready to start.  There's been a question.  I know, Mr. Berlin,

9    you filed an Order to Show Cause.

10          THE CLERK:  Excuse me, Judge, can I just get

11    appearances.

12          THE COURT:  Oh, I'm sorry, can we have appearances,

13    please.  Sorry.

14          MR. HEWITT:  Yes, this is Robert Hewitt from Miranda

15    Sambursky Slone Sklarin Verveniotis, on behalf of the

16    Plaintiffs.

17          THE COURT:  Mr. Berlin, you --

18          MR. BERLIN:  Berlin, Aaron Berlin, 1909 New York

19    Avenue, Brooklyn, New York 11217.

20          THE COURT:  And you're going to represent yourself?

21          MR. BERLIN:  Yes.

22          THE COURT:  Okay.  I'll give each of you an

23    opportunity, if you want, to make an opening statement.  I

24    don't think it's necessary, but if you want, you can, or you

25    can reserve and do it afterwards.

7

1          Mr. Berlin filed an order to show cause last week asking

2     the Court to limit the scope and nature of the proceeding to,

3     in his view, what was previously determined by the State

4     Court.  And I think Mr. Berlin's argument was since this Court

5     had told counsel and the parties that the extent of this

6     hearing is going to revolve around not the underlying aspects

7     of the State Court decision, but whether in fact the State

8     Court decision, which held Mr. Berlin liable for certain

9     amount of money, is dischargeable or non-dischargeable, this

10    Court felt that certain elements of 523 that have to be

11    established were not clearly established in the State Court

12    proceeding, and therefore I was not going to grant summary

13    judgment.  That does not mean that the only thing that can be

14    introduced here are the pleadings from the State Court.  That

15    would be counter-intuitive if I already decided it's

16    insufficient to render a decision.

17         So the aspect of what this trial is, is we know there's a

18    judgment that has been entered by the State Court against Mr.

19    Berlin.  We know the amount of it, and the argument is whether

20    or not that's dischargeable.  The only issue on that is not

21    whether that Judge rendered that judgment properly or

22    improperly; it is deemed to be a binding judgment on this

23    Court.  This Court is not going to look at any of the

24    underlying aspects of why that judgment was entered.  The only

25    thing this Court is interested in is whether or not it can be

---

Appendix  A - 101

Opening Statement - Mr. Hewitt          8

1   established that the elements necessary to find the 523 were

2   involved in that action.  That's it.

3       So what an attorney did or an attorney didn't do, what a

4   judge did or a judge didn't do is not what we're dealing with

5   here.  We're primarily dealing, I think to some degree within

6   this case, whether the Plaintiff can establish that Mr.

7   Berlin's actions in that underlying libel action were

8   intentional, malicious, the necessary terms to solve 523.  And

9   that's what the hearing is -- that's what this trial is about.

10  Did everybody get that?  This is a yes or no.  Do you

11  understand what I said?

12          MR. HEWITT:  Yes.

13          THE COURT:  Do you understand what I said?

14          MR. BERLIN:  Yes.

15          THE COURT:  Okay.  Now we're going to start.  So if

16  Plaintiff goes first, do you want to make any opening

17  statement, sir?

18          MR. HEWITT:  Yes, Your Honor, I'll make a statement.

19          THE COURT:  Okay, then you'll have an opportunity,

20  Mr. Berlin, if you want.

21          MR. HEWITT:  You want us to speak from the podium,

22  correct?

23          THE COURT:  Please.

24          MR. HEWITT:  Okay.  Your Honor, through the

25  testimony that we will elicit and the documents submitted into

9

1    evidence, we will be able to demonstrate that the defamation

2    debt owed by Defendant to the Plaintiffs collectively in the

3    amount of 1.2 million should be non-dischargeable, as it is

4    the result of a willful and malicious injury to Plaintiffs by

5    the Debtor Defendant, Aaron Berlin.

6         A wrongful act unintentionally which necessarily produces

7    harm, of which harm is intended, and which is wrongful and

8    without just cause or excuse, will constitute a willful and

9    malicious injury under the bankruptcy law.  The State Court

10   found, and this Court could and should find independently,

11   that the Defendant acted willfully and intending to cause

12   injury, and that he undertook an intentional act which

13   necessarily would produce harm, not just that he was reckless

14   or negligent in taking these defamatory actions.

15        In fact, recklessness or negligence was never even pled

16   in the underlying action, only intentional injury, such that

17   it was impossible that the Court below could grant the motion

18   and find defamation on a reckless or negligent basis, only

19   intentionally.

20        Further, by the nature of the actions, by the nature of

21   the emails, it should be obvious that the Defendant's actions

22   were wrongful and without just cause or excuse, both

23   explicitly and as can be implied by the facts and

24   circumstances.  Hence they were malicious.

25        As Your Honor has stated, we do not need to retry the

10

1   underlying action.  The Court below clearly found Berlin sent

2   the emails, that the emails were false, that they were

3   defamatory, that they were malicious, and that they did cause

4   harm.  The real focus then needs to be on whether or not these

5   defamatory emails, sent by Berlin, which caused injury, were

6   for a willful and malicious injury by the Debtor against the

7   Plaintiffs.

8       The State Court, through Judge Feinman, found in its

9   report, adopting the referee's report, that Elliot Zaretsky

10  sustained damages based on a libelous email sent by Defendant

11  Aaron Berlin, and based on various libelous emails sent by

12  Feige Zaretsky, Berlin's daughter.  The same was found as to

13  Harold Zaretsky, Shirley Zaretsky, and Maxi-Aids, that Aaron

14  Berlin sent these libelous emails and that they sustained

15  damages.

16      Therefore the State Court has determined that Berlin sent

17  libelous emails and these emails were defamatory, and that

18  damages were sustained as a result of those emails.  Those

19  findings, obviously, as Your Honor has acknowledged, must be

20  respected by this Court under the Rooker-Feldman Doctrine; it

21  cannot be disturbed.

22      Despite the Debtor's conspiracy theories about the

23  actions of other parties, what he can't get past is that the

24  nature of these emails, on their face, demonstrates them to be

25  willful and malicious.  The emails allege bribing judges;

Appendix  A - 104

11

1    bribing -- filing false documents with the IRS; perjuring;

2    that the Plaintiffs perjured themselves; that Harold Zaretsky

3    engaged in domestic violence; that this was encouraged by

4    Shirley Zaretsky; that she paid Harold to do this; that Elliot

5    Zaretsky threatened to kill Feige Zaretsky; that Maxi-Aids

6    stole from blind people; that Maxi-Aids diverted resources

7    from third world countries; that Maxi-Aids, despite it being a

8    business that helps the handicapped, was, in fact, hurting the

9    handicapped.

10        The emails themselves also make the following statements:

11    Do the hospitals and companies who deal with Maxi-Aids know?

12    Does the Government say the papers mean nothing?  Should the

13    Court reward?  Everybody hates Maxi.  If they hate the world,

14    let them; the world hates them back.  What about Harold's

15    creditors, do they know?  The statements in these emails were

16    clearly intended for an audience in order to hurt Maxi-Aids

17    and the Plaintiffs, their reputation among their employees,

18    their reputation among the deaf community and the handicapped

19    community, their reputation with the government, government

20    agencies that Maxi-Aids relies upon, the Courts, by the very

21    nature of these claims.  It's clear that the Defendant

22    intended to cause injury to Plaintiffs, including damages to

23    the Zaretskys' and Maxi-Aids' reputation, by sending the

24    emails.

25        Examination of all the claims and the emails would show

12

1    they necessarily would produce harm and were intended to

2    produce harm.  Elliot Zaretsky will testify to the fact that

3    as the marital relationship between his son, Harold, and the

4    Defendant's son -- daughter, Feige, deteriorated, that Berlin

5    made it his mission to basically destroy the Zaretskys'

6    reputation, and that these emails were part of that plan.

7        As I said, the emails, on their face, are malicious.

8    They accuse Harold and the Zaretskys of not supporting a

9    {quote}{unquote} "poor, deaf, starving mother and the three

10    children," despite Harold paying her $10,000 a month in

11    support, of forgeries and frauds in the tax returns in the

12    Family Court, and other things that just, on their face, are

13    malicious and intended to cause injury.

14        Thank you, Your Honor.

15            THE COURT:  Mr. Berlin?

16            MR. BERLIN:  I will take the opportunity -- I think

17    I'm going to take the opportunity a little later to this --

18    just to show -- to prove that the entire statement that

19    basically he read was just nonsense.

20            THE COURT:  Well, you'll have an opportunity to put

21    a case on and you can make the argument that you disagree with

22    counsel --

23            MR. BERLIN:  I disagree with the counsel.

24            THE COURT:  -- and I'll make the decision.

25            MR. BERLIN:  I disagree with him.

13

```
 1              THE COURT:  Okay.  I assume you do.  So --
 2              MR. BERLIN:  I'm going to do the opposition on -- by
 3    the stages from the time.  Do I have to give a statement?
 4              THE COURT:  You do not have to do anything.  You
 5    don't have to give any statement.  You have a right to put
 6    your case on.  When -- you can cross examine a witness.  You
 7    can then put your own case on, and after that you can make a
 8    final statement if you want.
 9              MR. BERLIN:  Okay, I think that's better.
10              THE COURT:  There's no need for you to do
11    anything --
12              MR. BERLIN:  Okay.
13              THE COURT:  -- at this point, okay?
14              MR. BERLIN:  Okay, thank you.
15              THE COURT:  All right.  Call your first witness,
16    sir.
17              MR. HEWITT:  Okay, I call Elliot Zaretsky.
18              THE COURT:  Mr. Berlin, please be seated.  The
19    interpreter we had -- we had an interpreter for your daughter.
20    The interpreter missed her train -- or his or her train, will
21    be here in about a half hour.  Since your daughter is not the
22    party to this, we can continue, but she will not be asked to
23    be a witness until the interpreter is here.  Please be seated,
24    ma'am.
25              ELLIOT ZARETSKY, PLAINTIFF'S WITNESS, SWORN
```

14

1           THE CLERK:  Please be seated.

2           THE COURT:  Sir --

3           THE CLERK:  State and spell your full name in the

4     microphone.

5           THE COURT:  Tell us your name.

6           MR. ZARETSKY:  My name is Elliot Zaretsky.

7           THE COURT:  Okay.

8           MR. HEWITT:  Just, for Your Honor --

9           THE CLERK:  Please spell that, sir.

10          MR. HEWITT:  Sorry.

11          MR. ZARETSKY:  Pardon?

12          MR. HEWITT:  Oh, she asked you to spell your name.

13          MR. ZARETSKY:  Oh, it's Z-A-R-E-T-S-K-Y.

14          MR. HEWITT:  Just for Your Honor's knowledge,

15    obviously my client is 82 years old, he's a little hard of

16    hearing, so I'd just ask a little indulgence.

17          Just for the record, one of the reasons we wanted the

18    interpreter, we originally planned to call Harold Zaretsky,

19    the son of Elliot Zaretsky.  I was informed when Elliot got

20    here today that Harold had had an asthma attack and he was

21    being hospitalized.  But Elliot decided he wanted to go

22    forward today in any event.  So just for the record.

23          THE COURT:  Well, we had the interpreter for Ms.

24    Feige Zaretsky as well.

25          MR. HEWITT:  Correct.

E. Zaretsky - Direct                    15

1          THE COURT:  If you intend to call her as a witness.

2     Okay.

3                    DIRECT EXAMINATION

4     BY MR. HEWITT:

5     Q     Hi, Elliot.  Can you tell me where you were born?

6     A     I was born in Poland.

7     Q     And what year were you born?

8     A     Pardon?

9     Q     What year were you born?

10    A     In 1931.

11    Q     And can you give me a little history of your childhood?

12    A     Well, I was born in Poland, and I didn't have much of a

13    childhood, because I was -- I wound up in concentration camp

14    when I was seven years old.  I was in three camps, camp

15    (inaudible) in (inaudible), Stulln, and (inaudible), but in

16    three camps.  I came -- to make it short, I escaped.  I was

17    (inaudible) in the (inaudible).

18         And the first thing that I had to do was I was sent to --

19    with my sister.  My sister survived also, escaped.  And the

20    first thing that I had to do was put dynamite under the

21    railroad tracks for the trains that were going to Stalingrad.

22    That's in Russia.  After that, I was for 2½ years in the

23    forest.  And then I came -- and I was liberated in 1945 and my

24    father find us -- found us.  It seems my father has escaped

25    also from concentration camp, and my sister.

Appendix  A - 109

E. Zaretsky – Direct                16

1      We wound up in DP camp in Germany.  It was a home for the
2   orphans.  I was supposed to go to Yisrael at that time, but my
3   father came around and he said please come with us; I want to
4   see my sister, and she is in the United States.  I went with
5   my father to go there for temporary time until December of
6   1948.  After that my father got a job in a butcher shop, and
7   what happened, he stabbed himself in the stomach.  So that
8   changed our whole complete plan to go to Yisrael.

9      So I started school, public school, and I was in school,
10   public school, about six months, and after that I graduated
11   from public school.  I went to a high school.  After three
12   years in high school, I graduated and at that time I was
13   working in a pharmacy.

14   Q    Okay.

15   A    So I --

16   Q    Oh, finish your sentence.

17   A    In a drug store.

18   Q    You can finish your sentence.

19   A    Pardon?

20   Q    You can finish the sentence that you were going to say.

21   A    Sure.  So I worked in the pharmacy, so I said to my
22   boss, what do I do now?  I finished high school, what am I
23   going to do now?  So he says why don't you go to pharmacy
24   school.  So he took me to St. John's University, and they
25   accepted me right away, and I started pharmacy.  I had to use

E. Zaretsky - Direct          17

1    a dictionary to study, because at that time I didn't know the

2    language too well.  And I graduated in four years.  I received

3    my BS degree in pharmacy, and I worked for a year after that.

4    Then I said to myself, if I can work for somebody else, I

5    could work for myself, too.  So I bought a pharmacy.

6        At that time I got married, and I borrowed $3,000 from my

7    mother-in-law, and from the $3,000 I built up a business from

8    $25 a day to $2,500 a day.  I sold the pharmacy -- well, in

9    between I opened four other pharmacies.

10   Q    Okay, I think that's enough --

11   A    Yeah.

12   Q    -- as background.  And you mentioned you got married.

13   Who did you marry?

14   A    I married Shirley.  She came to see me -- she came into

15   the pharmacy and she was buying a toothbrush.  So I sold the

16   toothbrush and I asked for her number.  She wouldn't give me

17   the number.  So next time, on a Thursday, I was calling a girl

18   from the telephone booth.  I don't know if you remember, they

19   had those boxes, you know.  And I see her coming in, so I

20   said, "This is your lucky day.  I'm calling a girl for a date,

21   but since you came into the store, would you like to go out

22   with me?"  So she said, "I don't know, call me."  So I called

23   her again, and we started off a relationship, and six months

24   later we got married.

25   Q    And what year did you get married?

E. Zaretsky - Direct                    18

1    A      In 1957.

2    Q      And are you still married to Shirley today?

3    A      I'm still married, 56 years, I'm married to the same

4    lady.  And we just celebrated -- off the record -- we just

5    celebrated her 75th birthday, and I made her the party.  So

6    they had a wonderful -- all 25 women were there.

7    Q      Okay, and Shirley Zaretsky, she's one of the Plaintiffs

8    in this action, correct?

9    A      Yes.

10   Q      Okay, and how many children did you have?

11   A      I have three children and eight grandchildren.

12   Q      Okay, and can you tell me your children's names?

13   A      The names of my children is Harold, who is the youngest,

14   Pamela, the middle one, and Mitchell is the oldest one.

15   Q      Okay, and Harold Zaretsky is one of the Plaintiffs in

16   this action as well, correct?

17   A      Harold Zaretsky is deaf, and he is one of the

18   Plaintiffs, yes.

19   Q      And do you know how old Harold is?

20   A      Sixty-three, so that's forty -- 47 years old.

21   Q      And do you know a company named Maxi-Aids?

22   A      Pardon?

23   Q      Do you know a company named Maxi-Aids?  Do you know the

24   company Maxi-Aids?

25   A      Yes, certainly.

E. Zaretsky - Direct                          19

1    Q      Okay, and how do you know the company?

2    A      Well, I established Maxi-Aids in 1986.  And I was at the

3    airport and a gentleman was walking around -- a deaf person

4    was walking around with couple pencils.  And my wife looks at

5    it and she says, "That's what's going to happen to our son."

6    I says, "No, it's not going to happen to our son," and "I'll

7    think of something."

8           Well, I came back from vacation, and since I was in the

9    pharmacy business, I decided -- and we had no product for the

10   deaf people at that time, I said to myself, let me go into

11   that type of business and see what I can do.  Anyway, Maxi --

12   and we named it Maxi-Aids.  Why do you want to want to call

13   Maxi-Aids -- what kind of name is Maxi-Aids?  I says look,

14   it's a lucky name.  I opened up, at that time, nine

15   pharmacies.  And I said select a name.  I was going to call it

16   Maxi-Aids.

17          And I had Maxi-Aids and I sent -- made up a calendar of

18   home health care products, and thank God it was successful.

19   Q      And --

20   A      I was getting orders.  I started with five orders, ten

21   orders, twenty orders, a hundred orders; gee, it looked great.

22   So we -- in 1990, we decided to move Maxi-Aids to large

23   quarters, and we moved it to Farmingdale to 24,000 square

24   company -- building.

25   Q      What kind of business is Maxi-Aids in?

Appendix  A - 113

E. Zaretsky - Direct                    20

1    A       Maxi-Aids distributes products for independent living

2    for people who are blind, people who are deaf, people who have

3    Alzheimer's, people who have Parkinson's, mobility problems,

4    anything that has to do in order to make a person self-

5    sufficient.  Cooking aids, blood pressure machines that talk,

6    glucometers that talk, everything voice activation.  Computers

7    that speak, computers that can print a letter for a blind

8    person.  Also, a computer that can send faxes, emails,

9    everything by a blind person.

10           And also communication for the deaf people.  Deaf people

11   can use to communicate with the computer.  So it became a very

12   big company, and we are now the largest company in the world

13   that does what we're doing.  I have 90 employees --

14   Q       90?

15   A       90 employees, who are very dedicated to the business,

16   and they're the people that make the business.  I'm very proud

17   of them, and we are doing something very important for the

18   community.  We are putting also blind people to work and deaf

19   people to work, and that's what people I have working for me

20   now, deaf and blind people.  And --

21   Q       Can I ask you --

22   A       Yes.

23   Q       As part of your work with Maxi-Aids, what is your

24   position with Maxi-Aids?

25   A       I'm the president of the Maxi-Aids.

Appendix  A - 114

E. Zaretsky - Direct                    21

1   Q        Okay, and is Harold affiliated with Maxi-Aids at all?

2   A        Yes, he is.

3   Q        Is he an employee or is he part of --

4   A        He's an employee.  He works in warehouse, and he keeps

5   an eye on people to make sure that nothing gets out of hand.

6   Q        Okay, and as part of your work with Maxi-Aids, do you

7   have to deal with government agencies?

8   A        Yes.

9   Q        Okay, can you tell me a little bit about the government

10  agencies you deal with?

11  A        Yes, we have a contract with the Veteran's

12  Administration.  We supply them the product for people who are

13  blind and deaf, all them disabilities.  And then we also

14  supply products to agencies that help people who are

15  handicapped, people who are in wheelchairs and so forth, we do

16  that also.

17  Q        Okay, and to get the contracts with these agencies, what

18  do you have to do?

19  A        For Veteran's Administration we have to have a contract,

20  but from the agencies we don't have to have a contract.

21  Q        Okay, and how do they learn about Maxi-Aids?

22  A        Pardon?

23  Q        How do they know about Maxi-Aids?

24  A        Well, Maxi-Aids has an excellent reputation, and one

25  agency tells to another agency what Maxi-Aids is doing.  We

E. Zaretsky - Direct                    22

1    give them special attention, we give them service, we ship it

2    on time, and they can always call us and ask us information on

3    our product, especially on setting talking watches, which they

4    have problems.

5    Q       And are these state agencies or federal agencies or

6    both?

7    A       Some of them are federal agencies, like CAP, it's a

8    federal agency.  But most of them are independent agencies who

9    are funded by the Government.

10   Q       Okay, and can you tell me the names of some of these

11   independent agencies?

12   A       Oh, there's Virginia Association for the Blind.  There's

13   Massachusetts Association for the Blind.  There's Missouri

14   Association for the Blind.  There are deaf organizations,

15   okay, there are loads of them for the deaf organizations.

16   Also we supply products to the schools, the public schools,

17   colleges.  They have a lot of students who are disabled, and

18   we make sure that those students can be independent in

19   learning a trade, let us say, or going to college and become a

20   lawyer or a doctor.  So what we are doing is a very valuable

21   tool for all those students.

22   Q       Is your reputation important for you to keep getting

23   business from these agencies?

24   A       Pardon?

25   Q       Is your reputation important for you to keep getting

E. Zaretsky - Direct                    23

1  business from these agencies?

2  A      Very much so, very much true, especially with the

3  agencies, Board of Education, they're all our customers.

4  Q      And are you personally, or is Maxi-Aids, involved in any

5  charitable endeavors?

6  A      Yes.

7  Q      Can you tell me about those?

8  A      What I do is I have webinars, or webathon, it's called,

9  a webathon.  We give -- we advertise on the web and we give

10  10% of the day's receipts, which is very nice, and we give it

11  to maybe about Helen Keller, we give it to ACLD, we give it to

12  Veteran's Administration.  We give to about 15, 20

13  organizations.

14  Q      And do you -- does Maxi-Aids have to rely on the good

15  will of the handicapped community --

16  A      Yes, very much so.

17  Q      -- in order to be involved in these charitable

18  endeavors?

19  A      Very much so.

20  Q      Okay, can you tell me a little bit about that?

21  A      Well, an agency -- if you have a bad reputation, they

22  will not deal with you because it's a reflection on them.  So

23  it's very important that our company is looked at in good --

24  you know, in good eyes.  Whatever we do, we try to make sure

25  that our customer service people are taught to be tolerant of

E. Zaretsky - Direct                    24

1    handicapped people when they call you.  We have special

2    classes for them to teach them how to handle a handicapped

3    person.  So it's very important for the -- for our company to

4    look and do the right thing for the people.

5    Q    And are you and Shirley Zaretsky involved with the deaf

6    community because of Harold?

7    A    Yes, we were involved with like (inaudible) School for

8    the Deaf, we were involved with Milnik School for the Deaf.

9    We are involved with our temple, Jewish Center of Bayside

10   Oaks, for fundraisers and member raisers.  Also Yisrael

11   (inaudible), I was very active with Yisrael (inaudible).  I

12   raised a million dollars for them.  And also I send money to

13   poor towns in Yisrael for the holidays, for Passover

14   especially, and for the new year, Rash Hashanah.

15   Q    And do you have a lot of personal relationships now with

16   handicapped and deaf people?

17   A    I would say so, yes.  I'll tell you a cute little story

18   -- not a cute, nice story.  A man comes in with an 18-year-old

19   girl.  She came in from Yisrael, and she was carrying with her

20   the Bible.  And the father says to us she hasn't read the

21   Bible since she's a baby.  She couldn't read it; she couldn't

22   see it.  Well, she came to us with her father, and my people

23   tried a new type of glasses that we carried.  And I came over

24   to them, I says Shalom to them, hello, and I says let's try

25   this.  And then the girl picks up the Bible, and there's a

E. Zaretsky - Direct                    25

1  smile on her face.  And that gave me the reward.  It's not

2  only monetary reward, but it's a pleasure seeing that we help

3  somebody.

4       Also we had a boy who was 16 years old.  His parents had

5  elephantitis.  I don't know if you know what elephantitis is.

6  And they hadn't heard their son speak.  And they came to us

7  and I recommended an amplifier for him.  I would put on the

8  amplifier with a speaker, and his father says, "say one" and

9  the son says "one".  This is the first time in 16 years that

10 the parents heard the son say one.  And then the father says,

11 "Say daddy."  And his mother was standing there, and the boy

12 says, "Daddy," and the mother started crying because that's

13 the first time in their lives they heard their son talk.  So

14 we are doing a very good job in the company.

15 Q    And do you have to attend various fairs and --

16 A    We've gone to fairs, yes.  We've gone to a lot of

17 different fairs.  I don't know if you know, 23rd Street,

18 there's a building of all blind people, and we go there, show

19 them what's new, what's going on.  We've gone to other fairs

20 in Florida, they have a fair for the new products that are

21 made for the blind people.  We go to the Veteran's

22 Administration.  They have a White Cane Day, which is for the

23 blind servicemen.  We go all over.  In fact, we were just at

24 three in one month, we were there.

25 Q    And at these fairs, are there other competitors there as

E. Zaretsky - Direct                    26

1    well?

2    A    Oh, yes, yes.

3    Q    Okay, and are orders placed at these fairs?

4    A    Well, of some of them orders are placed, but most of

5    them are not.  We're just down to show them the products and

6    such.

7    Q    Okay, and orders may be placed in the future?

8    A    Possible, yes.

9    Q    Okay, and so is it fair to say that the reputation of

10   Maxi-Aids at these fairs is important?

11   A    We always have a line in front of our booth.

12   Q    But is it important that -- is your reputation

13   important --

14   A    Very much so.

15   Q    -- so that you get more attention than your competitors?

16   A    Very much so, very much so.

17   Q    Okay.  Can you tell me how you came to meet Mr. Berlin,

18   the Defendant in this action?

19   A    Well, I came to meet with him with my son, when he

20   called me up and to say the kids met each other, his daughter

21   and my son met.  It's Saturday night, they have a little party

22   for the -- after shoppers, what you call it .  The Malka, or

23   something, store.  Something Malka.  And we -- it was about

24   three months, I think, after they met, and according to the

25   religious people, they don't like to see a long courtship.  It

E. Zaretsky - Direct                    27

1    has to be a fast marriage.  So I looked at my wife and I said

2    look, let's go and meet the people and we'll see who the

3    people are, and we'll make a decision at that time.

4        So we called him up and we went to Brooklyn.  We met him

5    at Brooklyn.  We had dinner, which I paid for, okay.  And as

6    we were walking out, something hit me.  I said, "I don't know,

7    Shirley, doesn't strike me too much."  And that was it.  But

8    the kids wanted to get married.  That's his life; because I'm

9    not going to interfere with my kid's marriage.

10   Q    Okay.

11   A    And that's what it started as.  That's when I met him.

12   Q    Do you know what year that was?

13   A    Pardon?

14   Q    Do you remember the year?

15   A    It has to be 10, 15 years ago, 16 years ago.  16 years

16   ago, that would be 1997, is it?

17   Q    Okay.

18        MR. BERLIN:  Objection, it's '94.  1994.

19   A    1994.

20        THE COURT:  Do you have an objection?

21        MR. BERLIN:  Yeah, objection.

22        THE COURT:  What's your objection?

23        MR. BERLIN:  The dates they got --

24        THE COURT:  Stand up.

25        MR. BERLIN:  The date they met and got married.

Appendix  A - 121

E. Zaretsky - Direct                    28

1           THE COURT:  That's not an objection.  You'll have a

2    right to cross examine, okay?

3    A      Sorry.

4    BY MR. HEWITT:

5    Q      Just to be clear, when you say 1997, you're

6    approximating, is that correct?

7    A      Yes, sure.

8    Q      Okay.

9    A      Maybe it's before a few years, you know.

10   Q      And you said -- you mentioned you met him in relation to

11   Harold calling you up and saying he met a girl that he wanted

12   to get married to.

13   A      Right.

14   Q      Was that Mr. Berlin's daughter?

15   A      Yes.

16   Q      Okay, and do you know her name?

17   A      Feige.

18   Q        Okay.  And like your son, Harold, is Feige also deaf?

19   A      Yes.

20   Q      And how long were Harold and Feige married, if you

21   remember?

22   A      How long were they married?  Exactly by the minute, ten

23   years.

24   Q      And do you remember the year they got divorced, or that

25   divorce was filed for?

E. Zaretsky - Direct                    29

1    A       It's 2005.

2    Q       Are you approximating?

3    A       I think it was September 2005 when the whole thing

4    started, so I would say around 2005.

5    Q       Okay, and did Harold and Feige have any children?

6    A       Yes.

7    Q       How many children?

8    A       Three children.

9    Q       Can you tell me their names?

10   A       Yes.  Marty is the oldest one, then Torvah, and David.

11   And if I may inject something, Marty is now in college.  He's

12   University of Hartford studying art.  He's an excellent

13   student.  Torvah just was sweet 16.  I made her party.  David

14   just became bar mitzvah, 13.  I made him a bar mitzvah.  And

15   they're wonderful kids.

16           THE COURT:  Hold it one second.  Ma'am, are you the

17   interpreter?

18           INTERPRETER:  Yes, I am.

19           THE COURT:  Ms. Zaretsky is --

20           INTERPRETER:  We can go right and interpret, and

21   she's asking if I can go right and interpret for her.

22           THE COURT:  She's not a party to this, but you're

23   free to interpret for her during this process.  Go ahead.

24           MS. ZARETSKY:  I don't know what's going on.

25           THE COURT:  No, no, no, no, no, just explain to her

E. Zaretsky - Direct                    30

1  if she wants you to interpret what's going on, you can do

2  that, but she has no participation in this process.

3          MS. ZARETSKY:  Fine, okay.

4  BY MR. HEWITT:

5  Q      Elliot, I'm sure you're very proud of your

6  grandchildren.  I'm just going to remind you to try to respond

7  to my questions and not to go too far afield, okay?

8  A      Well, they're doing great, you know.

9  Q      When Harold and Feige got married, what was your

10 relationship with Feige at that time?

11 A      It's good.

12 Q      And did you help Harold and Feige out with their

13 marriage?

14 A      Oh, very much so.  I made their wedding.  I bought them

15 a house.  Oh, yes, before that I helped my son get her

16 engagement ring.  I made the wedding.  I bought the house for

17 them.  I invested $150,000 in renovating the house.  I wanted

18 them to be happy.  I wanted them to be a good family.  I did

19 everything possible to make their lives better.  I think they

20 deserved it.

21 Q      Okay, and --

22 A      Oh, by the way, the house I put in her name and his name

23 also.

24 Q      Okay, and when you met Aaron Berlin, the Defendant, did

25 he know how to speak English at that time?

E. Zaretsky - Direct                    31

1   A       Who, me?

2   Q       No, did Aaron Berlin, when you met him --

3   A       Yes.

4   Q       -- did he know how to speak English?

5   A       Yes.

6   Q       Okay, and what was your relationship with Aaron Berlin

7   during the early part of the marriage?

8   A       As far as I felt, it was a good relationship.  We got

9   along.  We have three children, I mean, you've got to get

10  along between those, you know.

11  Q       For the grandchildren, you mean?

12  A       Grandchildren, right.

13  Q       Did there come a time when Harold and Feige's marriage

14  broke down?

15  A       That was -- yes, in 2005, September 2005 when I found

16  out and Harold found out.  I got up in the morning and I was

17  called that he is being arrested, the police are there.

18  Q       Who were you called -- I'm sorry.  Who were you called

19  by?

20  A       By Harold.

21  Q       Okay.  And does Harold -- I know he's deaf; does he

22  communicate with a special telephone of some sort?

23  A       Well, at that time they had a TTY.  Now they have a --

24  what do you call it -- a person that you call the person on

25  the TTY and he interprets for you, a -- what do you call it?

Appendix  A - 125

E. Zaretsky - Direct                    32

1  My mind is blank.  Anyway, it was a person that translated
2  everything that Harold said.
3  Q    Okay, and did Harold tell you why he was being arrested?
4  A    He did not know.
5  Q    Okay.
6  A    But when he called me, I rushed to his house from
7  Bayside to Plainview, and I came to the house and she was --
8  she hid his keys to the office, because he was supposed to
9  open the office, so she hid his keys.  He asked her for the
10 keys and she wouldn't give him the keys.  And she was holding
11 them to him, standing in the way, he shouldn't walk out of the
12 house.  As he was standing that he couldn't walk out, the
13 police showed up and they arrested him.  Then --
14 Q    Do you know who called the police?
15 A    Pardon?
16 Q    Do you know who called the police?
17 A    She did.
18 Q    When you arrived, was Mr. Berlin, the Defendant, was he
19 present?
20 A    No, he was not.  Also, she was all dressed up at that
21 point.  Okay.
22 Q    There's no question pending.  Is it fair to say at that
23 point the marriage deteriorated?
24 A    I didn't think so.  You know, you have an argument,
25 something, you have an argument with your wife.  I didn't

E. Zaretsky - Direct                          33

1    think it would be anything, you know, stuff.

2              THE COURT:  Hold it.  What's the story?

3              THE CLERK:  I just want to take the appearances.

4              THE COURT:  Excuse me?

5              THE CLERK:  I just want to take the appearances of

6    the newcomer (inaudible)

7              THE COURT:  She's the interpreter.

8              THE CLERK:  (Inaudible).

9              THE COURT:  Ma'am, just give us your name.

10             INTERPRETER:  Yes, good morning, Your Honor, Gloria

11   Vargas, certified sign language interpreter.

12             THE COURT:  Thank you.

13             INTERPRETER:  You're welcome.

14   BY MR. HEWITT:

15   Q     After the police showed up, did Mr. Berlin ever show up

16   at that period?

17   A     No, he did not.

18   Q     Okay, did you hear from him after that event?

19   A     I did not hear from him until I was arrested.

20   Q     Okay, and why were you arrested?

21   A     They claimed that I threatened them, meaning the

22   Berlins.

23   Q     And who made that claim?

24   A     Pardon?

25   Q     Who made that claim?

E. Zaretsky – Direct                      34

1    A      Mr. Berlin and his son.

2    Q      What's his son's name?

3    A      His son's name is -- forgive me, I don't know.  I don't

4    remember his name.

5    Q      Okay, that's fine.

6    A      But his son -- and his name -- and they arrested me; I

7    was fingerprinted.

8    Q      And at that point, had you threatened them in any way?

9    A      No way at all.

10   Q      And what was the result of that arrest?

11   A      That was dismissed.  It was dismissed against my son.

12   In fact, it showed that she beat up my son.  He had bruises

13   all over his arm.  She beat up my son.  They dismissed against

14   me --

15   Q      Okay.

16   A      -- because there was no evidence to it.

17   Q      Okay, so you were not convicted?

18   A      Not at all.

19   Q      Okay, and you did not plead guilty to anything?

20   A      I would not plead guilty to anything, right.

21          MR. BERLIN:  Objection.

22          THE COURT:  Stand up.

23          MR. BERLIN:  Some guilty, they found guilty.

24          THE COURT:  That's not an objection.  An objection

25   is question of law as to form, relevance.

Appendix  A - 128

                            E. Zaretsky - Direct                    35

1              MR. BERLIN:  Okay.

2              THE COURT:  You will have an opportunity to question

3    the witness.

4              MR. BERLIN:  Thank you.

5              THE COURT:  All right?

6              MR. BERLIN:  Okay.

7              THE COURT:  Okay, let's go.

8    BY MR. HEWITT:

9    Q    So at that point was the relationship with the Berlins

10   totally deteriorated at that point?

11   A    Yes.

12   Q    Okay, and did the Defendant, Aaron Berlin, was he at

13   this point angry at you and your family?

14   A    Yes.

15   Q    Okay, and did he -- did Aaron Berlin do anything else --

16   besides the emails that are at the heart of this case, did

17   Aaron Berlin do anything else against you or your family at

18   that point?

19   A    He sent out letters defaming us.

20             THE COURT:  Just for the record, to be clear, the

21   Aaron Berlin is the Defendant in this case?

22   A    Yes, Sir.

23             THE COURT:  Okay.

24             MR. HEWITT:  Yeah.

25   A    Yes, Your Honor.

E. Zaretsky - Direct                    36

1          THE COURT:  All right.

2    A    It's about letters, he sent the emails to my employees.

3    BY MR. HEWITT:

4    Q    Okay, other than the emails --

5    A    Pardon?

6    Q    We'll get to the emails, but other than the emails.

7    A    Okay.  But he was defaming us, everybody he could meet,

8    you'll see.

9    Q    And at some point was child protective services called

10   against you or your family?

11   A    Child protective services were called at all times

12   against my son.

13   Q    And who called them?

14   A    They did, the Berlins.  Feige called.

15   Q    Okay, and what was the result of any of those

16   investigations?

17   A    Nothing.  No evidence of anything.

18   Q    And as we speak, Harold and Feige are divorced, correct?

19   A    Yes, sir.

20   Q    Okay, and who has custody of the children?

21   A    Harold has custody of the two boys, and he has partial

22   custody of Torvah.  He sees her once a month, a week.

23   Q    Okay, once a week?

24   A    One week a month, right.  But the boys are constantly

25   there, full-time custody.

E. Zaretsky - Direct                    37

1    Q      And to this day are you involved in your grandchildren?

2    A      Pardon?

3    Q      Are you involved with the three grandchildren?

4    A      Very much so.

5    Q      Okay, and to your knowledge, is the Family Court

6    proceeding still going on between Harold and Feige?

7    A      Yes, it's still going on, and I expect it to go on all

8    my life.

9    Q      And why is that?

10   A      Because they're looking for money and money and money,

11   and that's the support.

12   Q      And does Harold -- to your knowledge does Harold pay

13   child support or alimony of any kind?

14   A      Oh, yes, very much so.  He is paying, but I'm paying

15   also.  He can't afford it.  I'm paying for it.

16   Q      And how much is he paying?

17   A      $10,000 a month, plus for the children -- for one child

18   now, $340.

19   Q      Okay, and at some point did you, Shirley, Harold and

20   Maxi-Aids sue Aaron Berlin and Feige Berlin for defamation?

21   A      For what?

22   Q      Defamation.  Did you at some point sue them?

23   A      Did we defame them?

24   Q      No, did you sue them for defamation?

25   A      Yes, I did.

E. Zaretsky - Direct                          38

1    Q      Okay.

2           MR. HEWITT:  Your Honor, as far as the exhibits, I

3    would like to move to have Plaintiff's Exhibit-1 for

4    identification marked into evidence.  There's been no

5    objection from Mr. Berlin.

6           THE COURT:  Are there any objections to any of the

7    exhibits?  Can we move them all in, or do you want to move

8    them all in?

9           MR. HEWITT:  Well, when I spoke to Mr. Berlin last

10   Tuesday, the date the joint pretrial order was due, we had --

11   he had told me he had no objections, and he sent me his draft

12   saying there were no objections, and that was the day it was

13   due.  And so I put in the joint pretrial order he had no

14   objections to my exhibits.  The next day he filed an amended

15   one, I believe, on his own behalf, and he objected to several

16   exhibits on the basis of relevance.

17          THE COURT:  All right, we'll do them one by one.

18          MR. BERLIN:  It's not like this.  I didn't agree.

19   We didn't agree on the (inaudible).  They didn't want to put

20   anything from my argument there, so it's not from me.

21          THE COURT:  What counsel is saying is that you do

22   object to certain exhibits being introduced in evidence, is

23   that true?

24          MR. BERLIN:  Oh, this -- on the exhibits, I didn't

25   object, but I didn't look through the book because I was

E. Zaretsky - Direct                          39

1     already here at 9:15 --

2              THE COURT:  Well, you got these --

3              MR. BERLIN:  -- and I just -- and I didn't have time

4     to review it.

5              MR. HEWITT:  Well, Your Honor, we provided each

6     other by e-mail --

7              THE COURT:  Okay, this is simple.  We have all the

8     exhibits.  Either they can all be introduced into evidence,

9     and you have the right to go through the -- discuss them with

10    me, the relevance, whatever you want to talk about, but

11    they'll be introduced.  Or we'll do it one by one.  So if you

12    have no objection, I would -- can we just introduce all the

13    exhibits?  You have exhibits as well, correct?

14             MR. BERLIN:  Yes.

15             THE COURT:  Do you have any objections to his?

16             MR. HEWITT:  I object to two of his, yes.

17             THE COURT:  All right, we have to deal with two of

18    his.  Do you have any objections to his?

19             MR. BERLIN:  I wrote up in the memorandum; what's

20    the language of objection, objection to veracity of this, but

21    not the authenticity.

22             THE COURT:  What you think they say you can go over

23    in testimony.  The exhibit themselves, the exhibit itself, is

24    being introduced.  You can then --

25             MR. BERLIN:  Yeah, I think it --

E. Zaretsky - Direct                40

1          THE COURT:  -- deal with it as you like.

2          MR. BERLIN:  I think I don't have objection.

3          THE COURT:  Okay, then we'll introduce the

4    Plaintiff's exhibits 1 through 25, is that right, sir?

5          MR. HEWITT:  That's correct.

6        (Plaintiff's Exhibit-1 previously marked for

7    identification)

8        (Plaintiff's Exhibit-2 previously marked for

9    identification)

10        (Plaintiff's Exhibit-3 previously marked for

11    identification)

12        (Plaintiff's Exhibit-4 previously marked for

13    identification)

14        (Plaintiff's Exhibit-5 previously marked for

15    identification)

16        (Plaintiff's Exhibit-6 previously marked for

17    identification)

18        (Plaintiff's Exhibit-7 previously marked for

19    identification)

20        (Plaintiff's Exhibit-8 previously marked for

21    identification)

22        (Plaintiff's Exhibit-9 previously marked for

23    identification)

24        (Plaintiff's Exhibit-10 previously marked for

25    identification)

E. Zaretsky - Direct                    41

1          (Plaintiff's Exhibit-11 previously marked for

2     identification)

3          (Plaintiff's Exhibit-12 previously marked for

4     identification)

5          (Plaintiff's Exhibit-13 previously marked for

6     identification)

7          (Plaintiff's Exhibit-14 previously marked for

8     identification)

9          (Plaintiff's Exhibit-15 previously marked for

10    identification)

11         (Plaintiff's Exhibit-16 previously marked for

12    identification)

13         (Plaintiff's Exhibit-17 previously marked for

14    identification)

15         (Plaintiff's Exhibit-18 previously marked for

16    identification)

17         (Plaintiff's Exhibit-19 previously marked for

18    identification)

19         (Plaintiff's Exhibit-20 previously marked for

20    identification)

21         (Plaintiff's Exhibit-21 previously marked for

22    identification)

23         (Plaintiff's Exhibit-22 previously marked for

24    identification)

25         (Plaintiff's Exhibit-23 previously marked for

E. Zaretsky - Direct                42

1    identification)

2         (Plaintiff's Exhibit-24 previously marked for

3    identification)

4         (Plaintiff's Exhibit-25 previously marked for

5    identification)

6         THE COURT:  Without objection will all come in.

7    Okay, now which one are we dealing with first?

8         (Plaintiff's Exhibit-1 admitted into evidence)

9         (Plaintiff's Exhibit-2 admitted into evidence)

10        (Plaintiff's Exhibit-3 admitted into evidence)

11        (Plaintiff's Exhibit-4 admitted into evidence)

12        (Plaintiff's Exhibit-5 admitted into evidence)

13        (Plaintiff's Exhibit-6 admitted into evidence)

14        (Plaintiff's Exhibit-7 admitted into evidence)

15        (Plaintiff's Exhibit-8 admitted into evidence)

16        (Plaintiff's Exhibit-9 admitted into evidence)

17        (Plaintiff's Exhibit-10 admitted into evidence)

18        (Plaintiff's Exhibit-11 admitted into evidence)

19        (Plaintiff's Exhibit-12 admitted into evidence)

20        (Plaintiff's Exhibit-13 admitted into evidence)

21        (Plaintiff's Exhibit-14 admitted into evidence)

22        (Plaintiff's Exhibit-15 admitted into evidence)

23        (Plaintiff's Exhibit-16 admitted into evidence)

24        (Plaintiff's Exhibit-17 admitted into evidence)

25        (Plaintiff's Exhibit-18 admitted into evidence)

E. Zaretsky - Direct                    43

1        (Plaintiff's Exhibit-19 admitted into evidence)

2        (Plaintiff's Exhibit-20 admitted into evidence)

3        (Plaintiff's Exhibit-21 admitted into evidence)

4        (Plaintiff's Exhibit-22 admitted into evidence)

5        (Plaintiff's Exhibit-23 admitted into evidence)

6        (Plaintiff's Exhibit-24 admitted into evidence)

7        (Plaintiff's Exhibit-25 admitted into evidence)

8            MR. HEWITT:  Plaintiff's Exhibit-1.

9            THE COURT:  Mr. Berlin, you have copies of these

10   exhibits, correct?

11           MR. BERLIN:  Yes, they are copies.

12           THE COURT:  Okay.  He's dealing with 1, Exhibit-1.

13   BY MR. HEWITT:

14   Q    Elliot, can you turn to Exhibit-1?

15   A    What page?

16   Q    There's a tab, it's the first --

17           THE COURT:  There's a tab, it will say 1.

18   A    Yeah.

19           THE COURT:  Got it?

20   BY MR. HEWITT:

21   Q    Can you just take a look at Exhibit -- just take a look

22   at Exhibit-1 for me.  And then I'm just going to ask you, is

23   this the complaint you had filed in the State Court --

24   A    Right.

25   Q    -- alleging defamation against Aaron and Feige Zaretsky?

E. Zaretsky - Direct                     44

1    Is this the complaint you had filed in State Court?

2    A    Yes, it is.

3    Q    Okay.  Can you go to the third page, paragraph #9?

4    A    Yes.

5    Q    Do you see paragraph #9?  Can you read that paragraph

6    out loud?

7    A    Yes.  "That on or about September 5th, 2008, at 12:42

8    p.m., Berlin willfully and maliciously and with intent to

9    injure the good name of Elliot, and knowing the statements to

10   be false, sent an email to bulkbuys to Maxi-Aids.com, which

11   contained numerous malicious and false statements concerning

12   Elliot, from the email address" --

13   Q    Okay.

14   A    -- "Super100@hotmail.com."

15   Q    And can you read paragraph 11 out loud?

16   A    "In this email, Berlin thought to destroy Elliot's

17   reputation by publishing certain false and malicious

18   statements regarding Elliot's role in Harold's and Feige

19   Zaretsky's divorce.  The email is annexed hereto as Exhibit-

20   A."

21   Q    And what was the reason you had had this complaint

22   filed?

23   A    Because I felt that he is defaming us, and it's not

24   true.

25   Q    And is this because of a series of emails that was sent?

E. Zaretsky - Direct                    45

1   A      Emails were sent, and he writing about us in letters,

2   defaming everybody in my family, defaming my wife, my

3   children.

4   Q      I'm going to ask you to turn to -- I'm sorry -- there's

5   a paragraph 215.  You don't have to read it, I'm just asking

6   you to find that.

7   A      Yes, I do.

8   Q      Okay, two pages later after that, there's something

9   entitled Individual Verification.  Do you see that, it says

10  Individual Verification?

11  A      Two pages later.  One, two.

12         MR. HEWITT:  Your Honor, may I approach the witness

13  just to point that out to him?

14  A      Oh, that's one.  Okay.

15  BY MR. HEWITT:

16  Q      Do you see where it says Elliot Zaretsky and there's a

17  signature above that?

18  A      Yes.

19  Q      Did you sign this?

20  A      Yes.

21  Q      Okay, is that your signature?

22  A      It sure is.

23  Q      Okay.  Let's go to Exhibit-2.  You can see the tab on

24  the side of the exhibit folder.  Find Exhibit-2.

25  A.     2.

                              E. Zaretsky - Direct                    46

1    Q      Okay, and did you have your attorney at that time,

2    Michael Solomon, file this motion for summary judgment in this

3    case, Exhibit-2?

4    A      Yes.

5    Q      Okay.  And if you look about five pages in, there's an

6    affidavit in your name in support of the motion.

7    A      Five.  That's Exhibit-2 --

8           MR. HEWITT:  Your Honor, may I approach him?

9    A      Sorry

10   BY MR HEWITT:

11   Q      It's okay.  Right here.

12   A      Yeah.

13   Q      This appears to be a three-page affidavit.  Did you sign

14   this affidavit?

15   A      Yes.

16   Q      Is that your signature?  Okay.  Can we go to paragraph

17   four of the affidavit, please?  Turn back.

18   A      Turn back.

19   Q      And can you read paragraph four, please?

20   A      Yes, sir.  "This action for libel involves a series of

21   emails, emails repeatedly sent by Defendant to third parties

22   defaming all named Plaintiffs by transmitting knowingly false

23   statements about Plaintiffs with respect to Plaintiffs Harold

24   Zaretsky's divorce from Defendant Feige Zaretsky.  Specific

25   emails are annexed to the verified complaint set forth herein

E. Zaretsky - Direct                    47

1   as Exhibit-A.  The emails regarding me involve those

2   statements concerning my role in Harold and Feige's divorce.

3   Emails accuse me of buying the matrimonial" -- "me of buying

4   the matrimonial trial, of manipulating circumstances to deny

5   my grandchildren money in support of perjury, and tax fraud.

6   Defendants malign me and Maxi-Aids by intending to denigrate

7   the recipients' opinion.  In most cases, these emails were

8   sent to my employees at Maxi-Aids, thereby creating an

9   atmosphere where my own employees are being subjected to

10  defamatory statements accusing me of crimes and misdeeds.

11  Other emails were sent to as many as seven different

12  individuals, including friends of the family.  As a result, I

13  have been personally affected by these false statements, and

14  Maxi-Aids has suffered due to the exposure associated with the

15  defamatory statements."

16        (Defendant's Exhibit-A previously marked for

17  identification)

18  Q     Okay, thank you.  Are the statements made in that

19  paragraph true?

20  A     It certainly is.

21  Q     Okay, and for the record, have you ever engaged in tax

22  fraud?

23  A     Pardon?

24  Q     Have you ever engaged in tax fraud?

25  A     Well, I just paid a lot of money in taxes.  I never have

E. Zaretsky - Direct                    48

1    had fraud in my life.

2    Q     Okay.  Have you ever denied your grandchildren money and

3    support?

4    A     Not at all.

5    Q     Have you ever told untrue statements in Court?

6    A     Pardon?

7    Q     Have you ever told statements -- untrue statements in

8    Court?

9    A     No, never.

10   Q     Next in that same exhibit there's an affidavit from

11   Harold Zaretsky.

12   A     Yes.

13   Q     Okay, can you go to the second page of that?  Do you

14   recognize that as Harold's signature?

15   A     That's him, yes.

16   Q     Okay, and after that there's an affidavit from Shirley

17   Zaretsky.  I'll just ask you to go to the second page of that

18   and see if you recognize Shirley's signature.

19   A     Yes.

20   Q     Is that her signature?

21   A     Yes.

22   Q     Okay.  And did there come a time when your motion for

23   summary judgment was granted?

24   A     Yes.

25   Q     Going to Exhibit-5, I'd ask you to turn to Exhibit-5.

E. Zaretsky - Direct                    49

1    Did there come a time where you appeared before Lawrence

2    Schaefer, a court attorney referee, to testify about your

3    damages in the defamation case?

4    A     Yes.

5    Q     And the testimony you gave before Referee Schaefer, was

6    that truthful?

7    A     Yes, it was.

8    Q     Okay.  I'm going to go to Exhibit-14.  Take a look at

9    Exhibit-14.  Is that one of the emails that was sent that made

10   up part of the defamation action?

11   A     Yes.

12   Q     Okay, and the email, it's dated September 5th, 2008, at

13   12:42 p.m., is that correct?

14   A     Right.

15   Q     Okay, do you see where it says to bulkbuys@Maxi-

16   Aids.com?

17   A     Yes.

18   Q     What email address is that?

19   A     That's my company.

20   Q     Okay.  At the top of the email there's a name, Latanya

21   Thompson.

22   A     Yes.

23   Q     Was she an employee of the company at the time?

24   A     Yes.

25   Q     Okay, and was she the one who would have received emails

E. Zaretsky - Direct                    50

1    to bulkbuys@Maxi-Aids.com?

2    A    Yes.

3    Q    Okay.  In the opening of the email, can you read the

4    first four sentences?

5    A    "I am the father of Feige Zaretsky, hearing impaired.

6    From the day Harold Zaretsky filed for divorce from my

7    daughter, Feige Zaretsky, four years ago, 2004, until the

8    present time, the Zaretsky family, the owners of Maxi-Aids

9    Corporation, began using army of lawyers for Maxi-Aids

10   Corporation and all the strategies they learned in 50 years of

11   hostile corporate strategies."

12   Q    Okay, that's enough.  Who is the father of Feige

13   Zaretsky?

14   A    Mr. Aaron Berlin who is sitting right here, sir.

15   Q    And that's the Defendant in this action?

16   A    Yes, sir.

17   Q    Okay.  Looking at this email, there's a portion that's

18   bolded that it says, "rerouted donated most critical medical

19   supplies from poor countries."  Did Maxi-Aids ever reroute

20   critical supplies from poor countries?

21   A    Not at all.

22   Q    Okay.  Further on, can you read the next portion after

23   poor countries?

24   A    He's an internationally?

25   Q    Yeah, that's the one.

E. Zaretsky - Direct                    51

1    A    Oh.   "He's an internationally famed schemer, debarred

2    from Veteran's Administration contracts, assessed 3 million

3    fines, once filed Chapter 11."

4    Q    Do you still receive Veteran's Administration contracts?

5    A    Pardon?

6    Q    Do you still contracts from the Veteran's

7    Administration?

8    A    Constantly.

9    Q    Okay, were you debarred in 2008?

10   A    Never, never.

11   Q    Okay.

12        THE COURT:  Who was this email sent to?

13        MR. HEWITT:  Sent to bulkbuys@Maxi-Aids.  It was an

14   employee, Latanya Thompson, the name at the top, he testified

15   that it was sent to.  And she testified at the -- in the

16   transcript that's part of the referee's report.

17        THE COURT:  So Latanya Thompson was an employee at

18   Maxi-Aids, is that correct?

19   A    Yes, she's an employee of Maxi-Aids.

20        THE COURT:  All right.

21   BY MR. HEWITT:

22   Q    Is she currently an employee?

23   A    No, she is not.

24   Q    If you go a few pages in, there starts to be a series of

25   paragraphs that are numbered.

                    E. Zaretsky - Direct                52

1    A    Yes.

2    Q    It's about on the -- the third page starts the numbering

3    on the bottom.

4              MR. BERLIN:  Which exhibit?

5              MR. HEWITT:  Same exhibit.  It's the third page of

6    the exhibit.  On the bottom, there's 1, 2 on the next page, 3,

7    4, 5, and so on.

8    A    No, I'm not there.

9              MR. HEWITT:  Can I show the witness, Your Honor?

10             THE COURT:  Please.

11   A    Oh, yes, here it is.

12   BY MR. HEWITT:

13   Q    You found it?

14   A    Right there, I think this is it.

15   Q    You actually start here and it's long.

16   A    Oh, okay.

17             THE COURT:  And this entire email was sent by the

18   Defendant, Mr. Berlin?

19             MR. HEWITT:  That's what was found in the Court

20   below, Your Honor.

21             THE COURT:  Okay.

22             MR. HEWITT:  The referee found that, as well as the

23   -- Judge Feinman, when he adopted the referee's report,

24   specifically says Aaron Berlin and Feige Berlin sent these

25   emails.

E. Zaretsky - Direct                    53

1          THE COURT:  Okay.

2          MR. HEWITT:  I mean, as far as I'm concerned, that's

3    -- there's not an issue before this Court of whether the

4    emails were sent by Mr. Berlin.

5          THE COURT:  No, I'm just trying to clarify.  So the

6    State Court determined, State Supreme Judge determined there

7    is no issue that Mr. Berlin was the source of this email.

8          MR. HEWITT:  Yeah, do you want to me show you where

9    on the -- I'll just --

10         THE COURT:  No, it's okay.

11         MR. HEWITT:  Okay.

12   BY MR. HEWITT:

13   Q    Okay, go to the next page where -- #6.

14   A    Seven?

15   Q    #6.

16   A    Six, okay.

17   Q    Can you read #6?

18   A    Yes.  "Due to the hospitals and companies who deal with

19   Maxi-Aids know that all their paperwork is false and no such

20   corporation exists."

21   Q    Does Maxi-Aids exist as a corporation?

22   A    It sure is.

23   Q    Okay, and is the paperwork accurate to the best of your

24   knowledge?  Is the paperwork Maxi-Aids has filed accurate to

25   the best of your knowledge?

E. Zaretsky - Direct                    54

1    A    Very much so.

2    Q    Okay.  #11, you see where it says, "If Harold was

3    mentally incompetent"?

4    A    "If Harold is mentally incompetent, must the Court

5    appoint a representative for him?"

6    Q    Is Harold mentally incompetent?  Is Harold mentally

7    incompetent?

8    A    Not at all.

9    Q    Okay.  #16, can you read #16?

10   A    "He chooses to follow his father's lead for profit and

11   possibly the fun of stealing and abusing his wife."

12   Q    To your knowledge, did Harold ever abuse his wife, Mr.

13   Zaretsky?

14   A    My son would not touch -- how do I want to answer.

15   Q    Mr. Zaretsky, just answer my question.  To your

16   knowledge, did Harold ever abuse his wife?

17   A    Not at all.

18   Q    Okay, did you ever abuse your wife?

19   A    Not at all.

20   Q    Did you ever encourage Harold to abuse his wife?

21   A    Not at all.

22   Q    Okay.  After the series of numbered paragraphs, you see

23   where the last one says #27?

24   A    Yes, sir.

25   Q    Okay.  Can you go to the next page then?

E. Zaretsky - Direct                     55

1   A      I'm not sure -- yes.

2   Q      After like the first paragraph --

3   A      Yes.

4   Q      -- okay, where it talks about Judge Sher.

5   A      Oh.

6   Q      Do you see where it says "I move," right after that?

7   Right after it, it says either Judge Sher, there's a -- two

8   sentences down it says "I move."

9            MR. HEWITT:  Can I show the witness, Your Honor?

10  Thank you, Your Honor.

11  BY MR. HEWITT:

12  Q      Right here where it says I move.

13  A      Oh, up.

14  Q      Yeah, I move.  Can you read that sentence?

15  A      "I move that this Court report to the Attorney General

16  for encouraging and participating in a conspiracy to defraud

17  the IRS, and by extension of State Government in Nassau

18  County.  This Court, by accepting" --

19  Q      Oh, that's enough, that's enough.  Did you ever -- did

20  you, Harold, Shirley, or Maxi-Aids ever defraud the IRS?

21  A      Not at all, no.

22  Q      Did you ever defraud the State Government?

23  A      Not at all.

24  Q      Did you ever defraud Nassau County?  Did you ever

25  defraud Nassau County?

E. Zaretsky - Direct                    56

1   A     Not at all, sir.

2   Q     Okay.  Okay, can you continue the sentence, starting

3   with "this court," where I cut you off?

4   A     "This Court, by accepting in its mode for motions,

5   findings, non-prosecutions, by smiling at the cute testimony,

6   winking, appearing to be accepting monies in envelope from the

7   hands of Harold Zaretsky --

8   Q     All right, that's enough.

9   A     -- has entered the conspiracy --

10  Q     That's enough, that's enough.  Did -- to your knowledge,

11  did Harold Zaretsky ever give monies of -- envelopes filled

12  with money to judges?

13  A     Not at all.

14  Q     Mr. Zaretsky, did you ever bribe any judges?

15  A     Not at all, sir.

16  Q     Okay.  Okay, can we go to Plaintiff's Exhibit-15, the

17  next exhibit.

18        THE COURT:  So just so I'm reading this correctly,

19  this is an email sent by the Defendant, Mr. Berlin, stating

20  that the Court, State Court, in his email, accepted envelopes

21  of cash from Mr. Harold Zaretsky, and you're testifying that

22  never happened, correct?

23  A     It never happened, sir.

24        THE COURT:  All right.

25        MR. HEWITT:  Your Honor, I know you had given a

Appendix  A - 150

E. Zaretsky - Direct                        57

1    directive that we're not getting into the motives and concerns

2    of the State Court judges and other parties.  I don't enter --

3    you know, enter that as to malign Judge Sher or any other

4    judge, but just to talk about the -- my client Harold

5    Zaretsky's --

6              THE COURT:  Oh, I'm not dealing with it to malign

7    the judge.

8              MR. HEWITT:  Right, I just want to be clear.  Okay.

9    BY MR. HEWITT:

10   Q     Can we go to #15, Plaintiff's Exhibit-15?

11   A     Yes.

12   Q     Okay.  And was this email, according to what it says on

13   the top, sent on September 5th, 2008, at 1:33 p.m.?  You have

14   to answer in words.

15   A     Yes, that's right.

16   Q     Okay, and does it say it was sent to bulkbuys@Maxi-

17   Aids.com?

18   A     Yes.

19   Q     Okay, and again, is that email address affiliated with

20   your company?

21   A     My company, right.

22   Q     Okay, and was Latanya Thompson --

23   A     Yes.

24   Q     -- an employee of the company --

25   A     Yes.

Appendix  A - 151

E. Zaretsky - Direct                              58

1   Q      -- who received this email?

2   A      Yes, she received it.

3   Q      Is that correct?  Okay.  Exhibits 14 and 15, those two

4   emails, did at some point it come to your attention that those

5   exhibits -- that those emails had been sent to your company?

6   A      Yes.

7   Q      Okay, and how did it come to your attention?

8   A      It came from another employee.

9   Q      Okay.

10  A      You know, that Latanya had received this email defaming

11  us, and it was spreading through the whole company --

12  Q      Okay.

13  A      -- about our reputation.

14  Q      And do you see at the top of the email where it says,

15  "I'm the father of Feige Zaretsky, hearing impaired"?

16  A      Yes.

17  Q      Okay, and do you know who the father of Feige Zaretsky

18  is?

19  A      The father of Feige Zaretsky is Aaron Berlin, right

20  here.

21  Q      And that's the Defendant in this case?

22  A      Yes.

23  Q      Okay.

24              MR. HEWITT:  And again, Your Honor, I submit that

25  the State Court already found that the Defendant sent this

E. Zaretsky - Direct                          59

1    email.

2    BY MR. HEWITT:

3    Q      And Plaintiff's Exhibit-16, can you turn to that?  And

4    again, was this sent September 5th, 2008, at 6:06 p.m.,

5    according to what it says at the top of the email?

6    A      Yes.

7    Q      Okay.  And was it sent to bulkbuys@Maxi-Aids.com?

8    A      Right.

9    Q      Is that a yes?

10   A      Yes.

11   Q      Okay.  And was Latanya Thompson the employee at Maxi-

12   Aids who received this email?

13   A      Yes.

14   Q      Okay, and did it come to your attention that she had

15   received this email?

16   A      Yes.

17   Q      Okay.  After it says "everybody is angry at Maxi," can

18   you read the next sentence?

19   A      Say it again.

20   Q      Where it starts with "The whole world," can you read

21   that?

22   A      Yes.  "Everybody is angry at Maxi."

23   Q      The next sentence, can you read that?

24   A      Right.  "The whole world is in shock.  Nobody will

25   tolerate husbands who deprive their wives of food."

E. Zaretsky - Direct                    60

1    Q    Did you ever --

2    A    "Husbands who keep" --

3    Q    That's enough.  Did your son, Harold Zaretsky, ever

4    deprive his wife of food?

5    A    No way in the world.

6    Q    Okay.

7         THE COURT:  Again, this email, at the State Court

8    level, was found to be sent by the Defendant, Aaron Berlin?

9         MR. HEWITT:  Yes.

10         THE COURT:  Okay.

11         MR. HEWITT:  Well, I could -- it was found in the

12    hearing report, Plaintiff's Exhibit-6, by the referee, who --

13         THE COURT:  All right, if it's in the record it's in

14    the record.

15         MR. HEWITT:  And as adopted by the -- Judge Feinman

16    in Plaintiff's Exhibit-7.

17         MR. BERLIN:  (Inaudible).

18         THE COURT:  Don't speak.

19         MR. HEWITT:  Where Plaintiff's Exhibit-7 it says, as

20    to all the parties, but as an example, "Elliot Zaretsky

21    established that he sustained 100,000 and zero, over a hundred

22    dollars in damages based on a libelous email sent by Defendant

23    Aaron Berlin," and it says that for a number of -- for all the

24    emails and all the Plaintiffs in that action.

25         THE COURT:  All right.  Mr. Berlin, do you have any

Appendix  A - 154

E. Zaretsky - Direct                    61

1    objection to what he just -- not to the veracity of what he

2    said, do you have any legal objection to raise at this point?

3    If not, that's fine, but you were attempting to say something.

4    I just don't let two people speak at the same time, when I

5    told you not to speak.  So now I'm asking you.

6              MR. BERLIN:  Can I say something?

7              THE COURT:  Sure.

8              MR. BERLIN:  Feinman is only quotes Schaefer,

9    limited the amounts of Defendant, not as a finding.

10             THE COURT:  I'm not sure I'm following that.  What -

11   - I can't hear -- say it louder.

12             MR. BERLIN:  Feinman in this report does not -- the

13   language that he uses is only the finding which is limited to

14   the amount of payment, not as a finding that what Schaefer

15   was --

16             THE COURT:  So you're saying --

17             MR. BERLIN : -- recommended.  Not the

18   recommendation.  The recommendation that Schaefer -- Feinman

19   adopt this --

20             THE COURT:  The only question I'd ask counsel is do

21   you disagree -- what I've asked him, he said the record in the

22   State Court clearly finds that you are the author and

23   distributor of Exhibit #16, which is what we're talking about

24   now.

25             MR. BERLIN:  Yeah, that's based on a default only.

Appendix  A - 155

E. Zaretsky - Direct                    62

1   It's not a finding.  It's not something that actually happened

2   as an existing action.

3            THE COURT:  Well, I'm not --

4            MR. BERLIN:  This is a default, as a --

5            THE COURT:  If you want to, on cross examination,

6   try and establish --

7            MR. BERLIN:  Okay.

8            THE COURT:  -- you were not the author or sender of

9   this --

10           MR. BERLIN:  Yes.

11           THE COURT:  -- you'll have a right, though I think

12   if the State Court Judge found you were, that's not a fruitful

13   line for you to go down.  But I'll wait until your chance for

14   cross examination.  Go ahead.

15           MR. HEWITT:  Okay.

16   BY MR. HEWITT:

17   Q    Again, Elliot, we're on Plaintiff's Exhibit-16, about

18   five down, where it says -- I'm sorry, six down, where it

19   says, "who deprived charity and thousands of Braillers from

20   the blind in developing countries."  Did you ever deprive

21   charity and thousands of Braillers from blind people in

22   developing countries?

23   A    Say it again.

24   Q    Did you ever deprive charities and thousands of

25   Braillers from the blind in developing countries?

E. Zaretsky - Direct                    63

1   A      I don't --

2   Q      Do you see where I'm talking about in the line?

3   A      Oh, which line?

4          MR. HEWITT:  Can I show him, Your Honor, the line?

5   A      It's on this page?

6   BY MR. HEWITT

7   Q      Right there, who deprive charity.

8   A      Who deprive --

9   Q      I'll ask you to read that out loud, Elliot.  Can you

10  read that out loud?

11  A      "Who would deprive charity and thousands of Braillers

12  from the blind in developing countries."

13  Q      Is that -- did you ever?

14  A      I never deprived anybody.

15  Q      Did Maxi-Aids ever deprive anybody?

16  A      Not at all.

17  Q      To your knowledge, did Harold or Shirley ever deprive

18  anybody?

19  A      Not at all.

20  Q      Okay.  Go to Exhibit-17.  There's a -- can I ask you,

21  was this sent September 6th, 2008, at 11:51 p.m., according to

22  the top?

23  A      Yes.

24  Q      Okay, and is there a series of forwarded messages on the

25  front page?

E. Zaretsky – Direct                    64

1    A    Right.

2    Q    Okay, can you go to the second page?  At the top, where

3    it says original message, and where it says from

4    poppy55@aol.com.

5    A    Right.

6    Q    Do you know whose email address poppy55@aol.com is?

7    A    That's Feige.

8    Q    Okay.  And do you see where it says, "I'm the father of

9    Feige Zaretsky, hearing impaired?"

10   A    Yes.

11   Q    Who's the father of Feige Zaretsky?

12   A    Aaron Berlin, right there.

13   Q    Okay, and that's the Defendant in this action?

14   A    The Defendant, right.

15   Q    To your knowledge, would anybody else have any reason to

16   call themselves the father of Feige Zaretsky, other than Mr.

17   Berlin?

18   A    I don't think so.

19   Q    Okay.

20        MR. HEWITT:  And again, Your Honor, I would submit

21   that the State Court found that the email was sent by Feige

22   Zaretsky, but also that all the emails were sent by both of

23   them jointly, and that's why they were held jointly and

24   severally liable, because they used the terms "we," and things

25   like that.  Okay.

E. Zaretsky - Direct                    65

1    BY MR. HEWITT:

2    Q       Can we go to Plaintiff's Exhibit-18 now?  And was this -

3    - according to the top of this document, was this sent at

4    September 9th, 2008, at 10:45 a.m.

5    A       Yes.

6    Q       Okay.  Was this sent to bulkbuys@Maxi-Aids.com?

7    A       To Maxi-Aids.

8    Q       That's Maxi-Aids' email, one of them?

9    A       One of them, bulkbuys@Maxi-Aids.

10   Q       Okay, can -- I'll just ask you to keep your voice up as

11   best you can.

12   A       Okay.

13   Q       And was Latanya Thompson an employee of Maxi-Aids at

14   that time?

15   A       Yes, sir.

16   Q       Okay, and did you find that she received this email?

17   A       Yes, sir.

18   Q       Okay.  Do you see, about two-thirds of the way down,

19   where it says in big letters, "I'm the father of Feige

20   Zaretsky"?

21   A       Yes.

22   Q       Okay, and is the father of Feige Zaretsky present in the

23   courtroom today?

24   A       Yes, the Defendant.

25   Q       And is the Defendant Aaron Berlin?

Appendix  A - 159

E. Zaretsky - Direct                          66

1    A    Yes.

2    Q    Okay.  Then I'm going to go to Plaintiff's Exhibit-19.

3    And again, was this sent at September 9th, 2008, at 10:51

4    a.m.?

5    A    Right.

6    Q    And was it sent to bulkbuys@Maxi-Aids.com?

7    A    Right.

8    Q    Okay, and was this received by Latanya Thompson?

9    A    Yes.

10   Q    Okay.  And then Exhibit-20, Plaintiff's-20, was this

11   sent at September 14th, 2008, at 11:50 a.m., sir, was it?

12   A    Yes.

13   Q    Yes, and was it sent to websales@Maxi-Aids.com?

14   A    That's the Maxi-Aids web sale.

15   Q    Okay, and it says Angela at the top.  Was Angela a Maxi-

16   Aids employee?

17   A    That's one of my employees.  One of my employees.

18   Q    And do you know her last name?

19   A    Giglio, G-I-G-L-I-O.

20   Q    Okay, and is she still working for the company?

21   A    Oh, yes.

22   Q    Okay.  When you found out that these emails were

23   received, how did that affect you?

24   A    Well, we felt that the whole world is gone under our

25   feet.  I am -- my family happens to be an honorable family.

E. Zaretsky - Direct                    67

1    My children were always honorable.  They never got into

2    trouble.  I have worked all my life very hard to get where I

3    am, and somebody defaming my family left a very bad taste in

4    my mouth.  And being ashamed to face my employees because of

5    these emails really was very upsetting.

6    Q    Did it affect employee morale?

7    A    It sure did, yes, because they felt that since I'm

8    stealing from everybody else, I'll be stealing from them.  And

9    they told me so, that they didn't trust me anymore, you know.

10   Because it's not only one email that I received, but I got a

11   number of emails, and according to them they felt that I

12   shouldn't be trusted.  So I felt very bad about that.  If

13   somebody doesn't trust me, I felt they will not do business

14   with me.  And my motto is, even to the children, is be honest,

15   be truthful, tell it as it is.  And it's really hurt me to see

16   all of this that was done to me and to my family.

17   Q    And did it affect your business?

18   A    Yes, it did.

19   Q    In what way?

20   A    Pardon?

21   Q    In what way?

22   A    Well, financially it reduced my sales.  I think at that

23   time I lost over a million dollars for the year.

24         MR. BERLIN:  Objection, Judge.  This is not -- this

25   is the point that we are not going to discuss, the damages of

E. Zaretsky – Direct                68

1   this trial.  This is the trial for liability, not for --

2            THE COURT:  I think you're right.

3            MR. BERLIN:  -- going into the accountings of it.

4            THE COURT:  Stop.  I think you're right.  The State

5   Court has determined the amount of damages here.  That's not

6   up to this Court anymore, nor do I choose to do it.  The State

7   Court -- the issue solely before me is whether the damages

8   that were found by the State Court is dischargeable or not.

9   So that amount is set.  That State Court Judge and the referee

10  found that the Zaretskys and Maxi were injured in an amount

11  equal to whatever to those decisions are.  So it's not

12  necessary to get into this at all.

13           MR. HEWITT:  Okay, that's fine.

14  BY MR. HEWITT:

15  Q     Did these emails affect your reputation in the deaf

16  community?

17  A     It sure did, yes.

18  Q     In what way?

19  A     Well, I was on the board of one of the organizations

20  (inaudible) in New York City, and because of these emails and

21  what they heard, I lost my position on the board.  And

22  agencies stopped ordering from us, okay.  And financially -- I

23  mean, my reputation is more important than anything else, and

24  that was hurt.

25  Q     And did you receive calls of concern from customers or

E. Zaretsky - Direct                69

1   potential customers?

2   A      Yes, we received (inaudible) from us.

3   Q      Okay, and were there many such calls?

4   A      Pardon?

5   Q      Were there many such calls?

6   A      Yes, if I remember that, yes.

7   Q      Okay, and this personally caused you stress?

8   A      It sure did, because later on I developed an aneurysm,

9   and I had to have a pacemaker and a defibrillator at the same

10  time.  It caused my family a lot of aggravation, and it caused

11  a lot of dissension in the family between my oldest son and my

12  youngest son, my deaf son.  It caused dissension.  So it came

13  to the point where I had to ask my son, Mitchell, to leave the

14  company.

15  Q      Okay.  Did Mr. Berlin ever have any access to Maxi-Aids

16  tax returns?

17  A      No, he did not, not as far as I know.

18  Q      And did he ever have any access to your personal tax

19  returns?

20  A      Not as far as I know.

21  Q      So --

22  A      Oh, excuse me --

23  Q      So is it fair to say that any statements he would --

24  A      Pardon?

25  Q      Is it fair to say -- is it -- yeah.

E. Zaretsky - Direct                    70

1    A      May I correct my answer?

2    Q      Okay.

3    A      What happened to me is my son, Harold, used to take his

4    -- he used to file his tax returns and he used to take a copy

5    home and have it in his file.  Well, they ran off with some of

6    the files from my tax returns.

7    Q      Okay.

8    A      Okay.  When my son left their house, he was jailed in

9    (inaudible), they went through everything in the house, and

10   they took it and used against us.

11   Q      And prior to these --

12          THE COURT:  Can I just -- I'm just curious about

13   something.  When Mr. Berlin had you arrested, which was your

14   testimony --

15   A      Yes, Sir.

16          THE COURT:  Put your ear piece --

17   A      One moment, please.  Yes, Sir, I'm sorry.

18          THE COURT:  Okay.  When he had you arrested, was

19   that a surprise to you?

20   A      Yes, it surprised me because I did not -- there was no

21   reason for it.

22          THE COURT:  Okay.  At any point after that, did you

23   ask him why he did it?

24   A      Sir, I did not, Your Honor.

25          THE COURT:  Did you ever ask Mr. Berlin at any point

E. Zaretsky - Direct                    71

1    why any of these emails were sent, or why any of this

2    happened?  Did you ever have a conversation with him?

3    A      Just a lot of hate he had.

4           THE COURT:  Excuse me?

5    A      He didn't get what he expected to get, Sir.  He expected

6    -- he had all the lawyers lined up, like Raoul Felder, who is

7    a distinguished divorce lawyer in the City of New York, he had

8    them all lined up.  He had all the lawyers lined up, he had

9    the date when exactly ten years up for the marriage, he filed

10   for divorce.  He expected to get $2 million from my family,

11   okay, and what happened is I -- he didn't think that I would

12   stand up for my son.  And I stood up for my son, I took a

13   lawyer and I fought -- and we went to Court and we fought

14   these Raoul Felder, and we fought Judge Laport -- not Judge

15   Laport, lawyer Lambert, and he had Samuelson Hause and

16   Samuelson.  He had the best lawyers all lined up, Sir.  And I

17   fought him and I didn't let him get away with it.

18          THE COURT:  Where do you get the figure $2 million

19   from?

20   A      Sir?

21          THE COURT:  Why do you say he wanted $2 million?

22   A      That's what he expected.

23          THE COURT:  How do you know that?

24   A      That's what he said to his daughter, and his daughter

25   said it to one of her friends, who in turn, my son Harold

E. Zaretsky - Direct                    72

1    found out.

2              THE COURT:  Okay, go ahead.

3    BY MR. HEWITT:

4    Q     Subsequently --

5    A     Pardon?

6              MR. HEWITT:  Your Honor, can I just take a second

7    and go back to get some --

8    BY MR. HEWITT:

9    Q     At some point after the fact, after these emails were

10   sent, did Mr. Berlin bring a RICO case against you?

11   A     Oh, yes, yes.

12   Q     Did he also bring it against Maxi-Aids?

13   A     Against Maxi-Aids.

14   Q     Did he also bring it against Shirley and Harold?

15   Shirley and Harold?

16   A     Shirley and Harold, also the lawyers, Michael Solomon, I

17   guess, Michael Solomon who was representing us.

18   Q     And do you remember the allegations from the RICO case?

19   A     That we were importing -- diverting merchandise, we were

20   doing all kinds of illegal things, and it was, in fact, in

21   this Court, and it was all dismissed, all his allegations were

22   dismissed.

23   Q     And were some of the allegations in that action similar

24   to the allegations made in the emails?

25   A     Yes, sir.

E. Zaretsky - Direct                            73

1    Q     Okay.

2              MR. HEWITT:  I think that's it for me.  I have no

3    more questions.

4              THE COURT:  All right.  We're going to take --

5    you're going to get to cross examine, Mr. Berlin.  You're

6    going to get to cross examine.  What I'm going to do is I'm

7    going to let you go.  We started at what time, 10:30?

8              MR. ZARETSKY:  Quarter past 10.

9              MR. HEWITT:  It might have been 10:30-ish.

10             THE COURT:  Okay.  Let's go to -- if everybody can

11   do it, I'll let you go for a half hour, then we'll take an

12   hour break, and then we'll finish this afternoon if we can.

13             MR. HEWITT:  Okay.

14             THE COURT:  All right?  So Mr. Berlin, you can

15   either start now and go for a half hour, or we can break now

16   'til 1:15, and then you can start then.  It's up to you.

17             MR. BERLIN:  I think I will start then.

18             THE COURT:  You'll take choice #2?

19             MR. BERLIN:  Yeah.

20             THE COURT:  All right.  Okay, we'll adjourn now 'til

21   1:15.  You can leave all your stuff here.

22       (Recess)

23             THE Court:  Please be seated.

24             THE CLERK:  Trial continues on Zaretsky vs. Berlin.

25             THE COURT:  Mr. Zaretsky, you have to take the stand

E. Zaretsky - Cross                74

1    again, please.  You're still under oath, sir.

2        ELLIOT ZARETSKY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

3            MR. BERLIN:  May I make some introduction, like

4    statement?

5            THE COURT:  No.  All you can do is cross examine.

6                    CROSS EXAMINATION

7    BY MR. BERLIN:

8    Q     The had before the question.  Were you arrested?  Were

9    you arrested -- were Mr. Zaretsky arrested by Berlin family

10   or --

11           THE COURT:  Here's the deal.  You listened to what

12   was called direct examination.  You're entitled to ask this

13   witness anything you want that was brought out in direct

14   examination.  So, any question has to relate in some manner to

15   what he asked him this morning.

16           MR. BERLIN:  Yes, it's related to the action -- to

17   the question that Mr. Robert's --

18           THE COURT:  Talk to the witness.

19           MR. BERLIN:  Mr. Robert made to the witness that he

20   was arrested.  So, I want to ask this question.

21           THE COURT:  Put it in the form of a question --

22           MR. BERLIN:  Yes.

23           THE COURT:  -- and ask Mr. Zaretsky.

24   BY MR. BERLIN:

25   Q     Were you arrested by me or Bob, family?

E. Zaretsky - Cross                   75

1    A    By you?

2    Q    Were you arrested?

3    A    When?

4    Q    In '04, 2004?

5    A    What day -- what month in 2004?

6         THE COURT:  Guys, you're not having a conversation.

7    He's asking you a question.  If you don't know the answer,

8    say, I don't know.

9    A    Okay, Your Honor.  I was arrested in 2004, yes.

10   BY MR. BERLIN:

11   Q    Did you adjourn your trial?

12   A    What?

13   Q    There was set a date for trial for you on this arrest?

14   A    I don't understand your question, sir.

15   Q    After the arrest, what happened?  Did the --

16   A    I was arrested and taken to the police department.

17   Q    Yes.

18   A    I'm sorry, I was not taken to the police department.  I

19   came in myself.  I received a call from the police department

20   and I went in myself to the police department.

21   Q    And after this, did you receive any dates to come to

22   Court, to come to trial?

23        MR. HEWITT:  I'm going to object on relevance, Your

24   Honor.

25        THE COURT:  What arrest are you talking about?  The

E. Zaretsky - Cross                    76

1    arrest where you asked the police to arrest him?

2              MR. BERLIN:  Yes.

3              THE COURT:  Well, he testified this morning they

4    released him, and nothing happened.

5              MR. BERLIN:  Basically, it was for two and a half

6    years going on --

7              THE COURT:  Don't have a conversation with me.

8              MR. BERLIN:  Okay, okay.

9              THE COURT:  You asked him a question, he gave you an

10   answer.  You don't have a choice.  I mean, you don't choose

11   what answer you get.  Get the answer and move on, or ask

12   another question.

13   BY MR. BERLIN:

14   Q    So, was an order of protection against you related to

15   this arrest?

16   A    Say that again?

17   Q    There was an order of protection against you related to

18   this arrest?  Yes or no?

19   A    It was against my whole family, yes.

20   Q    The question is now against you.  Let me -- against you,

21   was an order of protection?

22   A    No, not against me alone.

23             MR. BERLIN:  Can I show papers?

24             MR. HEWITT:  We'd just like to know what papers

25   he's showing.

E. Zaretsky - Cross                     77

1              THE COURT:  He's not going to show him until we see

2    it.

3              MR. HEWITT:  I'm sorry, Your Honor?  I didn't hear

4    you.

5              THE COURT:  He's not going to use it until I see it.

6              MR. HEWITT:  Okay.

7              THE COURT:  Is this an exhibit, Mr. Berlin?

8              MR. BERLIN:  It's an exhibit in the Summary

9    Judgment, (inaudible).

10             THE COURT:  Is it an exhibit in this case?

11             MR. BERLIN:  In this case.

12             THE COURT:  What exhibit number is it?

13             MR. BERLIN:  I mean, it today's exhibit under

14   Summary Judgment.

15             THE COURT:  Today's case, one I'm sitting here on

16   now.  You submitted some exhibits --

17             MR. BERLIN:  Yes.

18             THE COURT:  -- is this one of them?

19             MR. BERLIN:  Yes.

20             THE COURT:  What exhibit letter or number is it?

21             MR. BERLIN:  It's in my Motion for Summary Judgment.

22   It's not so easy for me to -- I can't find it at the moment.

23   It's not organized.

24             THE COURT:  Then move on.

25   BY MR. BERLIN:

E. Zaretsky - Cross                    78

1    Q      How long was the order of protection against you?

2           MR. HEWITT:  I'm going to object on relevance, Your

3    Honor, again.

4           THE COURT:  What's the relevance of this?

5           MR. BERLIN:  To discredit his -- the Plaintiff's

6    credibility.

7           THE COURT:  Discredit what?

8           MR. BERLIN:  His credibility, that he's lying.

9           THE COURT:  He's lying?

10          MR. BERLIN:  Yeah.

11          THE COURT:  Well, then ask him a specific question

12   about what you think he's lying about if that's your point.

13          MR. BERLIN:  Yeah, so asked him how long was the

14   order of protection against you, for how long?

15          THE COURT:  What does that have to do with the State

16   Court Judge's decision that found you liable for damages for

17   having sent a false and malicious e-mail?  My only interest is

18   the fact, in which we said in the beginning of this case,

19   whether I can determine that you did that intentionally and

20   knowingly.  So, what they introduced on his direct testimony

21   was what they claim, and claimed the record shows are e-mails

22   you sent and that those e-mails contained false and malicious

23   information.  If I were you, I would be asking him about that,

24   but it's your witness, but I don't find it relevant at all.

25   You'd probably be better listening to me.

E. Zaretsky - Cross                        79

1              MR. BERLIN:  Okay.

2              THE COURT:  Again, do what you want.

3              MR. BERLIN:  Okay.

4    BY MR. BERLIN:

5    Q     Do you know (inaudible) Wacholder?  David Wacholder?

6    A     I saw him, yes.

7    Q     You saw him?

8    A     In Court, yes.

9    Q     You know him?

10   A     I don't know him but I saw him with you.

11   Q     How many times -- did you speak to him by phone?

12             MR. HEWITT:  I'm going to object here on relevance.

13             THE COURT:  Okay.  Who did you -- I didn't hear.

14   Who did you ask him if he saw?

15             MR. BERLIN:  David Wacholder.

16             THE COURT:  David what?

17             MR. BERLIN:  Wacholder.  Wacholder.

18             THE COURT:  What does that person have --

19             MR. BERLIN:  He the person that created the e-mails

20   on the command of him and he's the one that sent it, I have

21   proof of this.  But this is not the Court, that's not the

22   place.

23             THE COURT:  Stop.  He -- you're claiming he's the

24   person who sent the e-mails?

25             MR. BERLIN:  Not only sent the e-mails.  He created

E. Zaretsky - Cross                  80

1     the e-mails on his --

2              THE COURT:  Fine, except you have a State Court

3     record and Judge, State Supreme Court Judge, who has found

4     that you sent and created the e-mails.  I'm no longer trying

5     that issue.

6              MR. BERLIN:  Okay, so let me go to the Order from

7     the State Court.  Let me go to the Order of the State Court.

8              THE COURT:  No, what you can do is you can ask

9     Mr. Zaretsky questions or say you have no questions, and then

10    we'll move on and counsel can pull another witness.  Then

11    he'll finish and you can go.  That's the way it works.  I'm

12    not interested in any speeches right now.

13             MR. BERLIN:  Okay, so --

14             THE COURT:  Either ask Mr. Zaretsky relevant

15    questions or don't.

16             MR. BERLIN:  I would like to reserve my right to ask

17    him later and I want to make my statement.

18             THE COURT:  Well, the answer to that is no.  He's on

19    the stand now.

20             MR. BERLIN:  Yeah.

21             THE COURT:  Ask him questions or don't ask him

22    questions.  Your opportunity.

23             MR. BERLIN:  Okay, so I'm not going to ask him any

24    questions for the moment --

25             THE COURT:  Fine with me.

1          MR. BERLIN:  -- until I make the statement.  We'll

2     see, maybe after -- I want to reserve the rights to bring him

3     on stand after he's going to make the other lawyer --

4          THE COURT:  You will have the right to call any

5     witness, if they're here --

6          MR. BERLIN:  Okay.

7          THE COURT:  -- and you have subpoenaed him.

8          MR. BERLIN:  Okay, so in the meantime --

9          THE COURT:  So, if you no longer have any questions

10    for him --

11         MR. BERLIN:  Yes.

12         THE COURT:  -- then you don't have any questions.

13    But whether or not you intend to call someone in the future on

14    your direct case, we'll see what we do with it.

15         MR. BERLIN:  Okay, so --

16         THE COURT:  But right now you're done with --

17         MR. BERLIN:  -- not -- right now, I have no

18    questions.

19         THE COURT:  Fine.

20         MR. BERLIN:  So, now I will --

21         THE COURT:  Counsel, that's it.  That's the

22    question.  You're done for the moment.

23         MR. BERLIN:  Yeah.

24         THE COURT:  Do you have any additional questions?

25    Redirect?  I don't know why.

Appendix  A - 175

82

1          MR. HEWITT:  I don't have any questions for the

2    witness.

3          THE COURT:  Good.  Sir, you can step down.  Thank

4    you.  Now, Mr. Berlin, you sit down.  Counsel gets to call

5    another witness.  He goes.

6          MR HEWITT:  I'm going to call Feige Zaretsky.

7          THE COURT:  We'll also swear in the interpreter,

8    please.  First swear in the interpreter, please.

9      (GLORIA VARGAS sworn to interpret from sign language to

10   English)

11         THE CLERK:  Please state your name.  State and spell

12   your name for the record.

13         MS. VARGAS:  My name is Gloria Vargas, V-A-R-G-A-S.

14   I am a certified sign interpreter.  Good afternoon, Your

15   Honor.

16         THE COURT:  So, you've testified in Court before --

17         MS. VARGAS:  Yes, I have.

18         THE COURT:  -- or interpret -- okay.

19         MS. VARGAS:  Yes.

20         THE COURT:  Now, can we swear in the witness,

21   please?

22         THE CLERK:  Please stand, raise your right hand.  Do

23   you swear to tell the truth, the whole truth --

24         THE COURT:  Slow down.

25          FEIGE ZARETSKY, PLAINTIFF'S WITNESS, SWORN

Appendix  A - 176

F. Zaretsky - Direct                    83

1              THE CLERK:  Please be seated.  State and spell your

2     name into the microphone.

3              MS. ZARETZSKY:  F-E-I-G-E, first name.  Last name is

4     Z-A-R-E-T-S-K-Y.  Do you need my address?

5              MR. HEWITT:  Yes, the witness can state her address

6     for the record.

7              MS. ZARETSKY:  10 Chestnut Drive, Plainview, New

8     York 11803.

9              THE CLERK:  Thank you.

10             MR. HEWITT:  Can I go forward, Your Honor?

11             THE COURT:  Please.

12                      DIRECT EXAMINATION

13    BY MR. HEWITT:

14    Q     Was there a time where you were married to Harold

15    Zaretsky?

16             THE COURT:  With these -- with a witness who has a

17    -- an interpreter, remember to go a little slower.

18             MR. HEWITT:  Okay.  I'm sorry, Your Honor.

19    A     Yes, I'm divorced now.

20    BY MR. HEWITT:

21    Q     Okay, and what -- when did you get married to him?

22    A     May 29th, 1994.

23    Q     And when were you divorced?

24    A     September 10th, 2004.

25    Q     Is the Family Court proceeding still going on?

F. Zaretsky - Direct                84

1    A     Yes.

2    Q     And what is still at issue in the Family Court

3    proceeding?

4              MR. BERLIN:  Objection.

5              THE COURT:  What's the objection?

6              MR. BERLIN:  It's not relevant.

7              THE COURT:  Stand up.

8              MR. BERLIN:  It's not relevant, it just -- first of

9    all, she got an order Friday --

10             THE COURT:  Just state your objection.  Your

11   objection is it's not relevant?

12             MR. BERLIN:  It's not relevant to the case.

13             THE COURT:  Okay.  What's the relevance?

14             MR. HEWITT:  I'm just trying to establish the

15   feelings of the Berlins against the Zaretsky's.

16             THE COURT:  All right.  We'll let it go for a little

17   while, but I think we've established that the two groups are

18   not the best of friends.

19             MR. HEWITT:  Okay, I'm not really going to go into

20   the Family Court matter.

21             THE COURT:  I'm going to give you a little leeway,

22   but not much.

23             MR. HEWITT:  Okay.

24   BY MR. HEWITT:

25   Q     What are the issues still remaining in the Family Court

F. Zaretsky - Direct                          85

1    matter?

2    A     The reason why we're in Family Court is because Harold

3    Zaretsky is not following the order because he's behind child

4    support as well as alimony.  And the Family Court has all of

5    the information there and it has not been resolved.  It's not

6    finished.

7    Q     So, this has been a difficult divorce, would you say?

8    A     Yes.

9    Q     And when did the divorce proceedings begin?

10   A     That question isn't clear.

11   Q     When was -- when did somebody file for divorce?

12   A     I believe in 2004.

13   Q     As a result of this divorce, what is your father's

14   feelings towards the Zaretsky's?

15            MR. BERLIN:  Objection.

16            THE COURT:  Sustained.

17   BY MR. HEWITT:

18   Q     What are your feelings towards the Zaretsky's as a

19   result of the divorce?

20            MR. BERLIN:  Objection.

21            THE COURT:  Overruled.

22   A     So, can you clarify the question?

23   BY MR. HEWITT:

24   Q     Yes, how do you feel towards, let's take Elliot

25   Zaretsky?

F. Zaretsky - Direct                86

1   A       Well, his goal is to take away all the kids from me.

2   That's his goal and that's what's causing me to go through a

3   very difficult time.  He wants to take everything: the

4   children, everything, so I would have nothing left for myself.

5   How do I protect myself through these difficult times?

6   Q       Are you angry towards Elliot Zaretsky?

7   A       The point is the Court.  I'm still continuing going to

8   Court for the last ten years.  And his goal is he doesn't me

9   to do anything.  That is why I'm very worried.  I'm paranoid.

10  I'm going to lose my children (inaudible).  I don't want to

11  lose them all.  I'm trying to fight for that, but this is not

12  right.  He wants to take away my house, my kids, everything.

13          MR. HEWITT:  I'll move to strike the non-responsive

14  portion of that answer, please.

15          THE COURT:  You asked her how she feels about

16  Mr. Zaretsky, so we'll leave it at --

17          MR. HEWITT:  Okay.

18  BY MR. HEWITT:

19  Q       Then my last question was, are you angry at

20  Mr. Zaretsky, Elliot Zaretsky?

21          MR. BERLIN:  Objection.

22          THE COURT:  Overruled.

23  A       The question's not clear.

24  BY MR. HEWITT:

25  Q       Are you mad at him?

F. Zaretsky - Direct                    87

1   A     I'm very, very frustrated.  Paranoid.  That's my entire

2   response.  I'm worried about myself, my kids.

3   Q     And how long have you felt this way?

4   A     What do you mean?

5   Q     Have you felt this way since the beginning of the

6   divorce in 2004?

7   A     Yes, from the beginning up to this point.  To now, yes,

8   worried, paranoid, because Harold has the custody of the kids.

9   I want half custody of the kids, but he wants them entirely to

10  belong to him.  I want the children to be with me, too, and

11  that's what's causing me to become very stressed, and worried,

12  and paranoid.  Every single day, I'm worried.  This Court has

13  made be very, very upset because it's very difficult because

14  of the fact that this whole proceeding has been taking such a

15  long time.  It's ongoing.

16          MR. HEWITT:  I'll move to strike the non-responsive

17  portion.

18          THE COURT:  We'll strike the last part of the

19  answer, but let's move on.

20          MR. HEWITT:  Okay.

21  BY MR. HEWITT:

22  Q     Do you have the same feelings towards Harold Zaretsky as

23  you testified you have towards Elliot Zaretsky?

24  A     Harold and Elliot are joined together.  They agreed with

25  one another, and they were trying to do something in Court

F. Zaretsky - Direct                    88

1    against me.  Their goal is to see this finished and that I did

2    nothing.

3    Q    And do you have the same feelings against Shirley

4    Zaretsky?

5    A    I don't know.  I just can't see.

6    Q    And what are your feelings towards Maxi Aids, the

7    company?

8    A    I'm sorry.

9    Q    Maxi Aids, the company?

10   A    Elliot is part owner of this company.  Who's the owner?

11   Elliot.

12   Q    What are your feelings towards Maxi Aids?

13   A    I don't understand the question.

14   Q    Do you have bad feelings about Maxi Aids?

15   A    I'm sorry, what do you mean?

16   Q    Do you have negative feelings against Maxi Aids or

17   positive feelings, or something else?

18   A    I'm assuming it's pretty negative.

19   Q    Did you bring a RICO lawsuit with your father against

20   the Zaretsky's and Maxi Aids?

21   A    Yes.

22   Q    And in that RICO action, did you allege that you were

23   threatened by the Zaretsky's?

24        MR. BERLIN:  Objection.

25        THE COURT:  What grounds?

F. Zaretsky - Direct                    89

1              MR. BERLIN:  It's too much (inaudible).

2              THE COURT:  First of all, stand up and then repeat

3    it so I can hear you.

4              MR. BERLIN:  It's basically to arrest her.

5              THE COURT:  It's what?

6              MR. BERLIN:  To arrest her.  To pay to make cause of

7    payment, that's the purpose of the question.

8              THE COURT:  Overruled.

9    BY MR. HEWITT:

10   Q    Did you allege in the RICO action that the Zaretsky's

11   threatened you and your family?

12   A    I'm not sure I understand the question.

13   Q    In the RICO action, did you claim that the Zaretsky's

14   threatened you with harm?

15   A    I'm not sure.

16   Q    Did you allege that Elliot Zaretsky paid bribes?

17   A    I don't know.

18   Q    Did you allege that Harold beat you up?

19   A    I don't remember.

20   Q    Did you allege that Elliot threatened to murder you and

21   your children?

22   A    Elliot said that?

23   Q    No, did you allege that in your RICO complaint?  Did you

24   allege that Elliot threatened to murder you and your children?

25   A    I don't remember.

Appendix  A - 183

F. Zaretsky - Direct                    90

1    Q      Did you ever hear Elliot threaten -- did you ever --

2    were you ever told Elliot threatened to murder you and your

3    children?

4    A      I can't remember, show me the line or evidence.

5    Q      I'm just asking the questions, you should answer them to

6    the best you can.

7    A      Really, I have to say I don't know.

8           THE COURT:  Hold it.

9    BY THE COURT:

10   Q      Ask the witness if she's saying she doesn't remember

11   whether anyone ever told her that she and her children's lives

12   were being threatened by Elliot.

13   A      Can you repeat the question, please?

14   Q      Does she remember whether anyone ever told her that

15   Elliot Zaretsky threatened her life and the lives of her

16   children?

17   A      Yes.

18   Q      Who told her that?

19   A      Elliot made action.  And he told negative things to the

20   children about me, the mother, so that I could lose my kids.

21   That's part of the threat.

22   Q      No, I'm asking specifically, did anyone tell you, or did

23   you hear Elliot Zaretsky threaten to murder you or your

24   children?

25   A      No.

Appendix  A - 184

F. Zaretsky - Direct                    91

1          THE COURT:  Thank you.

2    BY MR. HEWITT:

3    Q      Did Elliot Zaretsky ever beat you physically?

4    A      No.

5    Q      Did you allege in your RICO action that Elliot Zaretsky

6    beat you physically?

7    A      I don't know.  I can't remember.

8    Q      Did Shirley Zaretsky ever beat you physically?

9    A      No.

10   Q      Did you allege in your RICO action that Shirley Zaretsky

11   beat you physically?

12   A      Maybe verbal abuse.  She'll tell the kids that to reject

13   their mother, more like verbal abuse or something like that,

14   but that was a long time ago.  It's hard to remember what

15   happened.

16   Q      I'm asking if you alleged in the RICO action physical

17   abuse by Shirley.

18   A      I don't remember.  Maybe if you can show me the lines of

19   that action.

20   Q      Did your father ever tell you that he wanted to damage

21   the Zaretsky's?

22   A      No.

23   Q      Did he ever tell you he wanted to hurt them?

24   A      No.

25   Q      Did he ever tell you he wanted to ruin their reputation?

F. Zaretsky - Direct                    92

1    A    No.

2    Q    Did you ever look at the RICO complaint that's in your

3    name and your father's name?

4    A    Yes.

5    Q    Can you tell me what your e-mail address was in

6    September 2008, if you had one?

7    A    Yes.  My e-mail address?  Popp555@aol.com.

8    Q    Does anybody else have access to that e-mail address,

9    specifically your father?

10   A    That e-mail address, at the time, 2008, my family can

11   have access to my e-mail because we trust one another.

12   There's no privacy, but now my e-mail has become more private,

13   because back then, it was just my family, and we were all

14   together.  So, there was nothing wrong with that.

15   Q    Does your family include your father?

16   A    All of my family.

17   Q    Just answer yes or no, does that include your father?

18   A    I would say my family, meaning whoever they are.

19   Q    Is your father part of the family you're talking about?

20   A    Yes, because sometimes I need my family's help.  I can't

21   read English.  You know, when I have to pay my bills I ask my

22   family to please help me out because they can look into my

23   computer because they live pretty far, and there are many

24   important things that I need to read and I depend on my family

25   a lot with that.

F. Zaretsky - Cross                    93

1          MR. HEWITT:  I just move to strike the last portion
2     of that.
3          THE COURT:  These are her answers and I think I have
4     to give this witness a little leeway because she's trying to
5     get across information.  So, we can discern what is responsive
6     and not, but I'd rather not strike the whole answer.  So,
7     we'll let her -- I just ask that you try to keep your answers
8     more targeted to the question.  If you don't understand the
9     question, just say, I don't understand it.
10         MR. HEWITT:  I don't have any further questions for
11    the witness.
12         THE COURT:  All right, well, that's easy.
13    Mr. Berlin, do you have any questions?
14         MR. BERLIN:  Questions to my daughter?
15         THE COURT:  To the witness, that's correct.  If you
16    do, go to the podium, please, so we can hear you.
17                   CROSS EXAMINATION
18    BY MR. BERLIN:
19    Q    Do you know a guy, David Wacholder?
20         MR. HEWITT:  I'm going to object.  Relevance, Your
21    Honor, again.
22         THE COURT:  I'll let her answer the question.
23    A    Yes.
24    BY MR. BERLIN:
25    Q    Was he the one that uses your phone?

Appendix  A - 187

```
                        F. Zaretsky - Cross                94
1              THE COURT:  Uses her what?
2              MR. BERLIN:  For communication for sending --
3    because he was her --
4              THE COURT:  All right.
5              MR. BERLIN:  -- lawyer, so --
6              THE COURT:  Okay.
7              MR. BERLIN:  -- he used her phone to type her in.
8              MR. HEWITT:  I'm going to object to the relevance of
9    that.
10             THE COURT:  You asked her who uses her e-mail.  I'm
11   going to let him ask if somebody uses her phone.
12   A    Yes, because I have a hard time communicating with him.
13   So, I show him I phone to ask -- to help me read it, to open
14   in my pager what's happening, because I cannot read well, so
15   he uses that.
16             THE COURT:  Okay.  All right.
17   BY MR. BERLIN:
18   Q    Were you or David Wacholder for me a lawyer, like a
19   lawyer for the papers?
20             MR. HEWITT:  Objection, relevance.
21             THE COURT:  Overruled.
22   A    Could you say the question again, please?
23   BY MR. BERLIN:
24   Q    He claimed that he's a --
25             THE COURT:  Ask a question, sir.
```

F. Zaretsky - Cross                    95

1   BY MR. BERLIN:

2   Q      Did he claim that he's a good, smart lawyer?

3            MR. HEWITT:  Objection, relevance.

4            THE COURT:  She doesn't have to answer that.

5   Sustained.  What he claims is not her testimony.

6   BY MR. BERLIN:

7   Q      Did you told me to stay away from Wacholder because

8   he's --

9            MR. HEWITT:  Objection, relevance.

10           MR. BERLIN:  -- lying or fooling?

11           THE COURT:  Are you -- sir, are you asking this

12  witness whether she told you something?

13           MR. BERLIN:  If she knows about this, if this was

14  her opinion.

15           THE COURT:  And what's the relevance of what her

16  opinion is?

17           MR. BERLIN:  Because Wacholder is the one that

18  wrote, produced, and sent the subject e-mails.

19           THE COURT:  That may have -- I'm sorry.  Okay.

20           MR. BERLIN:  What?

21           THE COURT:  That may have been relevant in your

22  State Court proceeding, but the issue of who sent those e-

23  mails and who drafted those e-mails has been resolved in the

24  State Court.  You have been found to have written and sent

25  them.  And again, my only issue is to determine whether you

Appendix  A - 189

F. Zaretsky - Cross                96

1    sent those with the intent required under 523 to make this a

2    nondischargeable debt.  So, any discussion of who else may

3    have sent them is not relevant to this proceeding.

4              MR. BERLIN:  Okay, so no further question.

5              THE COURT:  Okay.  You may step down.  Do you have

6    anymore witnesses, sir?

7              MR. HEWITT:  Yes, can I take a few minute break?

8              THE COURT:  Yes.  Take a break until 2:15.

9              MR. HEWITT:  Okay.

10       (Recess)

11             MR. HEWITT:  Your Honor, I believe Defendants walked

12   their daughter out (inaudible) the last witness.

13             THE COURT:  All right.

14             MR. HEWITT:  So, they're not here.

15             THE COURT:  I assume they're coming back?

16             MR. HEWITT:  I assume so.  They didn't say anything

17   about (inaudible).

18       (Pause in proceedings)

19             THE COURT:  Do you have anymore witnesses, sir?

20             MR. HEWITT:  Your Honor, we do not have anymore

21   witnesses.

22             THE COURT:  Do you rest?

23             MR. HEWITT:  We rest.

24             THE COURT:  Mr. Berlin, do you have any witnesses to

25   call?

97

1           MR. BERLIN:  No, I'm sorry.

2           THE COURT:  So you rest?  If you don't have any

3  witnesses, you need to --

4           MR. BERLIN:  For the moment, I've not got a witness.

5  Maybe he's going to come up (inaudible).

6           THE COURT:  No.  He's done.

7           MR. BERLIN:  Okay.

8           THE COURT:  If you have no witnesses, you're done.

9           MR. BERLIN:  (Inaudible).

10          THE COURT:  Excuse me?

11          MR. BERLIN:  Let me look at my defense.  I want to

12  say my defense.  A statement.

13          THE COURT:  I'm going to let you make a statement,

14  so if you have no witnesses, your case is done.  Do you have

15  any witnesses?

16          MR. BERLIN:  I am my witness.

17          THE COURT:  You're going to be your own witness?

18          MR. BERLIN:  Yes.

19          THE COURT:  Then you're going to take the stand and

20  he's going to cross examine you.  I don't quite understand it,

21  but --

22          MR. BERLIN:  (Inaudible) able to make a statement --

23  closing statement --

24          THE COURT:  I just told -- sir -- I just told you.

25  I'm going to permit you to make a closing statement, but if

Closing Argument - Mr. Berlin                    98

1     you're done with your case-in-chief, so to speak, which is you

2     have no witnesses, then I'm closing that portion of the

3     record.  There won't be anymore witnesses.  If you wish to be

4     your own witness, for whatever reason, which is beyond me, but

5     I've seen it, if you want to go in there and ask yourself

6     questions in some bizarre way, but then he's going to have an

7     opportunity to question you.

8               MR. BERLIN:  But basically will make my arguments --

9     I didn't make the arguments --

10              THE COURT:  Well, you can't make your arguments from

11    the witness box, because you have to ask yourself questions.

12              MR. BERLIN:  Okay.

13              THE COURT:  All you're looking for me is to let you

14    make a statement, right?

15              MR. BERLIN:  Yes.

16              THE COURT:  Okay.  I'm going to let you make a

17    statement, but your case is closed.  There are no more

18    witnesses for either side.  Plaintiff rests.  Defense rests.

19    I'm going to now let the Defendant -- does Plaintiff have any

20    statement he wishes to make?

21              MR. HEWITT:  Yes, I'll make a closing statement.

22              THE COURT:  Okay.  You go first.  You make your

23    statement.

24              MR. BERLIN:  Mr. Robert and the Judge repeatedly

25    made clear the language -- the record of the State Court is

Case 2:15-cv-00014-JMA   Document 10-1   Filed 06/30/15   Page 194 of 264 PageID #: 2180
Case 8-12-08371-reg   Doc 34   Filed 03/05/14   Entered 03/05/14 16:39:04

99

1    like -- is a finding of Mr. -- Defendant of (inaudible).  So,

2    I just want to read what the order -- this is Plaintiff's

3    Exhibit #7.

4            THE COURT:  Plaintiff's Exhibit-7, okay.

5            MR. BERLIN:  This is the order of Judge Feinman,

6    which his order, is the order about find the liabilities.

7    Only Feinman is the Judge of liabilities, and this is

8    confirmation repeating what he made already in January 9

9    order.  As he start the language, "As per this Court's order,

10   dated January 9th, the Plaintiff's unopposed Motion for

11   Summary Judgment was granted, and the matter was scheduled for

12   appear for hearing issues of damages."  It specifically

13   separates -- the Judge separates his order and the order that

14   is -- the power that gives over to the Shaffer (phonetic) --

15   to the referee, about damages.  It should be very clear that

16   this order does not give any power for Shaffer to make any

17   findings about the liabilities.  And the liabilities, as in

18   the Court -- in the order of Judge Feinman, which is Exhibit-4

19   -- Plaintiff's Exhibit-4, says only, "The Plaintiff's

20   unopposed Motion for Summary Judgment is granted."  This very

21   little words is the entire finding of Judge Feinman.  It does

22   not mention in this decision anything about even liable.

23   Because the motion that was for Summary Judgment for such

24   moronic motion, that the lawyer who presented the motion to

25   the Judge doesn't even ask anything.  He's asking only for one

1   thing, to grant Summary Judgment.  It doesn't say what Summary

2   Judgment there.  Prayer for relief.  The basis of Summary

3   Judgment was so empty that this Judge couldn't find any

4   (inaudible) in the rules to say granting what -- he just finds

5   the unopposed Motion for Summary Judgment -- this is decision

6   I think never in the history appears such a decision because

7   according to the motion was so empty and void, nothing was to

8   the motion, so the Judge couldn't find any words in the world

9   other than to say unopposed Summary Judgment because the --

10  relief request -- well, to grant Summary Judgment -- is the

11  Summary Judgment was granted.  It was granted, what for

12  Summary Judgment?  Summary Judgment was granted for Summary

13  Judgment.  It does not mention any finding about e-mails,

14  about sending e-mails -- it doesn't say anything.  The same

15  thing on Exhibit-7 that he goes to confirm -- to confirm what

16  he made the order -- it says, "As per the order prepared

17  January 9th, which Plaintiff unopposed Summary Judgment was

18  granted, and an order was scheduled for damages."  So, is

19  gonna give the (inaudible) this order for damages -- is

20  (inaudible) is quoting only Shaffer, what Shaffer wrote, but

21  if he ends up as (inaudible) report in a condition contains

22  (inaudible) it does not mention in his orders, in his full

23  orders, it is not mentioned there that it's even for liable.

24  It goes the damages, the amounts, is ordered.  Judge Feinman

25  only his order is governing the liability -- doesn't mention

1    even the word liable, not liable for the fault, wilful, but

2    even for liable.  And if we gonna discuss the way that Robert

3    reads the recommendation under the Court of Shaffer,

4    (inaudible) that because in the Complaint, if everything which

5    is mentioned in the complaint is Summary Judgment granted.

6    Meaning, if it wasn't this Complaint -- and this same

7    complaint it was saying that Mr. Berlin, the Defendant, killed

8    John Chorley (phonetic) and cremated his body -- was in the

9    Complaint, and then this Complaint went to -- for damages --

10   for civil damages.  And Mr. Berlin, the Defendant, for some

11   reason, for some -- he was late with the position papers five

12   days or ten days.  So, the order was -- Summary Judgment

13   granted, meaning that the guy -- some Judge, even if he slips

14   in the (inaudible) of the Court, he's not alive -- because in

15   the Complaint, saying (inaudible) that Defendant -- alleging

16   is sufficient, because when the Judge says Summary Judgment

17   granted, means everything in the world under the sun in the

18   Complaint is included.  It was done.  This is sort of thing I

19   didn't go to law school.  But that doesn't make sense to me

20   that anybody in the world shall understand Shaffer's finding

21   that because everything in the Complaint was included by the

22   liability from these five words of -- they never find such an

23   order in any Court saying, unopposed Summary Judgment granted.

24   Gone.  Woo.  Forever.  For everything.  Even if it happened in

25   Iraq, if it was alleged that Mr. Berlin was somehow alleged

102

1    for killing people, and even they are alive (inaudible) and

2    they have to go to vote today, they wouldn't be able to vote

3    because in the Complaint it alleges the debt.  So how can this

4    guy (inaudible) and if (inaudible) kill them, he has no

5    abilities because this guy is (inaudible) but the finding --

6    it's a finding because the language unopposed Summary Judgment

7    is such a powerful finding that nowhere on -- nothing in the

8    world can even compare to this.  This is what Mr. Robert is

9    trying to say that this puts unopposed Judgment (inaudible)

10   the Complaint, which is a Complaint -- e-mail (inaudible)

11   which is not in the rule again, but if it's alleged, and that

12   the Judge that ends says "granted."  So even this Judge that's

13   gonna be here on the (inaudible), you can kill him because

14   there is going to be a finding that he's not alive.  This is

15   not the right person because the language found in the

16   judgement granted is no stronger than any finding in any Court

17   and it creates an existent facts that this Judge (inaudible),

18   because it was alleged in the Complaint and it didn't -- the

19   papers were late for somehow the Judge says granted, was

20   granted, and the relief it doesn't ask even granted what.

21   That even this lawyer (inaudible) and I wrote the letter

22   clearly, and in my brief that the entire motion doesn't make

23   any sense whatsoever because it doesn't ask for anything.  All

24   the Summary Judgment granted said the Judge couldn't find

25   anything -- not Summary Judgment granted.  It doesn't say the

Appendix  A - 196

Closing Argument - Mr. Hewitt                103

1   guy sent e-mails, the guy hit somebody, the guy robbed
2   somebody.  No Summary Judgment granted.  Summary Judgment
3   granted.  Summary Judgment.  That's all.  And this is going to
4   be out here in Court about making from this finding an
5   (inaudible) which sits in the (inaudible) you call him, he's
6   not alike.  Because in the Complaint was alleged that the
7   Defendant, Mr. Berlin, saw (inaudible) kill him, and later on
8   in the civil action, he didn't (inaudible) in the Complaint
9   (inaudible).  It doesn't make sense to me.  It doesn't make
10  sense to me at all.  Thank you.
11          THE COURT:  Okay.
12          MR. HEWITT:  As I said in my opening, I believe the
13  testimony we've elicited and the documents moved to evidence
14  conclusively demonstrate that the defamation debt should be
15  nondischargeable as the result of a wilful, malicious injury.
16  We can prove this in several ways.  Number one, despite Mr.
17  Berlin's theatrics, it's a fact that the State Court, to find
18  Summary Judgment, must be finding that the allegations in the
19  Complaint are accurate and true.  It was also reiterated by
20  the referee that the State Court had to come to those
21  determinations for liability.  The State Court Complaint never
22  alleged a reckless disregard for the truth or falsely give a
23  statement.  It never alleged negligence.  Every single one of
24  the causes of action for liable for each of the Plaintiffs
25  alleged the statements were sent wilfully and maliciously and

Appendix  A - 197

1    with intent to injure, and that Berlin knew the statements to

2    be false.  The Complaint alleges Berlin sought to destroy

3    Elliott's (phonetic) reputation, the reputations of Shirley,

4    of Harold, and Maxiayes (phonetic), that the e-mails were

5    meant to denigrate the third parties' opinions of all those

6    parties, that they were intended to cause injury.  All that is

7    in Plaintiff's Exhibit-1.  Therefore, the Complaint was

8    alleging that they were wilful and malicious as required for

9    dischargeability in the Bankruptcy Code.  When Summary

10   Judgment was granted, the Court was finding that the

11   allegations in the Complaint were true and the injuries were

12   wilful and malicious.  If Mr. Berlin has an argument that

13   Judge Feinman didn't make the appropriate findings that he was

14   supposed to make under the state law to find Summary Judgment,

15   he had his rights to appeal or to ask to vacate the judgment,

16   which he did repeatedly, and he repeatedly lost.  The referee

17   was given jurisdiction to hear and report on all issues, and

18   hear and resolve all issues by the order of Judge Feinman in

19   granting Summary Judgment.  That's Plaintiff's-6 in evidence.

20   As the report by the referee states, "All allegations in the

21   Complaint are deemed admitted by the failure to oppose the

22   Summary Judgment Motion."  The referee found defendant's

23   default established Defendant's liability with regard to the

24   allegations of publishing these false, malicious, and

25   defamatory statements.  It is clear that it was established in

1    the State Court that each of the e-mails were false,

2    malicious, and defamatory, published by Defendant, and sent

3    with the intent to injure.  The referee's report also found

4    Harold Zaretsky (phonetic) was portrayed in the e-mails as "a

5    mentally incompetent, vindictive, contemptuous man with no

6    regard for his children."  The referee found that the e-mails

7    were jointly composed by Ahron Berlin, the Defendant, and his

8    daughter, Favey (phonetic).  This report was adopted by Judge

9    Feinman in his decision in which he also found Mr. Berlin

10   obviously sent the e-mails, as Your Honor has said.  I think

11   we have established as well, that due to the breakdown of the

12   marriage between Favey and Harold, that Defendant Berlin, had

13   it out for Elliott.  It is undisputed that Defendant Berlin

14   had Elliott arrested, that there was no cause, that Berlin

15   sent these e-mails that had allegations of fraud before the

16   IRS, allegations of fraud to State Governments and State

17   Agencies, that Shirley encouraged Harold to beat Favey, that

18   Harold beat Favey, that Elliott also encouraged it.  All of

19   these by the State Court decision are deemed to be false

20   allegations.  We know that Berlin intended to harm because of

21   the questions asked in the e-mails.  Does the Government say

22   the papers mean nothing?  Do the hospitals and companies who

23   deal with Maxiayes know these allegations?  Should the Court

24   reward -- and then it goes on to make the defamatory

25   statements.  What about Harold's creditors?  Do they know?

106

1    Then, Defendant Berlin files a RICO action, 10-3771, in which

2    many of these statements are alleged again against the

3    Zaretskys and Maxiayes.  He clearly intends to harm the

4    Zaretskys and Maxiayes.  He clearly intended to send the

5    e-mails.  The e-mails on their face are malicious.  These kind

6    of allegations which were found to be false in the State

7    Court, just cannot be made recklessly.  They cannot be made

8    negligently.  They were intentional, and they were malicious.

9    They're the type of allegations that could destroy a

10   reputation of a company that's in the business to help

11   disabled people.  It's the kind of allegations that could

12   destroy the reputation of Harold, of Elliott, and of Shirley,

13   among the close-knit deaf community, among the employees who

14   received the e-mails, among the friends who received the

15   e-mails.  Defendant should not get to make intentional

16   defamatory statements about Plaintiffs, hurt their business

17   and reputation, fail to defend the statements in State Court,

18   allow findings to be made and a judgment to be issued, and

19   then repeatedly delay collection on that judgment by filing

20   unnecessary and legally improper actions in State Court time

21   and time again, and when that does not work, file bankruptcy

22   with the motive to wipe out this wilful and malicious debt.

23   That is the reason why the statute exists.  Thank you, Your

24   Honor.  If Your Honor requires any kind of post-trial

25   submissions, we would of course would be happy to submit them.

1        THE COURT:  All right.  We still haven't resolved

2   the Defendant's Exhibits.  Are they being admitted without

3   objection, all these exhibits?

4        MR. HEWITT:  I object to several of the exhibits.

5        THE COURT:  Well, let's go over them, because we've

6   got to close this --

7        MR. BERLIN:  (Inaudible).

8        THE COURT:  No, you're done.  You're done.

9        MR. HEWITT:  As for Exhibit-A, when he described it

10  in our discussions for the Pretrial Order, I had no objection.

11  My objection now to Exhibit-A is that it's only two pages out

12  of ten.  I didn't realize that he was only going to submit

13  those two pages when he described it as his emergency

14  response.  I don't believe it's complete, and I'm not sure of

15  the relevance, but even if it is relevant, it's incomplete.

16       THE COURT:  Mr. Berlin, your Exhibit-A, according to

17  counsel is not a complete document, and therefore should not

18  be admitted.

19       MR. BERLIN:  I (inaudible).

20       THE COURT:  It should be an exhibit, even though

21  it's two pages of a ten-page document?  How can I admit that?

22       MR. BERLIN:  This is what I presented in the Summary

23  Judgment.  This is only showing you the date that the request

24  for (inaudible) --

25       THE COURT:  It doesn't work.  We're going to exclude

108

1   A.   Next.

2            MR. HEWITT:   Okay.   B is our Motion for Summary

3   Judgment in the State Court.   That's also one of my exhibits.

4   I have no objection to B.

5       (Defendant's Exhibit-B previously marked for

6   identification)

7            THE COURT:   All right.

8       (Defendant's Exhibit-B admitted into evidence)

9            MR. HEWITT:   I don't have an objection to C.

10      (Defendant's Exhibit-C previously marked for

11  identification)

12      (Defendant's Exhibit-C admitted into evidence)

13           THE COURT:   All right.   Just tell me what you have

14  an objection to.

15           MR. HEWITT:   I have an objection to I.   It's

16  supposed to confirm the arrest of Elliott Zaretsky.   Mr.

17  Zaretsky testified that he was arrested.   I is two pages -- or

18  three pages -- several pages of a very long transcript,

19  apparently, and there's no signature at the end or a testament

20  by the Court reporter, it's incomplete.

21      (Defendant's Exhibit-I previously marked for

22  identification)

23           THE COURT:   I'm not sure it matters.

24           MR. HEWITT:   I don't know if it's relevant, either,

25  but --

1          THE COURT:  I'll let it in.  It's an incomplete

2     document, so I'll let it in for whatever purpose the Court

3     views its relevance.  So we're excluding A and admitting

4     everything else?

5          (Defendant's Exhibit-I admitted into evidence)

6          MR. HEWITT:  No, J I also have --

7          THE COURT:  Let me see what J is.

8          MR. HEWITT:  He divided J into a bunch of sub-parts.

9          THE COURT:  Oh, here's J.  Okay.

10         MR. HEWITT:  Exhibit-J -- I don't see an Exhibit-

11    J(a).  It's starts with Exhibit-J(b), I believe.  Exhibit-J(b)

12    he has as an affirmation of David Lockholder (phonetic) from

13    the State Court.  I object to that on hearsay grounds, on the

14    fact that he could have called Lockholder as a witness in this

15    action, that he submitted this in the State Court action and

16    it was rejected in his attempt to vacate.

17         (Defendant's Exhibit-J(b) previously marked for

18    identification)

19         THE COURT:  I'm going to admit it, but it has no

20    value.

21         MR. HEWITT:  Okay.

22         THE COURT:  I'm going to let him admit it, but the

23    Court will -- it has no value since it can't be authenticated.

24         (Defendant's Exhibit-J(b) admitted into evidence)

25         MR. HEWITT:  J(c), it's apparently a check from

110

1    Favey to David Lockholder -- I don't know.  And then there's

2    another one that's just made out to cash, not even made out to

3    Lockholder.  I don't think it's relevant.

4        (Defendant's Exhibit-J(c) previously marked for

5    identification)

6            THE COURT:  Again, I think a lot of this has no

7    purpose --

8            MR. HEWITT:  Okay.

9            THE COURT:  -- but if the Defendant believes -- Mr.

10   Berlin, why should I admit this exhibit about David Lockholder

11   -- whatever his name is?

12           MR. BERLIN:  Because the findings (inaudible).

13   findings does even mention liable -- very clear separation

14   from this order and --

15           THE COURT:  I got that -- I got -- Mr. Berlin -- Mr.

16   Berlin --

17           MR. BERLIN:  (Inaudible).

18           THE COURT:  I listened to you.  I understand your

19   argument.  As a matter of law and fact, you're wrong.  But

20   it's your argument, so you're entitled to it.

21           MR. BERLIN:  I mean all that --

22           THE COURT:  Don't argue with me.  I don't see any

23   purpose in an exhibit relevant to Mr. Lockholder under the

24   theory that he is actually the one who may have done something

25   --

1          MR. BERLIN:  (inaudible)

2          THE COURT:  All right.  I'm going to admit the

3   exhibits, but I'm telling that I don't think they have any

4   purpose, but I understand the Defendant's argument that his

5   belief is that the State Court Judgment did not determine

6   liability or the fact that he, in fact, sent the e-mails.  He

7   and I disagree on that, but that's his position.  So, for

8   purposes of supporting his position, I'll admit the exhibits,

9   even though as a matter of law, I believe he's wrong.  But

10  it's his position.  He's entitled to his position.

11       (Defendant's Exhibit-J(c) admitted into evidence)

12          MR. HEWITT:  Can I make one other objection?

13          THE COURT:  Sure.

14          MR. HEWITT:  J(g).  It's an affirmation from a

15  person Nathan Galant (phonetic).  There's been no testimony as

16  to who Mr. Galant is in this action.  He didn't call Mr.

17  Galant.  The statements are hearsay.  As well, in the State

18  Court Plaintiff's Exhibit-12, this same affirmation was

19  rejected --

20          THE COURT:  This is J(g)?

21          MR. HEWITT:  Yeah J(g).

22          THE COURT:  I have an affirmation by Nathan Galant?

23       (Defendant's Exhibit-J(g) previously marked for

24  identification)

25          MR. HEWITT:  Yes.  I'm objecting to that because Mr.

112

1    Galant did hearsay statements.  Mr. Galant wasn't present.

2    There's been no testimony as to who he is.

3              THE COURT:  Who is Mr. Galant?  If I can interrupt

4    your conversation.  Who is Mr. Galant?

5              MR. BERLIN:  Mr. Galant is a witness that he saw

6    that the (inaudible) that the e-mail was produced by Elliott

7    and (inaudible) together.

8              THE COURT:  Well, since you never called him as a

9    witness --

10             MR. BERLIN:  (Inaudible) I can (inaudible) --

11             THE COURT:  Not anymore, you can't.  You never --

12             MR. BERLIN:  At the time we (inaudible) was

13   (inaudible) but I can call him but it takes two or three

14   weeks.  Yeah.

15             MR. HEWITT:  There's another --

16             MR. BERLIN:  He's in (inaudible) --

17             THE COURT:  All things come to an end, and this has

18   come to an end.

19             MR. HEWITT:  The other thing is in Plaintiff's

20   Exhibit-12, there was a decision --

21             THE COURT:  I'm going to exclude the affirmation of

22   Nathan Galant.

23             MR. HEWITT:  Okay.  Yes.  I don't have a real

24   objection to Exhibit-J(h) other than again, it's incomplete.

25   It's a pleading, but it's incomplete.  It ends on page 50.

Case 2:15-cv-00014-JMA   Document 10-1   Filed 06/30/15   Page 208 of 264 PageID #: 2194
Case 8-12-08371-reg   Doc 32   Filed 03/05/14   Entered 03/05/14 16:39:04

113

1    Unless --

2        (Defendant's Exhibit-J(h) previously marked for

3    identification)

4        (Defendant's Exhibit-J(h) admitted into evidence)

5        THE COURT:  That's going to be a public record.

6    That's --

7        MR. HEWITT:  Oh, I'm sorry, it seems like it's

8    continued on J(i), so it's a public record.

9        THE COURT:  I'm going to leave that in.

10       MR. HEWITT:  I don't have a problem with that as

11   well.  And then, J(j) is an e-mail from David Lockholder.  I

12   don't see the relevance of it.

13       (Defendant's Exhibit-J(j) previously marked for

14   identification)

15       THE COURT:  Again, Mr. Berlin's position, and I've

16   stated my own --

17       MR. HEWITT:  Sure.

18       THE COURT:  -- relies to some degree on Mr.

19   Lockholder in some capacity, and since this supports his

20   argument, I'm going to allow him to leave it in.

21       (Defendant's Exhibit-J(j) admitted into evidence)

22       MR. HEWITT:  All right.  The only other objection is

23   to J(d), it's (inaudible) before.  There are several pages.

24   The first one says page one out of three, but it's never

25   continued.  It's just -- it seems to be some kind of memo, but

114

1    it's not sure who -- clear who it's from.

2         (Defendant's Exhibit-J(d) previously marked for

3    identification)

4              THE COURT:  What is this?

5              MR. BERLIN:  It's an e-mail (inaudible) --

6              THE COURT:  It's your exhibit.  What is it?

7              MR. BERLIN:  It's the complete e-mail that

8    Lockholder sent to me (inaudible) he --

9              THE COURT:  In the house there is a painting of a

10   ballerina and a painting of a woman?

11             MR. BERLIN:  Yes, (inaudible) told me what

12   (inaudible) to do.  (Inaudible).

13             MR. HEWITT:  I mean, I'll leave it to the Court.  It

14   doesn't really -- authenticating who it's from and what it is.

15             THE COURT:  I'm going to leave it in.

16        (Defendant's Exhibit-J(d) admitted into evidence)

17             MR. HEWITT:  Okay.

18             THE COURT:  I think this is all consistent --

19   whatever my view of Mr. Berlin's argument -- it's consistent

20   with his argument.  I think there were some infirmities to it,

21   but I don't think it's --

22             MR. HEWITT:  Your Honor, I don't have any -- that's

23   all my objections.

24             THE COURT:  All right.  The Court's going to reserve

25   -- what we have, just so you all understand in my view is, we

115

1    have a State Court judgment, which I've already said what I

2    think it says.  We've now had an opportunity for the parties

3    to put before this Court a basis for the Court's determination

4    of whether or not I think that Mr. Berlin's conduct in this

5    case meets the parameters as required by 523 or not.  In that

6    capacity, Mr. Zaretsky took the stand and denied affirmatively

7    almost all the allegations that were contained in those

8    e-mails.  There was nothing put on that supported any truth to

9    them.  But, we have a record.  We'll look at the record.

10   We'll get you a decision as quickly as we can.  That's it.

11   Thank you very much.

12          MR. HEWITT:  Your Honor, there's no post-trial

13   submissions?

14          THE COURT:  No post-trials are necessary on this.

15          MR. HEWITT:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17      (Court adjourned)

18

19                        CERTIFICATION
20   I certify that the foregoing is a correct transcript from the
21   electronic sound recording of the proceedings in the above-
22   entitled matter.
23
24
25   *Lewis Parham*                        3/5/14
26
27
28   Signature of Transcriber              Date


Appendix  A - 209

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
In re:

AHRON BERLIN,                                                    Case No. 8-12-74600-reg
                                                                Chapter 7

                        Debtor.
---------------------------------------------------------------X
ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY, AND MAXI-AIDS, INC.,

                        Plaintiffs,                             Adv. Pro. No. 8-12-08371-reg

                -against-

AHRON BERLIN,

                        Defendant.
---------------------------------------------------------------x


## DECISION AFTER TRIAL

This matter is before the Court pursuant to an adversary proceeding commenced by Elliot

Zaretsky, Harold Zaretsky, Shirley Zaretsky, and Maxi-Aids, Inc. (the "Plaintiffs") against

Ahron Berlin (the "Debtor" or "Defendant") seeking a determination that prepetition awards in

the aggregate sum of $1,290,000.00, plus interest and fees, against the Debtor based on default

judgment at the summary judgment stage in a state court action for defamation are

nondischargeable under section 523(a)(6) of the Bankruptcy Code.  That section provides that a

debtor may not be discharged from debt incurred based on liability "for willful and malicious

injury by the debtor to another entity or to property of another entity."  The Plaintiffs previously

made a motion for summary judgment in this adversary proceeding, alleging that the underlying

state court findings were *res judicata* in this proceeding and the findings satisfied each element

required under section 523(a)(6).  Although the Court agreed that the findings regarding the

Page **1** of **10**

dollar amount of the debt and the defamation claim were *res judicata* in this proceeding, the state

court record was insufficient to conclude that the Debtor's conduct was "willful and malicious"

within the meaning of section 523(a)(6). Because defamation can be established without a

finding of willful and malicious conduct, and the state court record was unclear as to the

Debtor's intent, a hearing was necessary to make appropriate findings. Based on the record

before the Court, including the Debtor's closing argument at trial, the Court concludes that the

Defendant's conduct regarding the defamatory statements was willful and malicious as to each

plaintiff. Therefore, the debts owed by the Debtor to the Plaintiffs as set forth in the State Court

judgment are nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

## FACTS

Elliot Zaretsky ("Elliot") is the founder and owner of Maxi-Aids, Inc. ("Maxi-Aids"), a

company that sells equipment and products designed to enhance the lifestyles of individuals with

special needs, such as those who are blind or deaf. Elliot and Shirley Zaretsky ("Shirley") are

the married parents of Harold Zaretsky ("Harold"). Harold was married to and subsequently

divorced from the Debtor's daughter, Feige Zaretsky ("Feige"). The divorce was bitter and

contentious.

On September 26, 2008, subsequent to the entry of the Judgment of Divorce, the

Plaintiffs commenced a libel action in the New York State Supreme Court, Nassau County (the

"State Court"), against the Debtor and Feige (the "Defendants"). The Plaintiffs alleged that the

Defendants sought to destroy the Plaintiffs' reputation by sending false and defamatory

statements via email to various third parties, including several employees of Maxi-Aids, Inc.

Appendix   A - 211

The emails were incorporated by reference in the State Court complaint and include the following statements:[1]

a.  "The Zaretskys have no problem coming up with unlimited funds to pay for lawyers and other court expenses, but have trouble coming up with money for this poor deaf starving mother and her three children."

b.  "They brazenly use the courts as a way to try to rid of Faige and use the children as weapons against their own mother."

c.  "We believe the information we are sending to you illustrates that the Zaretskys are experienced in implementing corrupt tactics by manipulating the court system as ping pong balls and instruments of abuse against Faige Zaretsky, an innocent victim."

d.  "The whole world is in shock. Nobody will tolerate husbands who deprive their wives of food . . . who owe a million in child support and attorney fees . . . who uses every trick to delay paying maintenance and CS . . . who try to steal children from a devoted mother . . . who own over two thirds of the shares of Maxi and lied in court that Harold owns nothing."

e.  "If Harold is mentally incompetent, must the must the court appoint a representative for him?"

f.  "He [Harold] chooses to follow his father's lead for profit and possibly the fun of stealing and abusing his wife."

g.  "Mother Shirley to encourage him to yell at his wife, control his wife, and even punch his wife – gives him 5000 dollar presents every month!"

---

[1] Plaintiffs have annexed as exhibits seven different versions of defamatory emails sent by the Defendants. Plaintiffs' Exs. 14-20. This Court has selected several of the dozens of statements contained in one or more of the emails. As there are four Plaintiffs in this case, the Court has included at least one statement that refers to each of them.

Appendix   A - 212

h.  "It is grandmother Shirley who hates Feige and wants revenge."

i.  "The OWNERS of Maxi-Aid's Corp. began using the army of lawyers of Maxi-Aid's Corp. and all the strategies they learned in 15 years of hostile corporate strategies."

j.  "The very same Shameless team of lawyers of Maxi-Aid's Corp. that was convicted in the supreme court many times of stilling [sic] from the blind and veterans constantly for more than ten years."

k.  "'rerouted' donated most critical medical supplies from poor countries, is an intentionally famed Schemer – debarred from Veterans' Admin contracts – assessed 3 million fine – once filed chapter 11."

l.  "Do the hospitals and companies who deal with Maxi AIDS know that all their paperwork is false and no such corporation exists?"

m.  "Is the NYS Certificate of Incorporation totally <u>fraudulent</u> and a nullity as it is based on false information?"

n.  "Let us sing a Maxi song 'steal cheat lie for a bigger piece of pie, conspire scheme plot for an even blacker pot."

The Defendants filed an Answer in the State Court action, and on November 10, 2008, the Plaintiffs moved in the State Court for summary judgment on their defamation claims. Plaintiffs' Ex. 2. The Defendants failed to file a timely opposition. The Plaintiffs' motion was granted on January 9, 2009. The order issued by Justice Feinman states as follows: "Plaintiffs' unopposed motion for summary judgment is granted." Plaintiffs' Ex. 3. The matter was referred to a Special Referee for an inquest to determine damages. After a trial on the issue of damages, at which the Defendants did not appear, the Special Referee concluded that Elliot, Harold, and

Appendix  A - 213

Maxi-Aids each sustained damages in the amount of $380,000.00, and Shirley sustained damages in the amount of $150,000.00.  Plaintiffs' Ex. 6.  The Special Referee's report and recommendations were adopted by the State Court, and judgment was entered in favor of the Plaintiffs against the Defendants jointly and severally.  Plaintiffs' Ex. 7.  All of the Defendants' motions to vacate the judgment have been denied.

On September 24, 2012 the Plaintiffs commenced this adversary proceeding to except from the Debtor's discharge the amounts awarded pursuant to the State Court judgments.  On May 30, 2013, the Plaintiffs moved for summary judgment asserting that the State Court's prior determination and judgment "conclusively determined that the [Debtor's] debts to the Plaintiffs result from willful and malicious injury."  Plaintiffs' Motion for Summary Judgment at 4. Plaintiffs contended that the doctrine of collateral estoppel barred relitigation of whether the Debtor's conduct was willful and malicious, and that the judgments should be excepted from discharge under section 523(a)(6).  The Debtor cross-moved for summary judgment to dismiss the complaint.  The Court denied both motions and held that the doctrine of *res judicata* barred the Debtor from re-litigating liability and damages for defamation as to each plaintiff; however, the findings made by the State Court were insufficient to establish as a matter of law that the debt was nondischargeable under section 523(a)(6) of the Bankruptcy Code.  Because a finding of defamation could be made based on negligence by the defendant under New York law, and the record from the State Court proceeding was not clear as to the Debtor's intent, a hearing would be necessary to determine whether the Debtor's conduct was willful and malicious, as required under section 523(a)(6).  *See Roche v. Claverack Co-op. Ins. Co.*, 59 A.D.3d 914, 916, 874 N.Y.S.2d 592, 595-96 (Sup. Ct. App. Div. 3rd Dept. 2009) (defamation can be established upon varying levels of intent, including negligence.).

Page **5** of **10**

A trial was held on November 5, 2013.  The Plaintiff called Elliot and Feige to testify.  At trial, the following exhibits were admitted: Plaintiffs' 1-25; Debtor's B, C, I, J(b), J(c), J(d), J(h), J(j).  The exhibits include the letters referred to in the State Court complaint.  The Debtor called no witnesses and argued on his own behalf.  The Debtor questioned Elliot and Feige briefly and made a closing statement.  The Debtor argued that he never wrote or sent the defamatory emails and urged this Court to disregard the State Court judgment based on alleged deficiencies in the Plaintiffs' State Court motion for summary judgment and in the State Court's order granting the motion.[2]  In his closing statement, the Debtor referred to the Plaintiffs' motion for summary judgment in the State Court action as "moronic," "empty" and "void."  (Trial Tr. p. 99-100).  The Debtor offered no reasonable explanation for sending the emails or for their outrageous contents.

## JURISDICTION

A proceeding to determine dischargeability of a particular debt, such as this one, is a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 157 and 1334.

## DISCUSSION

### A.  The State Court Judgment

As set forth above, the State Court judgment resolved a number of issues, including the Debtor's liability for defamation and the amount of damages.  This Court must afford full faith and credit to the State Court judgment, which is *res judicata* as between the Plaintiffs and the Debtor as to both liability and damages.  *See In re Krautheimer*, 210 B.R. 37, 52 (Bankr. S.D.N.Y. 1997).  *See also Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir. 1987) ("The bankruptcy court . . . was bound to give preclusive effect to the default judgment obtained in the

---

[2] The Debtor previously advanced these and other arguments several times in the State Court. As mentioned above, however, all of the Debtor's motions to vacate the State Court judgment have been denied. Plaintiffs' Exs. 10-12.

Appendix  A - 215

state court by [the Plaintiff] to the same extent as would a New York court."). Therefore, the issue before this Court is "not whether the state court decision was correct, but whether the state court judgment [is] dischargeable under § 523(a)(6)." *In re Salem*, 290 B.R. 479, 482 (S.D.N.Y. 2003) (citing *Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir. 1987)). Because liability for defamation and damages had already been established as a matter of law, the trial was limited to determining whether the defamatory statements were made by the Debtor with the requisite intent to render them nondischargeable under section 523(a)(6).

### B. *"Willful" and "Malicious" under 11 U.S.C. § 523(a)(6)*

Section 523 of the Bankruptcy Code provides a list of categories of debts that are excepted from a debtor's discharge. Among them are debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The term "entity" includes a person. 11 U.S.C. § 101(15). The burden is on the Plaintiff to prove, by a preponderance of the evidence, that this exception to discharge applies. *In re Goldberg*, 487 B.R. 112, 125 (Bankr. E.D.N.Y. 2013) (citing *In re Goidel*, 150 B.R. 885, 888 (Bankr. S.D.N.Y. 1993). "As the consequences to a debtor of finding a debt excepted from discharge are severe, exceptions to discharge are to be narrowly construed and all doubts should be resolved in the debtor's favor." *Id.* (citing *In re Wisell*, 494 B.R. 23, 34-35 (Bankr. E.D.N.Y. 2011)).

The terms "willful" and "malicious" are separate elements that must each be proved. *See In re Salem*, 290 B.R. 479, 485 (S.D.N.Y. 2003) (citing *In re Krautheimer,* 241 B.R. 330, 340 (Bankr. S.D.N.Y. 1999)). For purposes of section 523(a)(6), the term "willful" requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *In re Goldberg*, 487 B.R. at 127 (quoting *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974,

140 L.Ed.2d 90 (1998). "Merely showing that a debtor committed a conscious act that resulted in an injury is not sufficient. The act must be shown to have been done with the intent to cause the injury." *Id.*

The term "malicious" means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *In re Goldberg*, 487 B.R. at 128 (quoting *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir.2006)). "Malice may be constructive or implied . . . . Implied malice may be demonstrated by 'the acts and conduct of the debtor in the context of [the] surrounding circumstances.'" *In re Goldberg*, 487 B.R. at 128 (quoting *In re Stelluti*, 94 F.3d 84, 88 (2d Cir. 1996)).

### C. Application

Applying these legal standards to the facts in this case, the Plaintiffs have proved by a preponderance of the evidence that the Debtor's conduct was "willful and malicious," within the meaning of section 523(a)(6).

The Plaintiffs allege that the Debtor made the defamatory statements with the intent to injure the Plaintiffs. The Court agrees. The facts of this case and the extreme nature of the defamatory statements leave no doubt that the Debtor sought to harm the reputations of the Plaintiffs. Elliot testified that the Debtor made the statements because he hated Elliot and Elliot's family. (Trial Tr. p. 70-71). According to Elliot, the Debtor expected to procure $2,000,000 from Elliot's family in connection with the family court proceedings.[3] (Trial Tr. p. 71). When Elliot "didn't let him get away with it," the Debtor retaliated by sending the

---

[3] Elliot testified that he knew this because "That's what [the Debtor] said to his daughter, and his daughter said it to one of her friends, who in turn, my son Harold found out." Tr. at 71-72. The Debtor did not object to the admissibility of this testimony on any grounds. Therefore, the Debtor waived his right to object to the testimony, and the Court may consider it. *See Cameron Int'l Trading Co., Inc. v. Hawk Importers, Inc.*, 03-CV-02496 JS, 2010 WL 4568980 at *4 (E.D.N.Y. Nov. 2, 2010) *aff'd*, 501 F. App'x 36 (2d Cir. 2012).

defamatory emails. (Trial Tr. p. 71). The emails, many of which are several pages in length, insult, disparage, and allege countless wrongdoings of the Plaintiffs. Elliot testified that due to the nature of Maxi-Aids's business, the reputation and good name of his family and of Maxi-Aids were vital to the business's success. (Trial Tr. p. 22-23). The Debtor also sent several emails to employees of Maxi-Aids. Plaintiffs' Exs. 14-16, 18-20. Elliot testified that the emails affected employee morale and his employees no longer trusted him. (Trial Tr. p. 67). The Court finds that the Debtor made the defamatory statements with the intent to injure the Plaintiffs, thereby establishing "willfulness" within the meaning of section 523(a)(6).

The Plaintiffs have also proved that there is no just cause or excuse for the Debtor's conduct regarding the defamatory statements. The sheer number and outrageous nature of the statements establishes that the Debtor was not merely reckless as to their truth or falsity, but rather knew the statements were false. For example, the Debtor stated that Harold abused Feige and that Harold was mentally incompetent. Plaintiffs' Ex. 14. The Debtor also accused Maxi-Aids of "rerout[ing] . . . critical medical supplies from poor countries." Plaintiffs' Ex. 14. Elliot testified that each and every one of these and other defamatory statements were entirely false. (Trial Tr. p. 50, 54). Therefore, the Court finds that the Debtor acted with "malice" within the meaning of section 523(a)(6).

It should be noted that the Debtor gave no explanation for his conduct, nor did he present any evidence to rebut the Plaintiffs' showing that his actions were anything other than "willful and malicious." The Debtor did not call any witnesses, nor did he elicit any testimony from either of Plaintiffs' witnesses that was relevant to the issue at trial, namely the Debtor's intent for purposes of section 523(a)(6). The Debtor's arguments focused on the merits of the Plaintiffs' defamation case and the validity of the State Court judgment. As discussed previously, those

Appendix   A - 218

issues were already conclusively decided by the State Court judgment, which must be given full

faith and credit by this Court.

**CONCLUSION**

For all of the foregoing reasons, this Court finds that the Plaintiffs have proved that the

Debtor's actions were "willful and malicious" within the meaning of 11 U.S.C. § 523(a)(6).

Accordingly, the Plaintiffs' awards against the Debtor in the amounts set forth in the State Court

judgment are nondischargeable.  The Court shall enter judgment in favor of the Plaintiffs

forthwith.

Dated:  Central Islip, New York
       June 19, 2014

                                     By:  _/s/ **Robert E. Grossman**_
                                        Robert E. Grossman,
                                        United States Bankruptcy Judge

Appendix   A - 219

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

AHRON BERLIN                                    Case No. 8-12-74600-reg
                                                Chapter 7

                Debtor.
----------------------------------------------------------X
ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY, AND MAXI-AIDS, INC.

                Plaintiffs.                      Adv. Pro. No. 8-12-08371-reg

        -against-

AHRON BERLIN,

                Defendant.
----------------------------------------------------------x


## JUDGMENT

Pursuant to the Court's Decision After Trial, dated June 19, 2014, **JUDGMENT** is hereby
entered in favor of the Plaintiffs.  The full amount of the judgment-debt described in the
Decision After Trial is hereby excepted from discharge under 11 U.S.C. § 523(a)(6).

Dated:   Central Islip, New York
         June 19, 2014          */s/ Robert E. Grossman*
                                Robert E. Grossman
                                United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

AHRON BERLIN                                            Case No. 8-12-74600-reg
                                                        Chapter 7

                    Debtor.
----------------------------------------------------------X
ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY, AND MAXI-AIDS, INC.

                    Plaintiffs.                         Adv. Pro. No. 8-12-08371-reg

              -against-

AHRON BERLIN,

                    Defendant.
----------------------------------------------------------x


### ORDER SCHEDULING HEARING

Upon the Notice of Motion and Motion ("Motion") to Reconsider, Alter or Amend Judgment

filed on July 3, 2014, and upon all the exhibits attached thereto by Ahron Berlin (the "Movant")

seeking reconsideration, alteration or amendment of the Judgment dated June 19, 2014 entered in

this adversary proceding, it is hereby


          ORDERED that a hearing on the Motion shall be held before this Court on  November 5,

2014 at 9:30 a.m. or as soon thereafter as counsel can be heard, before the Honorable Robert E.

Grossman, Judge of the United States Bankruptcy Court, at the Long Island Federal Courthouse

located at 290 Federal Plaza, Courtroom 860, Central Islip, New York 11722; and it is further


          ORDERED that the Movant shall serve a copy of this Order, the Notice of Motion and

Motion by regular mail upon the Plaintiffs and counsel to the Plaintiffs on or before September

16, 2014, and it is further

Appendix   A - 221

ORDERED that objections, if any, to the relief requested in the Motion shall be served upon the Movant and filed with the Court on or before October 29, 2014, and it is further

ORDERED that the Movant shall file an affidavit of service with the Court on or before September 22, 2014.



Dated: **Central Islip, New York**
**September 11, 2014**

**Robert E. Grossman**
**United States Bankruptcy Judge**

Appendix   A - 222



Ahron Berlin
1909 New York Avenue
Brooklyn, N.Y., 11210
347-254-3532
Fax100@gmail.com

September 16, 2014

Hon. Judge Robert E. Grossman
United States Bankruptcy Court
Eastern District of New York
290 Federal Plaza
Central Islip, New York 11722

Re: Chapter 7,  8:12-ap-08371

Your Honor,

I received today the Court's order dated September 11 2014, directing me to serve the opposing party and their counsel with the order by September 16 2014.

Pursuant to FRCP rule 6, a party must file a request for more time before the time to move expires, or must show excusable neglect if the request is not timely made. A party is not entitled to an extension of time when their time move has run and did not request an extension, or showed excusable neglect.

The opposing party has not filed any opposition nor did they move, neither did they request any timely extension, nor have they filed a request showing excusable neglect.

I respectfully request the Court to consider my motion pursuant to the above without allowing the opposing party to file such a late response. However if the opposing party does get a chance to file an untimely and late response after having defaulted on the motion then I respectfully request that I should also be allowed reasonable time to file a reply upon being served any opposition. I also request that I be allowed to amend my motion to alter or amend judgment once.

Respectfully

Ahron Berlin

Appendix · A - 223

Forchelli, Curto, Deegan,
Schwartz, Mineo & Terrana, LLP
The Omni
333 Earle Ovington Blvd., Suite 1010
Uniondale, New York 11553
Tel. No. (516) 248-1700
Fax No. (516) 248-1729
By: Brian J. Hufnagel
bhufnagel@forchellilaw.com

*Attorneys for the Plaintiffs*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:                                    Case No. 8-12-74600-reg
                                          Chapter 7

AHRON BERLIN,

                    Debtor.
--------------------------------------------------------X
ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY, AND MAXI-AIDS, INC.,

                    Plaintiffs,           Adv. Pro. No. 8-12-08371-reg

        -against-

AHRON BERLIN,

                    Defendant.
--------------------------------------------------------X

### OBJECTION OF THE PLAINTIFFS TO MOTION OF DEFENDANT TO RECONSIDER, ALTER OR AMEND JUDGMENT

TO:   THE HONORABLE ROBERT E. GROSSMAN
       UNITED STATES BANKRUPTCY JUDGE:

community." (Motion at 2). These defamatory accusations are old news and have already been rejected by the Court. The Motion is a frivolous rant against the Plaintiffs and fails to state any legal basis for a change in this Court's final Judgment.

9. To earn his discharge the Defendant was required to explain his conduct and rebut plaintiff's showing that his conduct was willful and malicious. The Defendant failed to make that showing at trial and continues his malicious conduct in this Motion. In the Decision, the Court gave *res judicata* effect to the State Court judgment finding that liability and damages were resolved. The correctness of the finding in the Decision that conduct of the Defendant was "willful and malicious" is only amplified by the Motion.

**Subsequent Litigation filed by the Debtor**

10. Despite the State Court Judgment against him, and the Judgment of this Court that the debt is nondischargeable, the Defendant's conduct toward Plaintiffs has not abated. On May 14, 2014, Defendant filed an action against Plaintiffs, among other defendants including Plaintiffs' prior counsel in this adversary proceeding. A copy of the amended complaint in that action (the "District Court Complaint") filed on October 2, 2014, is annexed as Exhibit "4".

11. In the District Court Complaint, the Defendant continues to make false and defamatory statements against the Plaintiffs, too numerous to

-5-

21.    In addition to the Defendant not being able to attack the state court judgment which necessarily found that this statement was false due to principles of res judicata, there is nothing in the attached decision that demonstrates that the statement about "re-routing critical medical supplies from poor countries" is true. There is nothing that shows that it was not made with 'malice' within the meaning of Section 523(a)(6). There is nothing to show that it was not part of a series of numerous "outrageous" e-mails as this Court found. (Exhibit "1" at 9).   The Second Circuit decision simply was about copyright infringement which was not one of the defamatory statements made in the e-mails by Defendant. This Court listed fifteen "outrageous" statements out of the dozens of defamatory statements made by Berlin in its decision, none of which had anything to do with copyright infringement. (Exhibit "1" at 3-10).

22.    The decision is therefore irrelevant. It does not depict Plaintiffs as being the "Bernie Madoff of the blind community" as Defendant claims without support. (Motion at 2). Moreover, to the extent Defendant thought it was relevant, he could have submitted it as part of his Pre-Trial Brief which he submitted to the Court on October 30, 2013, or raised it at trial. He did neither. (*See* ECF No. 26).

23.    Third, the Defendant has not shown any "clear error" in the Decision, or any need to prevent "manifest injustice." *See e.g. Wik v. Kunego*, 2014 WL 1746477 (W.D.N.Y. April 30, 2014) (motion for reconsideration was

- 10 -



UNITED STATES BANKRUPTCY   COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x
In Re:
AHRON BERLIN

                Debtor.
-------------------------------------------------x
ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY AND MAXI-AIDES, INC.

                     Plaintiffs.

       -against-

AHRON BERLIN,

                     Defendant.
-------------------------------------------------x

Case No.: 12-74600-reg
     Chapter 7

Adv. Pro. No.: 12-08371-reg

## DEFENDANTS' REPLY IN SUPPORT OF MOTION
## TO RECONSIDER, ALTER OR AMEND JUDGMENT

AHRON BERLIN The defendant/debtor files this reply to the opposition of

plaintiffs to the motion for reconsideration filed by defendant on July 2, 2014, had

moved before this Honorable Court pursuant to Federal Rule of Civil Procedure 59(e)

for a Motion to Reconsider, alter or amend the Judgment dated June 19, 2014 finding

Plaintiffs' awards against the Debtor in the amounts set forth in the State Court judgment

are nondischargeahle based on testimony of Mr. Elliot Zaretsky.


This motion was properly brought pursuant to both F.R.C.P. Rule 59, Bankruptcy

Rule 9023, and Local Rule 9023-1.   See also *Krohn v. Burton (In re Swift),2014*

*Bankr. LEXIS 88,2014 WL 103229(Bankr. E.D.N.Y. Jan. 9, 2014).*  This motion was

properly brought as a motion to reconsider on several grounds pursuant to the rules,

Appendix  A - 227

Primarily to prevent a manifest injustice, for clear error of law and fact and because a fraud was perpetrated on this Court, as well as for any other ground the Court may find applicable.

Additionally, plaintiffs opposition to the instant motion is defective pursuant to Bankruptcy Rule 9006, and F.R.C.P. Rule 6, for failure to serve timely, and for their late response. While defendant received the opposition on Friday afternoon in the mail a mere two hours before the Shahbath, I prepared this reply in a hurry, while not having a proper chance to present the following, nonetheless, I have attempted to present to the Court some of my arguments as best as I can in this short two days timeframe.

The instant motion stems from the Plaintiffs fraudulent and scandalous default summary judgment default in the libel suit in State Court against the defendant, claiming inter alia that defendant had defamed plaintiffs by purportedly having publicized emails with false information against plaintiffs.

**mmm**

The Court made a finding of willful and malicious intent, after Plaintiffs raised collateral estoppel based on the state court judgment. Without such estoppels there could have heen no such finding, since defendant would have been able to present that

-2-

Appendix  A - 228

plaintiffs case was fraudulent and false.  Defendant had raised the issue that no

collateral estoppel was available to plaintiffs in this case,  however the Court did not

consider that, neither did defendant have a chance to present his arguments as to

same.

During the summary judgment motion pre-trial and during the trial Plaintiff attempted

to present that there was no collateral estoppel on numerous grounds, and that

plaintiffs had improperly used it.  Defendant respectfully submits that there is no

collateral estoppel or res judicata as further explained.  Plaintiffs testimony besides

being false as set out in the motion to reconsider and as further explained, had no

value, because the Court must make a finding that defendant indeed had sent those

emails.  Plaintiffs reliance on estoppel is misplaced, hence no finding of willful and

malicious can be had without first estahlishing that those emails were sent, a fact that

defendant had no opportunity to present.

Defendant had no reason to present that his intent was not malicious because he had

another intent for instance, hecause he had no intent at all, there can be no intent to

something that defendant never ever did or even dream about.  Defendant had no

chance to present this to the Court.

Plaintiffs indeed never had any knowledge of such emails until he found out from the

suit, nor of any of the acts in this purported scheme claimed by plaintiffs.  Defendant

Appendix   A - 229

posses material testimony and proof that plaintiffs had conspired with fraudulent intent to harm defendant by causing a certain Mr. Wacholder to send those emails without defendant's knowledge.

Defendant has since the trial recently received judgment against Mr. Wacholder in the amount of 2,275,000 by the Kings County Supreme Court for having caused and conspired with the plaintiffs for this purported libel scheme and default judgment.

Subsequent to the trial defendant received judgment by the New York State Supreme Court Kings County, which found that defendant was a victim of a conspiracy between Mr. Wacholder and plaintiffs, that defendant did not have a full and fair opportunity to defend the libel suit, because Mr. Wacholder had colluded with the instant plaintiffs to send those emails, he had colluded with plaintiffs to present himself as an attorney and had acted to harm defendant's interests, for a long time after the suit, until defendant was able to uncover the fraud. While defendant had presented some of the facts pre-trial, the Court had not considered those, due to the fact that plaintiffs improperly used estoppel against defendant

Despite the fact that defendant is a victim of this horrendous fraud and never publicized any material against plaintiffs, defendant attempted nonetheless to prove that such purported publication cannot be deemed wilfull and malicious, for the mere fact that plaintiffs have lied, while plaintiffs have been previously found in prior

-4-

Appendix   A - 230

Court's to have acted in bad faith and against the disabled and blind consumers. These facts defendant only found out long after the purported publication of emails took place.

Plaintiffs, attempt to subvert the issues, and pint to testimony from trial in the instant case, to show that defendant had purportedly publicized negative information against plaintiffs, to portray them as acting in bad faith against the blind and disabled industry, however plaintiffs simply ignore the voluminous records of the Eastern District Court proceedings spanning a few years, in which evidence was presented and findings made against them in not only a similar fashion, but directly finding them, to have done things that they testified against defendants.

Defendant request the chance to submit those records from the prior Court, they are voluminous, but nonetheless prove defendants case. While plaintiffs were fully aware of their fraudulent intent and that such evidence and findings were made against them in open Court, they still continued with their false testimony against defendant. To illustrate just one minor example, plaintiffs did not refute a single word in their opposition the fact that the Veterans department had excluded them from procurement, long before the purported emails were publicized. However plaintiffs have no problem to continue to maintain that their testimony in this Court is true. It is everything but truth.

Appendix   A - 231

Nothing in defendants papers or arguments should be construed as an admission to such purported defamation scheme was ever done by defendant. Nothing is further the truth, that defendant never acted, never even intended to or dreamed about such, nor had any such knowledge of any purported defamation, emails or other act fraudulently claimed by the plaintiffs . Defendant had therefore never acted in any way against plaintiffs, defendant had other worries and troubles in his own life than to be busy with such nonsense. The Defendant is merely pointing out that this purported scheme claimed by the plaintiffs was fraudulent, and that Plaintiff had testified falsely in this Court as well, as can be readily seen from the records of both the Second Circuit as well as the Eastern District Court of New York, and from the voluminous records of the media citing those Court's.

Whether this Court had notice of such prior Court findings or the media articles, is irrelevant, it is plaintiffs who testified with false and fraudulent intent, fully knowing the fraud they were perpetrating on this Court, as well as against defendant.

As stated above, pre-trial and during trial in the instant adversary proceeding, plaintiff relied upon and argued that defendant is barred from raising and arguing the issue of the truth of the allegations without which no willful and malicious finding can be made, with plaintiffs relying on collateral estoppels from the State Court judgment. Under New York State law the defendant could not be estopped from raising such issues.  The issues have never previously been determined on the merits in the State

Appendix  A - 232

Court, and defendant had no chance to present evidence to the contrary, that the libel was false, and that he never sent those emails.

It is well established in New York law, that a summary judgment on default cannot be used as collateral estoppel since the issues have not been decided on the merits and has not actually been litigated.  The Appellate division second department in *S.D.I. Corp. v. Fireman's Fund Ins. Companies, 617 N.Y.S.2d 790,792,  208 A.D.2d 706 (N.Y.A.D. 2 Dept., 1994)* established that a summary judgment issued on default of a party, has no estoppel since the issues were not decided on the merits.

> "The proponent of collateral estoppel as the basis for the granting of summary judgment has the burden of demonstrating that the issues which are determinative of his right to this drastic relief have been necessarily and actually decided in a prior litigation (Kaufman v. Lilly & Co., 65 N.Y.2d 449, 492 N.Y.S.2d 584, 482 N.E.2d 63; Mannix Indus. v. Antonucci, 191 A.D.2d 482, 594 N.Y.S.2d 327; Weber v. Kessler, 177 A.D.2d 843, 576 N.Y.S.2d 458; Kingston v. State Farm Mut. Auto. Ins. Co., 165 A.D.2d 970, 561 N.Y.S.2d 859). "An issue is not actually litigated if, for example, there has been a default * * * [or] a failure to place a matter in issue by proper pleading" (Kaufman v. Lilly & Co., supra, at 456-457, 492 N.Y.S.2d 584, 482 N.E.2d 63, citing Restatement [Second] of Judgments § 27, comments d, e, at 255-257; Gilberg v. Barbieri, 53 N.Y.2d 285, 441 N.Y.S.2d 49, 423 N.E.2d 807; see also, Giordano v. Patel, 177 A.D.2d 468, 575 N.Y.S.2d 900; Seaman v. Fichet-Bauche N. Am., 176 A.D.2d 793, 575 N.Y.S.2d 122). The plaintiff has not met its burden of showing that the issues upon which it bases its right to judgment against Fireman's Fund have been "actually [208 A.D.2d 709] litigated". It is possible, indeed it is likely, that the judgment against Summit General was based on its default in opposing the plaintiff's motion.
>
> It is impossible to determine whether the issue of the plaintiff's entitlement to judgment against Summit General has been actually litigated. There is no way to know whether the counter order dated November 29, 1990, and the judgment dated January 10, 1991, were

Appendix  A - 233

based on a resolution of the merits, or based instead on Summit General's failure to oppose the plaintiff's first motion. It clearly would have been proper to grant this motion strictly on procedural grounds, in light of the fact that Summit General offered no opposition.

While it is true that Fireman's Fund submitted affidavits in opposition to this motion, these affidavits were initially addressed not only to the plaintiff's application for judgment against Summit General, but also to that branch of the motion in which the plaintiff sought to strike all of the defendants' answers. That these affidavits were examined by the court does not mean that the court's grant of judgment in favor of S.D.I. and against Summit General was on the merits rather than on default. "There is, in short, no basis for determining from the present record exactly what specific issues were litigated or decided in that prior [motion] so that collateral estoppel may not be invoked" (Seaman v. Fichet-Bauche N. Am., supra, at 794, 575 N.Y.S.2d 122, citing Kaufman v. Lilly & Co., supra; Matter of Halyalkar v. Board of Regents of State of N.Y., 72 N.Y.2d 261, 268, 532 N.Y.S.2d 85, 527 N.E.2d 1222)."

In the instant case, it is even more so, because the State Court summary judgment on default clearly did not determine any issues. The subsequent inquest for damages, had not been on liability, and was only for damages, and was again on default, and New York case law dictates that such issues were not deemed determinative in any event.

Defendant had in the past come across many other similar case law in both New York appellate courts, New York Court of appeals, and in the Second Circuit which confirms same, but in the hurry of filing this reply defendant was unable to include all such cases.

-8-

Appendix   A - 234

As a matter of law, Court's must take extreme precaution before applying collateral

estoppel against a debtor in discharge proceedings, *See In re Hyman, 502 F.3d 61, 65*

*(2nd Cir., 2007)*;

> "To determine whether collateral estoppel applies to the
> Surrogate's Court's judgment, we look to New York law. See Marrese v.
> Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380, 105 S.Ct.
> 1327, 84 L.Ed.2d 274 (1985); Colon v. Coughlin, 58 F.3d 865, 869 n. 2
> (2d Cir.1995). Under New York law, collateral estoppel bars relitigation
> of an issue when (1) the identical issue necessarily was decided in the
> prior action and is decisive of the present action, and (2) the party to be
> precluded from relitigating the issue had a full and fair opportunity to
> litigate the issue in the prior action. Kaufman v. Eli Lilly & Co., 65
> N.Y.2d 449, 455-56, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985); see
> Jeffreys v. Griffin, 1 N.Y.3d 34, 39, 769 N.Y.S.2d 184, 801 N.E.2d 404
> (2003); Buechel v. Bain, 97 N.Y.2d 295, 303-04, 740 N.Y.S.2d 252,
> 766 N.E.2d 914 (2001); see also Khandhar v. Elfenbein, 943 F.2d 244,
> 247 (2d Cir.1991). Under New York law, collateral estoppel is [502
> F.3d 66] a flexible doctrine and whether to apply it a particular case
> depends on "general notions of fairness involving a practical inquiry
> into the realities of the litigation." Jeffreys, 1 N.Y.3d at 41, 769
> N.Y.S.2d 184, 801 N.E.2d 404.

> On this appeal, these principles must be analyzed jointly with
> others that have special significance in the bankruptcy context. The
> basic policy animating the Bankruptcy Code is to afford the "honest but
> unfortunate" debtor a fresh start. Marrama v. Citizens Bank of Mass.,
> ___ U.S. ___, 127 S.Ct. 1105 1107, 166 L.Ed.2d 956 (2007); Grogan v.
> Garner, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991);
> DeTrano, 326 F.3d at 322. The consequences to a debtor whose
> obligations are not discharged are considerable; in many instances,
> failure to achieve discharge can amount to a financial death sentence. In
> view of these harsh consequences, exceptions to discharge are to be
> narrowly construed and genuine doubts should be resolved in favor of
> the debtor. In re Renshaw, 222 F.3d 82, 86 (2d Cir.2000); In re Hayes,
> 183 F.3d 162, 167 (2d Cir.1999)."

Appendix   A - 235

While the libel suit and resulting litigation is still pending appeals, it is another factor to be considered. See *Connecticut General Life Ins. Co. v. Cole, 821 F.Supp. 193, 201 (S.D.N.Y., 1993);*

"*Duverney v. State of New York, 96 Misc.2d 898, 410 N.Y.S.2d 237, 245-46 (Ct.Cl.1978)* (stating in dictum that the existence of an appeal is a factor to be considered in determining whether a party had a full and fair opportunity to litigate an issue), aff'd, 76 A.D.2d 962, 429 N.Y.S.2d 70 (3d Dep't 1980). In New York, unlike other jurisdictions, the rule is that "the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." Matter of Amica Mut. Ins. Co., 85 A.D.2d 727, 445 N.Y.S.2d 820, 822 (2d Dep't 1981). Although Duverney, 410 N.Y.S.2d at 245-46, indicates that the existence of an appeal should be considered in determining whether a full and fair opportunity to litigate the issue existed, it emphasizes that this is but one of the factors to be considered. The other factors to be considered include: "the size of the claim, the forum of prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation." Schwartz v. Public Adm'r of County of Bronx, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 961, 246 N.E.2d 725, 729 (1969). Further, in Matter of Amica, 445 N.Y.S.2d at 822, the court stated in dictum that it would not apply collateral estoppel to a judgment if that judgment was substantially likely to be reversed on appeal because of a change in the applicable law"

Appendix  A - 236

See also *In re Moses (Bankr. E.D.N.Y., 2013) Case No. 10-51769-ess; Adv. Pro. No. 11-01286-ess;*

> "When a nondischargeability action arises from a judgment entered by another court, collateral estoppel is often invoked. Courts in this District and Circuit have noted that in such circumstances, collateral estoppel "must he applied with the utmost caution" to avoid inflicting upon a debtor the "severe" consequences of denying the discharge of dehts where such denial may not be warranted. Indo-Med Commodities, Inc. v. Wisell (In re Wisell), 2011 Bankr. LEXIS 3112, at *20 (Bankr. S.D.N.Y. Aug. 16, 2011)."

Plaintiffs have procured their lihel suit by both extrinsic as well as intrinsic fraud, defendant did not have an opportunity to present the facts and arguments, while plaintiffs have argued that this Court cannot look beyond the State Court default judgment. However in many instances in the Federal Court's including within this district, it was held that Court's may indeed look behind the judgment if justice warrants it, See *In re Slater, 200 B.R. 491, 495 (E.D.N.Y., 1996);*

> "Section 1738 "`requires all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so.'" Kelleran v. Andrijevic, 825 F.2d 692, 694 (2d Cir.1987), cert. denied, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988), quoting, Allen v. McCurry, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Accordingly, a bankruptcy court may look behind a state court judgment only if that judgment was procured by fraud or collusion, or where the rendering court lacked jurisdiction. Kelleran, 825 F.2d at 694; see also Stephens Fuel Co., Inc. v. Bay Parkway Nat'l Bank of Brooklyn, 10 F.Supp. 395, 397 (E.D.N.Y. 1935); In re Morton, 43 B.R. 215, 218 (Bankr.E.D.N.Y.1984); Bell v. Town Bd. of Pawling, 146 A.D.2d 729, 537 N.Y.S.2d 214, 215 (2d Dep't 1989); J.J. Miller Constr. Co. v. Berlanti Constr. Co., Inc., 197 N.Y.S.2d 818 (Sup.Ct. Westchester Cty.1960).

-11-

Appendix  A - 237

See also *In re Sanders, 408 B.R. 25, 35 (Bankr. E.D.N.Y., 2009); and In re Ward, 423 B.R. 22, 29 (Bankr. E.D.N.Y., 2010);*

> "Some cases have held that, notwithstanding the doctrine of res judicata, a New York state court's judgment is not given preclusive effect by the federal court if the judgment was procured by collusion or fraud. See Kelleran v. Andrijevic, 825 F.2d 692, 694 (2d Cir.1987), cert. denied, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988); Goddard, 2006 WL 842925, at *7; In re Slater, 200 B.R. 491, 495 (E.D.N.Y.1996); County of Suffolk v. Long Island Lighting Co., 710 F.Supp. 1387, 1393 (E.D.N.Y.1989). This is because New York law permits collateral attacks on judgments obtained by extrinsic, as opposed to intrinsic, fraud. Slater, 200 B.R. at 496 (citing Altman v. Altman, 150 A.D.2d 304, 542 N.Y.S.2d 7, 9 (N.Y.App. Div.1989)). Extrinsic fraud involves the parties' "opportunity to have a full and fair hearing," while intrinsic fraud, on the other hand, involves the "underlying issue in the original lawsuit." Id. Other cases have held that a judgment is still given preclusive effect even it was obtained by fraud. See Gray, 2009 WL 1787710, at *6; Alaimo v. Gen. Motors Corp., No. 07-CV-7624, 2008 WL 4695026, at *6 (S.D.N.Y. Oct.20, 2008); Keys, 578 F.Supp.2d at 635-636; Marshall v. Grant, 521 F.Supp.2d 240, 246 (E.D.N.Y.2007). However, these cases do not address the distinction between extrinsic and intrinsic fraud, and the fraudulent acts alleged in those cases appear to constitute intrinsic fraud.
>
> It has also been held that the Rooker-Feldman doctrine does not prevent the collateral attack on a state court judgment which is alleged to have been procured through fraud, if the claim now asserted is independent from the claim that the state court judgment was erroneous. See Marshall, 521 F.Supp.2d at 245; Goddard, 2006 WL 842925, at *5-6; Mac Pherson v. State St. Bank & Trust Co., 452 F.Supp.2d 133, 140 (E.D.N.Y.2006)."

The Court in *In re Teltronics Services, Inc., 18 B.R. 705, 707 (E.D.N.Y., 1982)* stated;

> "The Supreme Court has recognized that res judicata should not rigidly operate to bar claims in bankruptcy proceedings when the court would otherwise be free to remedy fraudulent conduct. For example, in Brown v. Felsen, 442 U.S. 127, 132, 99 S.Ct. 2205 2209, 60 L.Ed.2d 767 (1979), although a debt had been reduced to judgment in State court, the Court concluded that res judicata should not foreclose the

Appendix  A - 238

bankruptcy court from traversing "unexplored paths that may lead to truth." Similarly, in Heiser v. Woodruff, 327 U.S. 726, 741, 66 S.Ct. 853, 860, 90 L.Ed. 970 (1946), Justice Rutledge, concurring, explained that absent prior opportunity for adjudication of the grounds alleged for subordination, the equitable power of a bankruptcy court supersedes strict application of res judicata:

"If, as the Court declared in Pepper v. Litton, the bankruptcy court has power to reject claims, even when previously allowed, `in whole or in part "according to the equities of the case,"\` 308 U.S. 295 at 304 60 S.Ct. 238 at 244, 84 L.Ed. 281, see 11 U.S.C. § 93(k), I find no reason for qualifying that rule in this case. It necessarily comprehends that the bankruptcy court in the allowance or rejection and ordering of claims shall not be bound by any broad or rigid rule of res judicata." (Footnote omitted.)"

See also *Parsons Steel, Inc v. First Alabama Bank, 474 U.S. 518, 523, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986); Kremer v. Chemical Construction Corporation, 456 U.S. 461,481-483, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). See also Richards v. Jefferson County Alabama, 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996),* holding that lack of proper representation is a bar to estoppel.


Additionally, the plaintiffs have been the subject of lengthy litigation in the Eastern District before Hon. Judge Spatt spanning a few years, which was thereafter confirmed at the Second Circuit, the sum total of those cases clearly present findings by those Courts that the plaintiffs have perpetrated a scheme against the disabled and blind, that they confused consumers. Thus it was the Federal Court's who had found the plaintiffs to have acted improperly against the disabled in numerous ways, much before the purported Libel scheme claimed against the defendant.

-13-

Appendix  A - 239

Plaintiffs in both the State Court as well as in this Court have claimed that they are innocent and well respected, that they have never acted wrongly against anyone, let alone the blind or disahled, and that it was the defendant who through the purported lihel has damaged plaintiffs through the purported libel scheme by purportedly publicizing a false and negative image of plaintiffs, and that defendant was the first to puhlicize such information, causing harm to plaintiffs.

The record of the District Court and the Second Circuit is replete with the opposite, it clearly presents that the plaintiffs have acted against the disabled consumers and the blind in bad faith as determined by those Courts. For plaintiffs to testify in this Court to the contrary as the record reflects, is not only a manifest injustice, but a clear disrespect for the State Court, this Court, the District Court in the numerous proceedings in hoth Independent Living Aids, Inc. v. Maxi-Aids, Inc and in other cases as mentioned in defendants motion for reconsideration as well as the Second Circuit, presents that what plaintiffs attempt to portray in their testimony is far from the actual truth.

Besides this fraud, and besides the fact that defendant had no chance to properly present his case and innocence due to the plaintiff wrongly and improperly using collateral estoppel of the state default judgment. it was impossible for them to prove willful and malicious intend by defendant, when it was already proven in the Eastern

-14-

District Court long ago that plaintiffs had indeed been involved in acts that are far from decent against the Blind and disabled industry to say the least.

For plaintiffs to have acted with willful malicious intent or with any intent for that matter, even if one is to accept that defendants had sent and publicized those purported emails, which is indeed not the case, plaintiffs first have to establish that the libel was false and that defendant had fabricated the facts and was first to publicize them.

Despite the fact that defendant maintains his innocence and is the victim of a horrendous fraud, willful and malicious intent cannot be had when the actual libel was false, when the plaintiffs were proven long before to have acted improperly, which was highly publicized in the industry and the media and found so by the prior Courts.

For plaintiffs to argue that none of that is related, and that the issues were different, and that the defendant continues to defame plaintiffs, is nothing more than an further attempt to diffuse the issues, and cover up their fraud, to confuse the Courts. Defendant respectfuly requests to be able to supplement the record with the prior Court records.

Defendants intent in citing the Braille monitor was not for the Court to take judicial notice, rather it was merely used as background to show how the prior District and

Appendix  A - 241

Appellate Courts rulings and findings were presented in many media articles and industry monitors, rather than plain news articles publicizing their own news sources, this was plain and simple covering the Court's findings, which they covered in full. Whether the Court takes judicial notice or not, this cannot change the facts that the prior records of the Eastern District Court and the Second Circuit all of which present clear evidence of gross misbehavior by plaintiffs, and which renders plaintiffs testimony against defendant a big joke, and makes a mockery of this and all other Courts.

Additionally, for the Court to rely on plaintiffs testimony for a finding of willful and malicious intent, while plaintiffs testimony is replete with perjury and falsity, and that without defendant even having a chance to present all other evidence, would be manifest injustice, would allow the fraud on the Court to continue, and would deprive defendant.

Defendant further wishes to inform the Court, that the instant adversary proceeding like the default libel suit in the State Court, stems and is based upon tortious interference, by continuously damaging defendants business, as explained in defendants action 14-cv-3028 currently pending in the Eastern District. Thus this proceeding encompasses stern claims which require final adjudication at the District Court level, and hy interfering with defendants co-dehtor in that libel suit contract with plaintiffs, and was designed to damage and interfere with the above.

-16-

Appendix  A - 242

Plaintiffs contend that defendants have been warned and are acting in violation of the law, by continuing to defend his innocence in Court.  Interestingly, plaintiffs believe that defending ones innocence and arguing merits in a Court of law would be a violation of defamation law.  Defendant would be delighted to see law or case law cited on such an absurd suggestion.

Plaintiffs further contend that the Second Circuit has no relations here, however the Court in that summary order affirmed the District Court findings and the evidence presented that the plaintiffs caused confusion to the blind and disabled consumers, the District Court found numerous activities perpetrated by the plaintiffs that when looked as a whole, clearly shows that Plaintiffs were not the innocent victims of a purported lihel scheme, but rather have been engaged in deceptive practices against the blind and disabled, thus such purported lihel framing plaintiffs with shady practices, has long been found hy the Court's to be true.   Indeed defendant was unaware of all this evidence until a long time after the purported libel scheme should have taken place, and defendant is only citing to those to show that plaintiffs came with unclean hands.

Plaintiffs also contend that defendant did not raise those arguments pre-trial, however defendant had indeed notified plaintiffs of said Court's which they conveniently ignored in both at the summary judgment level and at the pre-trial documentary

Appendix   A - 243

exchange and to the Court, however plaintiffs chose to ignore all that and continue with their false testimony.

WHEREFORE, the Defendant respectfully requests that the Court allow defendant to supplement the record with the prior Court records showing plaintiffs fraud; grant the Motion for reconsideration in its entirety; and grant such other and further relief as is just and proper.

Dated: BROOKLYN, NEW YORK
         Novemeber 4, 2014

                                        AHRON BERLIN

-18-

Appendix  A - 244

ORIGINAL
                                                    Page 1

1    UNITED STATES BANKRUPTCY COURT

2    EASTERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5

6    AHRON BERLIN,                    Case No. 12-74600-reg

7

8              Debtor.

9

10   - - - - - - - - - - - - - - - - - - - - - - - - - x

11   ZARETSKY, ET AL.,

12             Plaintiffs,

13        v.                    Adv. Case No. 12-08371-reg

14   BERLIN,

15             Defendant.

16   - - - - - - - - - - - - - - - - - - - - - - - - - x

17

18             U.S. Bankruptcy Court

19             Long Island Federal Courthouse

20             Central Islip, New York

21

22             November 5, 2014

23             10:07 AM

24

25

Page 4

1                     P R O C E E D I N G S

2              THE CLERK:  Matters 26 and 27, Zaretsky versus

3    Berlin.

4              MR. MIRANDA:  Good morning, Your Honor.

5              THE COURT:  Hold it.  Get appearances, please.

6              MR. MIRANDA:  Sure.  Good morning, Your Honor,

7    Michael Miranda, Miranda Sambursky on motion number 20, an

8    uncontested motion to withdraw.

9              MR. HUFNAGEL:  Brian Hufnagel, Forchelli, Curto,

10   we're incoming counsel for the plaintiffs.

11             THE COURT:  Who do you represent now?

12             MR. MIRANDA:  Right now we represent the three

13   plaintiffs, Your Honor.  Zaretsky and Maxi-Aids.

14             THE COURT:  Okay.  And you're coming in.

15             MR. HUFNAGEL:  We're coming in.

16             THE COURT:  All right.  We'll grant the motion to

17   withdraw.  I assume your client is fine with this?

18             MR. MIRANDA:  Yes, Your Honor.

19             THE COURT:  Okay.

20             MR. HUFNAGEL:  Yeah, there's a stipulation that

21   says something like that.

22             MR. MIRANDA:  There's a stipulation.

23             THE COURT:  We'll grant the motion to withdraw and

24   then the Curto --

25             MR. MIRANDA:  Thank you.

1          THE COURT:  -- firm will come in.

2          MR. MIRANDA:  Thank you.

3          THE COURT:  Okay.  Whose motion is this?

4   Mr. Berlin, this is your motion.

5          MR. BERLIN:  Yes.  Yes.

6          THE COURT:  What do you want me to do?  What?

7          MR. BERLIN:  To put my name on record?

8          THE COURT:  Put your name on the record.

9          MR. BERLIN:  Yes, my name is Ahron Berlin, address

10   is 1909 New York Avenue.

11          THE COURT:  And you're representing yourself.

12          MR. BERLIN:  Yes.

13          THE COURT:  Okay.  What are you looking -- what do

14   you want me to do today?

15          MR. BERLIN:  I wrote -- I filed a motion to

16   reconsider and I filed replies.

17          THE COURT:  Just tell me what you want me to do.

18   Don't tell me you wrote a motion.  I know you wrote a

19   motion.  Tell me what you want.

20          MR. BERLIN:  I want the Court should read my

21   papers, should consider what it says over there.

22          THE COURT:  All right.  I read the papers.

23          MR. BERLIN:  And make a rules.  Okay.  So --

24          THE COURT:  I read your papers.  Now tell me what

25   you want.

Page 6

1          MR. BERLIN:  My paper explained very clearly what

2     I want, and I --

3          THE COURT:  Do you know what's in your papers?

4     I'm just curious.

5          MR. BERLIN:  What?

6          THE COURT:  Do you know what's in your papers?

7          MR. BERLIN:  Sure.

8          THE COURT:  Then tell me what you want.

9          MR. BERLIN:  This is a motion to reconsider the

10    judge -- the Court shall change, fix the error and make the

11    right ruling, which is justice.

12          THE COURT:  So, I made the wrong ruling.

13    According to you I made the wrong ruling?

14          MR. BERLIN:  I'm not talking personally to nobody.

15          THE COURT:  I'm not taking it personally.

16          MR. BERLIN:  I'm in a court of justice, I'm

17    fighting for justice, I made a motion --

18          THE COURT:  Stop.  Stop.

19          MR. BERLIN:  -- all these other statutes.

20          THE COURT:  Stop.  Stop.

21          MR. BERLIN:  Okay.

22          THE COURT:  The last thing, and you've been before

23    me before that I need is speeches, I don't have time for it.

24          Your motion -- you wrote a motion --

25          MR. BERLIN:  Yes.

Page 7

1              THE COURT:  -- where you cite law --

2              MR. BERLIN:  Yes.

3              THE COURT:  -- you cite cases.

4              MR. BERLIN:  Yes.

5              THE COURT:  And your argument is that the ruling I

6    issued as dischargeability of your debt to this plaintiff --

7              MR. BERLIN:  Correct.

8              THE COURT:  -- which was based in part -- or -- on

9    a New York State Court judgment --

10             MR. BERLIN:  Yes.

11             THE COURT:  -- which found that you had defamed,

12   and a whole serious of things, these defendants.  I didn't

13   grant summary judgment, I gave you a trial.  At that trial

14   the plaintiff submitted witnesses and exhibits, you

15   submitted some exhibits and had no witnesses.  We gave you a

16   full hearing on that.

17             You've taken positions such as -- I want to get

18   this right -- that the plaintiffs rerouted critical supplies

19   from poor countries, that they are -- and a whole series of

20   rather colorful discussions.  A State Court judge found that

21   you did that with malice and that you did it knowingly and

22   then entered a judgment against you in I think 300 plus

23   thousands to each -- $900,000, give or take.  I gave you a

24   full trial.

25             You're now saying that as to one of those

1    statements that Maxi-Aids rerouted critical supplies from

2    poor countries, that that was false.

3            You also apparently quote the -- this was from a

4    trial -- that decision was rendered in 2005; is that right?

5    When was the State Court decision rendered?

6            MR. BERLIN:   The Second Circuit was --

7            THE COURT:   I'm not asking the Second Circuit.

8    When was the State Court decision rendered?

9            MR. BERLIN:   2009?

10           THE COURT:   I'm asking, I don't know.

11           MR. BERLIN:   2009.   November 2009.

12           THE COURT:   Hold it.   Hold it.   Hold it.   Hold it.

13           MR. BERLIN:   What?

14           THE COURT:   Wait a second, please.

15           MR. HUFNAGEL:   December 1st, 2009.

16           THE COURT:   Nine, okay.   You then say that the

17   Second Circuit in 2005, is that right?

18           MR. BERLIN:   Yes.

19           THE COURT:   Issued a decision that confirmed the

20   decision that Zaretsky is quote "the Bernie Madoff of the

21   blind community."

22           I have a simple -- just a question on that.   The

23   Madoff case came about I think after 2008.   Was the circuit,

24   according to you, aware of Mr. Madoff's conduct so that they

25   could use him as an example in 2005?

Page 9

1       MR. BERLIN:  May I add something?

2           THE COURT:  No, you can answer my question.  Is

3    that a quote from the Second Circuit or did you make it up?

4           MR. BERLIN:  This is my statement.

5           THE COURT:  But you put it in quotes saying the

6    Second Circuit -- in fact the Court of Appeals -- was this

7    the Second Circuit or the New York Court of Appeals, or

8    nobody, I don't know.

9           MR. HUFNAGEL:  It's a Second Circuit Court of

10   appeals --

11          THE COURT:  Okay.

12          MR. HUFNAGEL:  -- decision in a trademark case.

13          THE COURT:  You said Second Circuit confirmed in

14   its decision that Zaretsky quote "is the Bernie Madoff of

15   the blind community."  You wrote that and submitted those

16   papers under penalty of perjury.  Did the Second Circuit say

17   that?

18          MR. BERLIN:  The Second Circuit said that they --

19   all the evidence were presented by them and they ruled

20   according to the evidence --

21          THE COURT:  Mr. Zaretsky (sic) --

22          MR. BERLIN:  -- and they accepted --

23          THE COURT:  -- I'm going make you stay all day

24   until you answer this.  Did the Second Circuit, as you

25   stated in your papers, say that Zaretsky is the quote

1   "Bernie Madoff of the blind community?"

2          MR. BERLIN:  This is my quote, I didn't quote the

3   language that this is what they said, I said according what

4   they --

5          THE COURT:  So you put quotes around it because

6   you're saying it's your quote?

7          MR. BERLIN:  It's my quote.  This particular --

8          THE COURT:  So you lied to me.  Let's put it this

9   simple, you lied on your papers.  The Second Circuit never

10  said that.  So, I'm going to take it that you lied.

11         MR. BERLIN:  I can --

12         THE COURT:  Now --

13         MR. BERLIN:  -- I can explain exactly what it

14  says.  I can --

15         THE COURT:  You could, but I'm not interested.

16         MR. BERLIN:  I quote --

17         THE COURT:  Now --

18         MR. BERLIN:  I quote what I said --

19         THE COURT:  -- that means you stop talking 'til I

20  ask you to talk again.

21         The Second Circuit found that it was not an abuse

22  of discretion by the lower court finding in a copywrite

23  infringement case Maxi-Aids' intentionally acted to cause

24  confusion.  This was in 2005, right?

25         MR. BERLIN:  Yes.

1          THE COURT:  So what does that have to do with a

2     trial claiming you defamed these folks in 2009?

3          MR. BERLIN:  Because the entire email is what he

4     claims was about those claims, about those statements.

5          THE COURT:  But a State Court judge has already

6     ruled on this.  He's found you to have acted with malice and

7     intent.

8          MR. BERLIN:  I never agreed to that, the court

9     never find it --

10          THE COURT:  Well, I don't think he was looking for

11     your agreement.

12          MR. BERLIN:  -- it was only -- it was only a

13     default which was not given any opportunity for me to --

14          THE COURT:  Mr. Berlin, as tough as this may be

15     for you to accept, a lot of the judges aren't looking for

16     your approval as to what they rule.  It's not one of the

17     requisites we have.

18          So you also then cite to some case from the

19     Appellate Division.  Tell me what that case says, the

20     Fireman's Fund case.

21          MR. BERLIN:  I have to read it, I can't --

22          THE COURT:  You wrote it --

23          MR. BERLIN:  Yes.

24          THE COURT:  -- what do you mean you have to read

25     it.  Tell me what it means.

Page 12

1          MR. BERLIN:  I have -- I quoted a lot of cases

2   from the Appellate Division except --

3          THE COURT:  You don't have any idea what it means?

4          MR. BERLIN:  As the I that says clearer that

5   there's no collateral estoppel on default summary judgment,

6   which is quoted in many other courts, that even if you're

7   going to accept there was a default judgment this was a

8   default on summary judgment, this for sure collateral

9   estoppel does not belong there.

10          THE COURT:  So how do you distinguish that from

11   the Flaxtor Square (ph) case?

12          MR. BERLIN:  What?

13          THE COURT:  How do you distinguish the Flaxtor

14   Square case?

15          MR. BERLIN:  I don't know, I don't -- I wrote on

16   the case law, I quoted it.

17          THE COURT:  Well but the way this works there are

18   cases that don't agree with that, and what I generally ask

19   is why should I listen to your case?  There are other cases

20   senior to that that disagree with it.

21          MR. BERLIN:  Your Honor, I studied --

22          THE COURT:  Can you distinguish it?

23          MR. BERLIN:  Only paper I can write up if the

24   judge want I can bring you -- give you --

25          THE COURT:  No, I don't want any more writings,

Page 13

1    trust me.

2         MR. BERLIN:  I cannot -- I'm not good in oral

3    argument, my English is my second language, I start using

4    English lately, and I'm not good in oral argument, I --

5         THE COURT:  I think you've completely mastered the

6    English language and you know exactly what you're saying,

7    so, I wouldn't be so harsh on myself.

8         All right.  Well you've got nothing more.  I

9    understand your position --

10        MR. BERLIN:  There's something else I can add.

11   There's something else I can add.  If we're talking about

12   (indiscernible) the machines, the (indiscernible) from

13   the --

14        THE COURT:  Right.

15        MR. BERLIN:  -- third-world country I personal --

16        THE COURT:  Mr. Berlin --

17        MR. BERLIN:  -- was involved in this.

18        THE COURT:  Okay.

19        MR. BERLIN:  Members of my family was involved

20   together with Zaretsky to this crime , so I know I can bring

21   evidence, I can prove it.  It's not just a statement.

22        THE COURT:  You can go some place else and prove

23   it, I'm not interested.

24        MR. BERLIN:  Judge said I have no right to prove

25   anything because the court --

Page 14

```
 1              THE COURT:  You had --

 2              MR. BERLIN:  -- the State Court already ruled and

 3    I cannot --

 4              THE COURT:  Stop talking.

 5              You had a trial, you had an opportunity to put in

 6    all your evidence in this Court, even though I probably

 7    could have gone on a summary judgment.  I asked you

 8    repeatedly do you have any witnesses?  You didn't.  Were you

 9    represented in that or did you represent yourself?  The

10    trial in front of me, did you represent yourself?

11              MR. BERLIN:  Yes.

12              THE COURT:  Okay.  You had an opportunity to have

13    a lawyer.  There was a full hearing.

14              MR. BERLIN:  If I shop for lawyer --

15              THE COURT:  There was a full hearing.  The

16    argument that there is one statement apparently in the State

17    Court I don't find persuasive, your cases are not

18    persuasive, you say they're distinguished by other courts.

19    There is no reason a summary -- a default judgment cannot be

20    given preclusive effect.  But I understand your argument.

21    Now I'll listen to plaintiff.  Thanks.

22              MR. HUFNAGEL:  Brian Hufnagel for the plaintiffs,

23    Your Honor.

24              Your Honor, it's hard to respond to a motion like

25    this that's full of the same types of outrageous comments
```

Page 15

1    that have been made against my clients at the State Court

2    level, at the trial level here, and as you see from the

3    exhibits to our papers here they're continuing to be made in

4    a recent amended complaint that's been filed with the

5    Federal Court.  Others state essentially that they're

6    untrue, they're -- all of them are disputed, many of them

7    you've already found to be untrue.  I just want to put that

8    on the record before we go through with responding to the

9    motion.

10          With respect to the motion itself, this is a

11   motion to reargument of a judgment and decision after the

12   full trial.  And as you stated as well where summary

13   judgment was also at play in the case.  It was a full and

14   fair opportunity for all evidence to be presented here.

15          Going through the standards, first there's been no

16   intervening change in the controlling law and there's no law

17   that you allegedly overlooked.  That's not even alleged in

18   the motion itself.  Some of that is in the reply, but even

19   when we look at the reply there's no change in the law and

20   you've ruled on the law.

21          The second consideration is whether there is new

22   evidence that was not available at the time of the trial.

23   As you've stated here everything that's presented in the

24   motion is old and was known and was available, and if he

25   wanted to present it and if it should have been a part of

1   the record then it could have.  But even if it was it would

2   not change the result in this case.

3        The third factor is whether there was clear error

4   or a need to prevent manifest injustice, and those factors

5   go completely in favor of the plaintiffs.

6        The plaintiffs are the victims here of the

7   defamation, which is still continuing and is ongoing and it

8   needs to stop.  We don't know how it's going stop with

9   continued lawsuits and continued claims, but it will

10  eventually stop and one way it stops is by upholding your

11  decision here that you've made denying the dischargeability

12  of this debt.

13       You know, I don't have much else to add other than

14  that unless you have any questions for me.

15       THE COURT:  He does cite to a case that apparently

16  deals with whether a court should issue -- should take a

17  judgment that was rendered pursuant to a default judgment

18  and whether that is given collateral estoppel, and I know

19  there are cases -- I think a circuit case goes the other

20  way.  But do you have any comment about that?

21       MR. HUFNAGEL:  Well, Your Honor, again, that was

22  raised in the reply, which I would have received late

23  yesterday, and I haven't researched -- read the cases that

24  he's cited, I can't address those specifically other than

25  what you've indicated here.

Page 17

1          But, Your Honor, there is also -- there were other
2     hearings at the State Court level and he could have also
3     moved to vacate his default or he could have taken actions
4     that he needed to if he had an defense at the State Court
5     level.  Now it's final, and you know, that's what a
6     defamation judgment means, is there are defaults.

7          THE COURT:  All right.  There's no basis for the
8     Detour grant any relief on this motion.  I think as an aside
9     the motion continues to make statements that other courts
10    have found to be defamatory.  Mr. Zaretsky (sic) intends to
11    cloak himself somehow in the protections of the court and
12    continue to make these statements.  That's not for this
13    Court and a remedy is not in this court for that conduct.
14    But the Court's decision relevant to the dischargeability of
15    that judgment will not be changed, there's no basis to
16    change it, there's nothing in the defendant's -- in the
17    movant's papers that comply even remotely with why a court
18    would reconsider or the elements necessary for a court to
19    reconsider a judgment.

20         So we'll deny the motion, we'll ask the plaintiff
21    please submit the order.  Thank you.

22         MR. HUFNAGEL:  Thank you.

23         MR. BERLIN:  If I could add something.

24         THE COURT:  Have a good day.

25    (Whereupon these proceedings were concluded at 10:23

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                                          Case No. 8-12-74600-reg
                                                                Chapter 7
AHRON BERLIN,

                          Debtor.
-------------------------------------------------------------X
ELLIOT ZARETSKY, HAROLD ZARETSKY,
SHIRLEY ZARETSKY, AND MAXI-AIDS, INC.,

                          Plaintiffs,                           Adv. Pro. No. 8-12-08371-reg

              -against-

AHRON BERLIN,

                          Defendant.
-------------------------------------------------------------X

## ORDER DENYING MOTION OF DEFENDANT TO RECONSIDER, ALTER OR AMEND JUDGMENT

       **UPON** the motion (the "Motion") [Dkt. #39] filed on July 3, 2014 by defendant Ahron

Berlin (the "Defendant"), filed *pro se*, and upon all the exhibits attached thereto, seeking

reconsideration, alteration or amendment of the Judgment dated June 19, 2014 entered in this

adversary proceeding, pursuant to Fed. R. Civ. P. 59, Fed. R. Bankr. P. 9023, and E.D.N.Y.

Local Bankruptcy Rule 9023-1; and the Court having entered an Order to Schedule Hearing on

September 11, 2014 [Dkt. #40]; and plaintiffs Elliot Zaretsky, Harold Zaretsky, Shirley Zaretsky,

and Maxi-Aids, Inc., by and through their attorneys Forchelli, Curto, Deegan, Schwartz, Mineo

& Terrana, LLP having timely filed opposition to the Motion on October 29, 2014 [Dkt. #46];

and the Defendant having filed a reply in support of the Motion on November 4, 2014 [Dkt.

#48]; on and upon the hearing held before this Court on November 5, 2014 at 9:30 a.m., and

appearing at the hearing was: (a) Ahron Berlin, *pro se*, and (b) Forchelli, Curto, Deegan,

Appendix  A - 260

Schwartz, Mineo & Terrana, LLP, by Brian J. Hufnagel, Esq. on behalf of Plaintiffs; and for the

reasons set forth on the record of the hearing; due deliberation having been had thereon; it is

hereby

> **ORDERED**, that the Motion is denied in its entirety.



Dated: Central Islip, New York
       November 7, 2014

                                                    Robert E. Grossman
                                               United States Bankruptcy Judge

Appendix   A - 261

Official Form 17
(12/04)

# United States Bankruptcy Court

_EASTERN_ District Of _NEW YORK_

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF
NEW YORK
2014 NOV 20 P 1:06
RECEIVED

In re _AHRON BERLIN_
Debtor

Case No. _8-12-74600-REG_

Chapter _7_

ADV. PRO. NO.
_8-12-08371-REG_

[Caption as in Form 16A, 16B, or 16D, as appropriate]

## NOTICE OF APPEAL

_AHRON BERLIN_____, the ~~plaintiff (or~~ defendant ~~or other party~~] appeals under 28 U.S.C.
§ 158(a) or (b) from the judgment, order, or decree of the bankruptcy judge (describe) entered in this adversary
proceeding [or other proceeding, describe type] on the _19_ day of _JUNE_ _2014_
                                                                              (month)   (year)

The names of all parties to the judgment, order, or decree appealed from and the names, addresses, and
telephone numbers of their respective attorneys are as follows:

ELLIOT ZARETSKY       2 BAY CLUB DR. #323, BAYSIDE NY, 11360
HAROLD ZARETSKY       66 PHIPP LANE PLAINVIEW, NY, 11893
SHIRLEY ZARETKY       2 BAY CLUB DR. #323, BAYSIDE, NY 11360
MAXI-AIDS, INC.       42 EXECUTIVE BLVD, FARMINGDALE, NY, 11735
                      ATTORNEYS: FORCHELLI, CURTO, DEEGAN, SCHWARTZ,
                                 MINEO, & TERRANA, LLP
Dated: _NOVEMBER 20, 2014_    THE OMNI, 333 EARLE OVINGTON BLVD
                                 #1010
                              UNIONDALE, N.Y., 11553
                              516-248-1700

Signed: _____
          Attorney for Appellant (or Appellant, if not represented by an Attorney)

Attorney Name: _AHRON BERLIN_____

Address: _1909 NEW YORK AVE._____

_BROOKLYN, N.Y., 11210_____

Telephone No: _(347) 254-3532_____

If a Bankruptcy Appellate Panel Service is authorized to hear this appeal, each party has a right to have the
appeal heard by the district court. The appellant may exercise this right only by filing a separate statement of
election at the time of the filing of this notice of appeal. Any other party may elect, within the time provided in 28
U.S.C. § 158(c), to have the appeal heard by the district court.

_If a child support creditor or its representative is the appellant, and if the child support creditor or its representative
files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required._

Appendix   A - 262

Official Form 17
(12/04)

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF
NEW YORK

2014 NOV 20 P 1:06

RECEIVED

# United States Bankruptcy Court

__EASTERN__ District Of __NEW YORK__

In re __AHRON BERLIN__,
      Debtor

Case No. __8-12-74600-REG__ / ADV. PRO. NO.
                             __8-12-08371-REG__

Chapter __7__

*[Caption as in Form 16A, 16B, or 16D, as appropriate]*

## NOTICE OF APPEAL

__AHRON BERLIN__, the plaintiff (~~or~~ defendant ~~or other party~~) appeals under 28 U.S.C.
§ 158(a) or (b) from the judgment, order, or decree of the bankruptcy judge (describe) entered in this adversary
proceeding [or other proceeding, describe type] on the __7__ day of __NOVEMBER__ __2014__
                                                  (month)      (year)

    The names of all parties to the judgment, order, or decree appealed from and the names, addresses, and
telephone numbers of their respective attorneys are as follows: ELLIOT ZARETSKY, SHIRLEY ZARETSKY
   ATTORNEYS FOR APPELLEES:    - 2 BAY CLUB DR, #323, BAYSIDE, NY, 11360
   FORCHELLI, CURTO, DEEGAN, SCHWARTZ  - HAROLD ZARETSKY
   MINEO & TERRANA, LLP.            66 PHILIP LANE, PLAINVIEW, NY, 11893
   THE OMNI - 333 EARLE OVINGTON BLVD  #1010  - MAN-AIDS INC.
   UNION DALE, NY, 11553           42 EXECUTIVE BLVD, FARMINGDALE, NY, 11735
   (516)-248-1700

Dated: __NOVEMBER 7, 2014__

Signed: _____    PRO-SE
       ~~Attorney for Appellant (or Appellant, if not represented by an Attorney)~~

Attorney Name: __AHRON BERLIN__

Address: __1909 NEW YORK AVE.__
          __BROOKLYN NY 11210__

Telephone No: __(347) 254-3532__

    If a Bankruptcy Appellate Panel Service is authorized to hear this appeal, each party has a right to have the
appeal heard by the district court. The appellant may exercise this right only by filing a separate statement of
election at the time of the filing of this notice of appeal. Any other party may elect, within the time provided in 28
U.S.C. § 158(c), to have the appeal heard by the district court.

    *If a child support creditor or its representative is the appellant, and if the child support creditor or its representative
files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.*

Appendix A - 263